# Exhibit A

4854-1891-1067v.6 0051461-005480

## Index: Court filings as of April 4, 2023

**New York County Supreme Court**
**COWIN TECHNOLOGY CO., LTD.**
**Case No. 651309/2023**

| Document No. | Document Name | Filing Date |
|:---:|:---:|:---:|
| 1. | Corrected Petition to Vacate Award of Arbitrator | 3/14/2023 |
| 2. | Notice of Petition to Vacate Arbitration Award | 3/13/2023 |
| 3. | Corrected Memorandum of Law and Authorities in support of Petition to Vacate the Award | 3/14/2023 |
| 4. | Exhibit List to Petition to Vacate the Award | 3/13/2023 |
| 5. | Petition Exhibit 1: Cowin v. Amazon Final Award dated December 15, 2022 | 3/13/2023 |
| 6. | Petition Exhibit 2: Amazon Services Business Solutions Agreement-BSA | 3/13/2023 |
| 7. | Petition Exhibit 3: Amazon abruptly banned Washington State Treat-Maker Chukar Cherries-The Seattle Times | 3/13/2023 |
| 8. | Petition Exhibit 4: Majority Staff Report and Recommendations, House Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary (House Antitrust Report) | 3/13/2023 |
| 9. | Petition Exhibit 5: Mobile Galaxy v. Amazon, Final Award dated February, 2021 | 3/13/2023 |
| 10. | Petition Exhibit 6: Sanyixiang v. Amazon Decision and Interim Order concerning ER process dated April 3, 2022 | 3/13/2023 |
| 11. | Petition Exhibit 7: Yanqiude v. Amazon, Final Award dated August 12, 2022 | 3/13/2023 |
| 12. | Petition Exhibit 8: Longxiang v. Amazon Final Award dated September 12, 2022 | 3/13/2023 |
| 13. | Petition Exhibit 9: Himalaya v. Amazon, Final Award dated January 3, 2023 | 3/13/2023 |

| 14. | Petition Exhibit 10: Petitioner Sales Revenue from June 1, 2020 to May 31, 2021 | 3/13/2023 |
|---|---|---|
| 15. | Petition Exhibit 11: Petitioner's Account Deactivation Notice | 3/13/2023 |
| 16. | Petition Exhibit 12: Amazon's Notice regarding the Reason for Deactivation and Appeal Period | 3/13/2023 |
| 17. | Petition Exhibit 13: Petitioner's Appeal Letter | 3/13/2023 |
| 18 | Petition Exhibit 14: Amazon's Final Decision regarding Petitioner's Appeal | 3/13/2023 |
| 19. | Petition Exhibit 15: Petitioner's Frozen funds in the Seller Account at Accountant Blocking Time dated July 2021 | 3/13/2023 |
| 20. | Petition Exhibit 16: Petition Demand for Arbitration and Request for ER dated December 21, 2021 | 3/13/2023 |
| 21. | Petition Exhibit 17: Declaration of Liang Zhou dated November 4, 2022 | 3/13/2023 |
| 22 | Petition Exhibit 18: Revise Endorsement Guides by FTC | 3/13/2023 |
| 23. | Petition Exhibit 19: Amazon Shut Down its Program that Paid Warehouse 'Ambassadors' to Tweet Positively - Insider | 3/13/2023 |
| 24. | Petition Exhibit 20: SEC Is Investigating How Amazon Disclosed Business Practices – WSJ | 3/13/2023 |
| 25. | Request for Judicial Intervention RE: Notice of Petition | 3/13/2023 |
| 26. | Request for Judicial Intervention Addendum – Commercial Division | 3/13/2023 |

4853-4225-3916v.2 0051461-005480

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK

X

COWIN TECHNOLOGY CO., LTD.,                :          Case No.

*Petitioner*,                :

v.                                          :          **PETITION TO VACATE
                                                      AWARD OF ARBITRATOR**

AMAZON.COM SERVICES, LLC,                   :

AMAZON.COM, INC.                            :

*Respondent(s)*.          :

– – – – – – – – – – – – – – – – – – – – – – – – – – –   X

Petitioner, COWIN TECHNOLOGY CO., LTD., by and through its attorney, JS LAW, brings

this special proceeding, pursuant to Article 4 of the Civil Practice Law and Rules ("CPLR"), for an order,

pursuant to CPLR §7511, vacating the award entered in the arbitration captioned *Cowin Technology Co.,

Ltd. v. Amazon.com Services, LLC, et al.*, AAA Case No. 01-21-0018-0880 ("Award", Exhibit P-1), and

alleges as follows:

## I.   PARTIES

1.      Petitioner, COWIN TECHNOLOGY CO., LTD., is a Hong Kong corporation with its

principal place of business currently in China.

2.      Respondent AMAZON.COM SERVICES, LLC is a Delaware limited liability company

with its principal place of business in Seattle, Washington. Amazon owns and operates the Amazon.com

website and equivalent international websites. Respondent AMAZON.COM, INC. is a Delaware

corporation with its principal place of business in Seattle, Washington, and the ultimate parent of its affiliated companies. Both Respondents are collectively referred to herein as "Amazon."

## II.   JURISDICTION AND VENUE

3.     This Court has jurisdiction over this special proceeding pursuant to CPLR 301 and CPLR 7501. The Amazon Services Business Solutions Agreement ("BSA", <u>Exhibit P-2</u>) provides no venue of arbitration, Petitioner selected New York, and the American Arbitration Association ("AAA") ruled that the locale for the arbitration is New York, NY. And the Award was issued in New York, rendering it subject to review by the Supreme Court of New York pursuant to CPLR Art. 75.

4.     Venue is proper in this judicial district, pursuant to N.Y. CPLR § 7502(a)(ii), especially pursuant to the U.S. Supreme Court's decision in *Badgerow v. Walters*, 142 S. Ct. 1310 (2022). The recent U.S. Supreme Court decision in *Badgerow* underscores state courts' role in enforcing the Federal Arbitration Act ("FAA"). The practical effect of the decision is that a party trying to confirm or vacate an arbitration award will often have to turn to the state, not federal, courts to do so, something the Court called a "feature of the statute." *Id*. at 1322.

## III.   FACTS COMMON TO ALL CAUSES OF ACTION

5.     According to an article in the Seattle Times (<u>Exhibit P-3</u>),[1] in the mass seller account blocking in 2021, Amazon accused over 55,000 third-party sellers of violating its review policies, including soliciting sponsored reviews, which is not even considered illegal activities under Federal Trade Commission laws, and then blocked sellers' accounts through Section 3 of the Amazon Services Business Solutions Agreement ("BSA", <u>Exhibit P-2</u>) and seized the sellers' millions of dollars of entire sales

---

[1] Katherine Anne Long, "Amazon abruptly banned Washington state treat-maker Chukar Cherries. Months of appeals went unheeded," THE SEATTLE TIMES (Sept. 27, 2021), available at https://www.seattletimes.com/business/amazon/amazon-abruptly-banned-washington-state-treat-maker-chukar-cherries-months-of-appeals-went-unheeded.

2

proceeds through its infamous Section 2, which provides in pertinent part: "*If we determine that your account—or any other account you have operated—has been used to engage in deceptive, fraudulent, or illegal activity (including the sale of counterfeit goods), or to repeatedly violate our Program Policies, then we may **in our sole discretion <u>permanently</u>** withhold <u>**any payments**</u> to you.*"

6.      ***"Divide and conquer" is Amazon's business plan.*** To prevent the 55,000 sellers from bringing up the low-cost class action against Amazon's improper account blocking and fund seizing in court, Amazon put a compulsory arbitration clause in Section 18 of its BSA ("Compulsory Arbitration Clause"), which provides in pertinent part:

1)    "*[A]ny dispute with Amazon or its Affiliates or claim relating in any way to this Agreement or your use of the Services will be resolved **by binding arbitration as described in this paragraph, rather than in court….**"*

2)    "*The arbitration will be conducted by the **American Arbitration Association (AAA) under its commercial rules**.*"

3)    "*The Governing Laws will govern this Agreement, without reference to rules governing choice of laws or the Convention on Contracts for the International Sale of Goods. Governing Laws" means the applicable one of the following: **the laws of the State of Washington**, United States together with the Federal Arbitration Act and other applicable federal law (if the Elected Country is Canada, Mexico, or the United States).*"

4)    "*[A]ny dispute resolution proceedings will be conducted **only on an individual basis and not in a class, consolidated or representative action**.*"

3

7.      Amazon is the dominant online marketplace. It reportedly controls about 65% to 70% of all U.S. online marketplace sales.[2] Amazon is the most-visited website in the world for e-commerce and shopping.[3] In fact, Amazon's marketplace enjoys a market share that is more than the next ten biggest competitors combined.[4] Amazon has monopoly power over most third-party sellers and many of its suppliers.[5] Sellers feel forced to be on Amazon because that is where the buyers are.[6] **With such kind of e-commerce dominance, small retailers do not have any viable or meaningful choice other than accepting Amazon's terms** if they want to get their products in front of online consumers.[7]

8.      Before an independent merchant can open a seller account ("seller account" or "account") on the Amazon platform, **all third-party sellers must fully accept the terms and conditions** set forth in Amazon's BSA.

9.      The BSA includes (1) **a compulsory arbitration provision** (Section 18); (2) Section 3 regarding seller account service termination, and (3) Section 2 regarding the sales proceeds withholding. Independent seller merchants have no negotiation power regarding the fairness and enforceability of the contract terms. Accordingly, this makes the BSA an adhesion contract.

---

[2] *See* "*Investigation of Competition in Digital Markets,*" Majority Staff Report and Recommendations, House Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary (Oct. 6, 2020) [hereinafter the "House Report"], available at https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf?utm_campaign=4493-519, *see* Exhibit P-4, at 255.

[3] *Id.* at 256.

[4] Melissa Repko, *Walmart is using its thousands of stores to battle Amazon for e-commerce market share*, CNBC (June 2, 2022), available at https://www.cnbc.com/2022/06/02/walmart-bets-its-stores-will-give-it-an-edge-in-amazon-e-commerce-duel.html.

[5] House Report, *supra note* 1, at 256.

[6] *Id.*

[7] Marcia Savage, *Amazon's e-commerce dominance: Is the price too high?*, THE FUTURE OF COMMERCE (January 28, 2022), available at https://www.the-future-of-commerce.com/2022/01/28/amazons-e-commerce-dominance-is-the-price-too-high.

4

Case 1:23-cv-03054-ALC   Document 1-1   Filed 04/12/23   Page 8 of 129

10.     *Section 3* of the BSA provides in pertinent parts: We may terminate your account or this Agreement for convenience **with 30 days advance notice**. We may suspend or terminate your account or this Agreement **immediately** if *we determine* that ... (b) your account has been ... used for deceptive or fraudulent, or illegal activity; or (c) your use of the Services has harmed ... other sellers, customers, or Amazon's legitimate interests.

Under Section 3 of the BSA, Amazon can exercise its arbitrary authority to terminate the seller's third-party seller account and remove its selling capability **at will**, even though this action basically means the *death penalty for small businesses-third-party sellers like Petitioner* who rely on the largest online retail platform—Amazon—for their exclusive or primary source of sales revenue. The exercise of this power is limited by the duty of *good faith and fair dealing*.

11.     Section 2 of the BSA gives Amazon the arbitrary authority to ***permanently*** ***withhold any*** ***amount*** *of sales proceeds in third-party seller accounts upon Amazon's sole determination*. The exercise of this power is limited by the duty of good faith and fair dealing.

12.     Section 2 of the BSA provides in pertinent parts: If we **determine** that your account—or any other account you have operated—has been used to engage in *deceptive, fraudulent, or illegal activity* (including the sale of counterfeit goods), or to *repeatedly violate our Program Policies*, then we may in our sole discretion **permanently** withhold ***any payments*** to you.

13.     *Several key arbitration cases prior in time have ruled against the validity of Section 2 of the BSA with collateral estoppel effect*:

    a.  On January 6, 2021, a Washington arbitrator ruled in the Arbitration Award of Amazon seller Mobile Galaxy that *Section 2 of the BSA is procedurally and substantively unconscionable and is unenforceable as a penalty and confiscation clause—rather than a proper liquidated damages clause*. *See* "Interim Arbitration Award" and "Final

Arbitration Award" in *Mobile Galaxy, LLC v. Amazon.com*, LLC (AAA Commercial Arbitration No. 01-19-0002-2648) dated January 6, 2021 (the "Mobile Galaxy Award", <u>Exhibit P-5</u>).

b.  On April 3, 2022, another arbitrator also ruled that the sales proceeds withholding provisions of ***Section 2 of the BSA constitute an unenforceable penalty***, do not have any indicia of a negotiated liquidated damages clause, and does not specify any liquidated damages amount. The arbitrator further ruled that the sales proceeds withholding provisions of Section 2 are unenforceable for being procedurally and/or substantively unconscionable. *See* the "Emergency Order" in *Shenzhen Sanyixiang E-Commerce Co., Ltd. v. Amazon.com Services, Inc., et al.* (ICDR Case No. 01-22-0000-3300) dated April 3, 2022 (<u>Exhibit P-6</u>).

c.  On August 12, 2022, another arbitrator ruled that Section 2 of the BSA was a substantively unconscionable and unenforceable penalty clause under Washington law. *See* the "Award" in *Dongguan Yanqiude Trading Co., Ltd. v. Amazon et al.* (ICDR Case No, 01-21-0018-1509) dated August 12, 2022 (the "Yanqiude Award", <u>Exhibit P-7</u>).

d.  On September 12, 2022, another arbitrator ruled against Amazon in a final award, ordering the release of a seller's withheld proceeds plus the payment of administrative fees and expenses. This implies that ***Section 2 is an unenforceable penalty clause***. *See Shenzhen Longxiang Culture Communication Co., Ltd. v. Amazon.com Services, LLC, et al.*, ICDR Case No. 01-22-0000-3814 dated September 12, 2022 (<u>Exhibit P-8</u>).

e.  On January 3, 2023, more recently, Arbitrator Wilf ruled in the *Himalaya* Final Award that ***Section 2 of the BSA was a substantively unconscionable and unenforceable***

**penalty clause under Washington law.** *See* "Award" in *Himalaya Trading Inc. v. Amazon et al.* (ICDR Case No, 01-22-0001-2440) dated January 3, 2023. (Exhibit P-9)

14.      Petitioner became a third-party seller on Amazon.com on November 30, 2020, by adhering to Amazon's "Business Solutions Agreement" (the "BSA" or "Agreement", Exhibit P-2). Before the deactivation of Petitioner's Account by Amazon, Petitioner regularly paid Amazon a subscription fee to use and maintain its Account.

15.      Petitioner enrolled in Amazon's FBA services program, stored inventory in Amazon's warehouse, and regularly paid Amazon a fee for the use of Amazon's FBA services.

16.      On June 24, 2021, without prior warning, Amazon suddenly deactivated the Petitioner's accounts and accused Petitioner of "manipulating customer reviews of Petitioner's products." *See* Amazon's notice of the account deactivation, attached as Exhibit P-11. The notice stated that, after 90 days, Petitioner could contact the disbursement team to appeal for the return of its funds.

17.      On October 6, 2021, Petitioner received another notice from Amazon stating that its account was in the funds' appeal period and declaring that it "believe[s] that [Petitioner's] account may have been used to engage in deceptive, fraudulent, or illegal activity that harms our customers, other selling partners, and our store." (Exhibit P-12) Subsequently, Petitioner filed an appeal for funds disbursement on October 6, 2021. (Exhibit P-13)

18.      On October 14, 2021, Amazon sent Petitioner a notice indicating that "[t]o make a final decision on your funds' disbursement, we need to verify information related to your identity and the authenticity of your supply chain." Petitioner then supplied information verifying its identity and the authenticity of its supply chain.

19.      On November 15, 2021, Amazon denied Petitioner's funds appeal and confiscated Petitioner's funds, notifying Petitioner of the following: "After completing the investigation and

Case 1:23-cv-03054-ALC   Document 1-1   Filed 04/12/23   Page 11 of 129

reviewing the information you provided, we determined that your Amazon seller account was used to

engage in deceptive, fraudulent or illegal activities that harmed our buyers, other sales partners, and our

stores. What will happen now? The funds in your account will not be paid to you. This is the final

decision made after reviewing the information you provided." (Exhibit P-14)

20.     Amazon has failed and refused to disburse Petitioner's funds, as required by the BSA.

Upon deactivation of Petitioner's seller account, Amazon simultaneously froze Petitioner's entire sales

proceeds in its seller account, amounting to $1,092,018.67. Later on, Amazon deducted unauthorized

charges from Petitioner's frozen sales proceeds after account deactivation. *See* Petitioner's Frozen Funds

Records, attached as Exhibit P-15. These funds are net proceeds Amazon holds under the BSA that

belong to Petitioner for the sales of Petitioner's inventory Petitioner sent to FBA.

21.     Petitioner has also incurred revenue losses and other losses due to improper account

Amazon. Section 8 of the BSA limits Amazon's liability for such damages to the last six months of

payments made by sellers to Amazon. Considering the Petitioner's average monthly sales is  $1 million,

and an average of 34% of sales revenue were payments to Amazon for Amazon's sales commissions and

other fees, the total amount paid to Amazon in the prior six months before activation is $3,960,000.

Petitioner demands that Amazon refund such payments. (Exhibit P-10)

22.     Amazon has already collected and deducted from Petitioner's entire sales proceeds all

costs and commissions it is entitled to under the BSA. Therefore, ***the remainder of the sales proceeds***

***belongs to Petitioner, not Amazon***. However, at present, Amazon still holds Petitioner's sales proceeds

and refuses to release them to Petitioner.

23.     On December 21, 2022, Petitioner filed a Demand for Arbitration before the American

Arbitration Association ("AAA"), seeking the release of funds Amazon holds representing customer

payments for Petitioner's sold merchandise on Amazon marketplaces. (Exhibit P-16) Petitioner's representative also submitted a declaration on behalf of Petitioner. (Exhibit P-17)

24.     On December 15, 2022, the Arbitrator appointed by the AAA ("Arbitrator") entered an Award denying Petitioner's claims and allowing Amazon to keep the entire sales proceeds in Petitioner's seller account, which is Petitioner's property. (Exhibit P-1)

25.     Petitioner seeks an order from this Court vacating the Award of the Arbitrator dated December 15, 2022, rendered before the AAA in the arbitration of *Cowin Technology Co., Ltd. v. Amazon.com Services, LLC, et al.*, AAA Case No. 01-21-0018-0880.

26.     The award of the Arbitrator should be vacated for ***exceeding the arbitrator's power, completely irrational and manifest disregard of the law*** under Civil Practice Law and Rules ("CPLR") §7511(b)(i) for corruption, fraud, or misconduct in procuring the award, or, alternatively, on the ground that the arbitrator exceeded his power under CPLR §7511(b)(iii).

27.     Petitioner has incurred arbitration and petition costs amounting to over $40,000 and attorney's fees over $80,000 to prosecute the arbitration and this action, and respectfully requests the court to order that Amazon pay reasonable attorney's fees as well as Petitioner's costs and interest on the sales proceeds per the legal rate per RCW 19.52.010.

### IV.     COUNT ONE (VACATION OF ARBITRATION AWARD)

28.     Petitioner repeats and realleges paragraphs above, as if fully set forth within.

29.     On December 15, 2022, the Arbitrator rendered an arbitral award.

30.     The Award exhibited the partiality and misconduct of the arbitrator and his manifest disregard for the law. Further, it was in excess of the Arbitrator's power in that:

    a.  The arbitrator's act in the Cowin Arbitration, including the evidentiary hearing, gave rise to justifiable doubts as to his impartiality in the Chinese sellers v. Amazon cases since ***the***

*arbitrator demonstrated obvious favor for Amazon, bias, and prejudice over Chinese sellers* by 1) improperly shifting Amazon's proof duty to the Chinese sellers, 2) copied and pasted Amazon's "naked" declaration as his factual findings, 3) disregarded the Chinese seller's declaration and credible evidence from government agencies.

b. *Amazon did not suffer any damages and did not file a counterclaim for damages. Still, the Award allowed Amazon to retain $1,092,018.67 of Petitioner's entire sales proceeds* for alleged minor breaches—soliciting sponsored reviews (sending gift card inserts to the customers in the shipping package to solicit honest reviews), *which Petitioner did not commit or admit*. Also, for the alleged breaches-soliciting sponsored reviews, sponsored reviews are not even illegal under the Federal Trade Commission laws (Exhibit P-18), and even Amazon itself did the same conduct—paying its workers to tweet Amazon positively—under its ambassador program (Exhibit P-19). The Award allows Amazon to retain over $1,092,018.67 of Petitioner's entire sales proceeds as compensation for Amazon's liquidated damages that did not even actually incur and that Amazon did not even file a counterclaim for. This blatantly *exceeds the Arbitrator's power*.

c. It upheld Section 2 of the BSA, granting Amazon the *sole discretion* to determine whether to *permanently* withhold *any amount* of Petitioner's net proceeds for the sale of its products on the Amazon site, even though under the governing law (Washington law), Section 2 is substantively unconscionable, an invalid liquidated damages clause, as well as an unenforceable penalty clause. This is a *manifest disregard for the law*.

d. It failed to rule that a post-contractual IPI was not a condition precedent for the disbursement of funds in the BSA—to emphasize, such a condition does not appear anywhere in the BSA. Undoubtedly, withholding the funds is equivalent to the total

Case 1:23-cv-03054-ALC   Document 1-1   Filed 04/12/23   Page 14 of 129

confiscation of the Petitioner's entire sales proceeds in its seller account. ***This is completely irrational***.

31.     **WHEREFORE**, by reason of the foregoing, Petitioner hereby respectfully requests that this Court enter an Order:

a.  Vacating the arbitration award entered in the arbitration captioned *Cowin Technology Co., Ltd. v. Amazon.com Services, LLC, et al.*, AAA Case No. 01-21-0018-0880;

b.  Ruling Section 2 of the BSA is procedurally and substantively unconscionable, and an invalid liquidated damages clause and unenforceable penalty clause;

c.  Ordering Amazon to release the entire sales proceeds in the seller account at the account blocking time on June 24, 2021, $1,092,018.67, plus annual interest at the rate of 12.00% via Petitioner's attorney's escrow account, within 15 days of the issuance of court rulings (*according to the Washington State Register, the interest rate required by RCW 19.52.020 is 12.000%*);

d.  Ordering Amazon to refund $3,960,000 of Petitioner's prior six-month payment to Amazon as compensation for losses for improper account blocking;

e.  Reimbursing Petitioner's arbitration and petition cost, approximately $40,000, and attorney's fees, roughly $50,000 for the arbitration and $50,000 for the petition; and

f.  Granting such other and further relief as the court deems and proper.

Dated: March 13, 2023

New York, New York

Respectfully submitted,

 /s/Julie Guo

11

ZHIHUI JULIE GUO (NY State Bar)

legal@jslawglobe.com

Jslawusa@gmail.com

JS Law

Tel.: (917) 773-1868

*Attorney for Petitioner*

Case 1:23-cv-03054-ALC   Document 1-1   Filed 04/12/23   Page 16 of 129

## ATTORNEY VERIFICATION

STATE OF NEW YORK                )

                                 ) ss:

COUNTY OF NEW YORK               )

**ZHIHUI (JULIE) GUO**, an attorney duly licensed to practice law in the Courts of the State of New York, states the following Declaration from Petitioner is a true and correct copy provided by the Petitioner under the penalties of perjury.

_____

ZHIHUI JULIE GUO

13

**SUPREME COURT OF THE STATE OF NEW YORK**

**COUNTY OF NEW YORK**

|  |  |  |
|---|---|---|
| | X | |
| COWIN TECHNOLOGY CO., LTD., | : | Case No. |
| *Petitioner* | : | |
| v. | : | **PETITION TO VACATE AWARD OF ARBITRATOR** |
| AMAZON.COM SERVICES, LLC, | : | |
| AMAZON.COM, INC., | : | |
| *Respondent(s).* | : | |
| – – – – – – – – – – – – – – – – – – – – – – – – – – – | X | |

PLEASE TAKE NOTICE that upon the Verified Petition of COWIN TECHNOLOGY CO.,
LTD., dated March 13, 2023, the exhibits attached thereto, and the accompanying Memorandum of Law,
Petitioner will move this court at 9:30am on the 13th of April, 2023, in the Motion Submissions
Part, Room 130, at the Supreme Court of New York, New York County, at the Courthouse located at
60 Centre Street, New York, New York, for an Order pursuant to CPLR 7511, vacating or modifying
the arbitration award issued in favor of Respondents against Petitioner, together with such other and
further relief as the Court deems just and proper.

PLEASE TAKE FURTHER NOTICE that, pursuant to CPLR 403, an answer and any
supporting papers must be served on the undersigned no later than seven days before the return date set
forth above.

Dated: New York, New York
　　　March 13, 2023

　　　　　　　　　　　　　　By:  /s/ Julie Guo
　　　　　　　　　　　　　　Zhihui Julie Guo
　　　　　　　　　　　　　　jslawusa@gmail.com
　　　　　　　　　　　　　　 (917) 773-1868
　　　　　　　　　　　　　　*Attorney for Petitioner*

Case 1:23-cv-03054-ALC Document 1-1 Filed 04/12/23 Page 18 of 129

**SUPREME COURT OF THE STATE OF NEW YORK**

**COUNTY OF NEW YORK**

| | |
|---|---|
| ─────────────────────────── X | |
| COWIN TECHNOLOGY CO., LTD., : | Case No. |
| | |
| *Petitioner,* : | |
| v. : | **MEMORANDUM OF LAW AND AUTHORITIES IN SUPPORT OF PETITION TO VACATE THE AWARD** |
| AMAZON.COM SERVICES, LLC, : | |
| AMAZON.COM, INC | |
| : | |
| *Respondent(s).* | |
| ─────────────────────────── X | |

## TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ................................................................................ 6

II.  SUMMARY OF FACTS (SEE VERIFIED PETITION FOR DETAILED STATEMENT OF FACTS) ............................................................................................................... 12

III. STANDARD OF REVIEW ................................................................................... 16

IV.  THE AWARD SHALL BE VACATED BECAUSE OF THE PARTIALITY AND MISCONDUCT OF THE ARBITRATOR ............................................................. 17

V.   THE AWARD SHALL BE VACATED BECAUSE THE ARBITRATOR EXCEEDED HIS POWER WHEN HE AWARDED AMAZON THE COMPENSATION OF DAMAGES. .............. 19

VI.  THE AWARD SHALL BE VACATED BECAUSE THE AWARD WAS RENDERED IN MANIFEST DISREGARD OF THE LAW. ................................................................ 20

**A.** **The Award was rendered in manifest disregard of the law because Section 2 of the BSA is unenforceable under Washington laws.** ............................................................................. 20

**B.** **Section 2 of the BSA is unenforceable as it is *procedurally* unconscionable.** ....................... 21

**C.** **Section 2 of the BSA is unenforceable as it is *substantively* unconscionable.** ..................... 22

**D.** **Section 2 of the BSA is unenforceable as it is an invalid liquidated damage clause and unenforceable penalty clause.** ............................................................................... 25

**VII. IT IS COMPLETELY IRRATIONAL TO RULE THAT AN IPI IS A CONDITION PRECEDENT TO DISBURSE THE PETITIONER'S SALES PROCEEDS BECAUSE THE BSA HAS NO SUCH CONDITIONS.** ............................................................................... 31

**VIII.    CONCLUSION** ............................................................................... 32

2

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Adler v. Fred Lind Manor*,
   103 P.3d at 781……………………………………………………………………21, 22

*Banco de Seguros del Estado v. Mutual Mar. Off., Inc.*,
   344 F.3d 255, 263 (2d Cir. 2003)…………………………………………………...20

*Brower Company v. Garrison*,
   2 Wn.App. 424, 468 P.2d 469 (1970)…………………………………………….28

*Brower v. Gateway 2000, Inc.*,
   676 N.Y.S.2d 569, 574 (N.Y. App. Div. 1998)………………………………….....23

*Brown v. MHN Gov't Servs., Inc.*,
   306 P.3d 948 (2013)……………………………………………………………...23

*Buchanan v. Kettner*,
   984 P.2d 1047 (Wash.App. Div. 2 1999)…………………………………………..26

*Burnett v. Pagliacci Pizza, Inc.*,
   470 P.3d 386 (Wash. 2020)………………………………………………………..21, 23

*Gandee v. LDL Freedom Enter., Inc.*,
   293 P.3d 1197, 1199 (Wash. 2013)………………………………………………21, 22, 23

*Lind Bldg. Corp. v. Pacific Bellevue Developments*,
   776 P.2d 977, 55 Wn.App. 70 (Wash.App., 1989)………………………………………28

*M.A. Mortenson Co., Inc. v. Timberline Software Corp.*,
   998 P.2d 305, 315 (Wash. 2000)……………………………………….………22, 23

*Matter of Erin Constr. & Dev. Co., Inc. v. Meltzer*,
   58 A.D.3d 729, 729, 873 N.Y.S.2d 315………………………………….……………16

*McKee v. At & T Corp.*,
   191 P.3d 845, 164 Wn.2d 372 (Wash. 2008)……………………………………..23

*Milford Fin. Corp. v. Lucas*,
   45 Mass. App. Dec. 53, 61 (Mass. Dist. Ct. 1970)……………………………………21

*Paradise Orchards Gen. P'ship v. Fearing*,
   122 Wash. App. 507, 518, 94 P.3d 372, 378 (2004)……………………………………..25

3

*Platts v. Arney*,
    50 Wash.2d 42, 46, 309 P.2d 372 (1957)…………………………………………………..28

*Schroeder*,
    544 P.2d at 23………………………………………………………………………………….21

*Wallace Real Estate Inv, Inc. v. Groves*,
    124 Wash. 2d 881, 889 (1994)……………………………………………………………..25

*Wallace v. Buttar*,
    378 F.3d 182, 189 (2d Cir.2004)……………………………………………………20, 32

*Walter Implement, Inc. v. Focht*,
    709 P.2d 1215, 42 Wn.App. 104 (Wash.App., 1985)……………………………………28

*Wien & Malkin Llp v. Helmsley-Spear, Inc.*,
    846 N.E.2d 1201, 6 N.Y.3d 471, 813 NYS2d 691 (N.Y. 2006)………………………………16

*Williams v. Walker-Thomas Furniture Co.*,
    350 F.2d 445, 450 (D.C. Cir. 1965)………………………………………………...24, 26, 27

*Zuver v. Airtouch Comm'n, Inc.*,
    103 P.3d 753, 759 (Wash. 2004)…………………………………………………………..21, 24

**Statute**

CPLR 7511(b)……………………………………………………………………14, 15, 16

RCW 62A.2-302……………………………………………………………………………….21

RCW 19.52.020…………………………………………………………………………….34

**Arbitration Cases**

*Sanyixiang v. Amazon, et al.*
    (ICDR Case No. 01-22-0000-3330), "Award" dated April 3, 2022……………………….............11

*Longxiang v. Amazon, et al.*
    (ICDR Case No. 01-22-0000-3814), "Award" dated September 12, 2022…………………………...11

*Mobile Galaxy, LLC v. Amazon.com, LLC*
    (AAA No. 01-19-0002-2648), "Final Arbitration Award" dated February 25, 2021……………passim

*Dongguan Yanqiude Trading Co., Ltd. v. Amazon, et al.*
    (ICDR Case No, 01-21-0018-1509), "Award" dated August 12, 2022……………………….…passim

*Himalaya Trading Inc., v. Amazon, et al.*
    (ICDR Case# 01-22-0001-2440), "Final Award" dated January 3, 2023………………………..………11

4

**Other Authorities**

"Investigation of Competition in Digital Markets," *Majority Staff Report and Recommendations, House Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary*, (Oct. 6, 2020) [hereinafter the "House Report"], available at https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf?utm_campaign=4493-519.........................................................................................................................................6

Melissa Repko, *Walmart is using its thousands of stores to battle Amazon for e-commerce market share*, CNBC (June 2, 2022), available at https://www.cnbc.com/2022/06/02/walmart-bets-its-stores-will-give-it-an-edge-in-amazon-e-commerce-duel.html.........................................................................................6

Marcia Savage, *Amazon's e-commerce dominance: Is the price too high? The Future of Commerce* (January 28, 2022), available at https://www.the-future-of-commerce.com/2022/01/28/amazons-e-commerce-dominance-is-the-price-too-high............................................................................................7

*German antitrust watchdog subjects Amazon to stricter supervision rules*, Reuters (July 6, 2022), available at https://www.reuters.com/business/german-antitrust-watchdog-subjects-amazon-stricter-supervision-rules-2022-07-06/.............................................................................................................8

Amazon 10-K Annual Report 2021, available at https://sec.report/Document/0001018724-22-000005/...................................................................................................................................................8

Dana Mattioli and Dave Michaels, *SEC Is Investigating How Amazon Disclosed Business Practices*, WSJ News Exclusive (Apr. 6, 2022), available at https://www.wsj.com/articles/sec-is-investigating-how-amazon-disclosed-business-practices-11649271819.........................................................................8

Katherine Anne Long, *Amazon abruptly banned Washington state treat-maker Chukar Cherries. Months of appeals went unheeded*, The Seattle Times (Sept. 27, 2021), available at https://www.seattletimes.com/business/amazon/amazon-abruptly-banned-washington-state-treat-maker-chukar-cherries-months-of-appeals-went-unheeded.......................................................................9

Isobel Asher Hamilton, *Amazon shut down its program that paid warehouse 'ambassadors' to tweet positively about the company, report says*, The Business Insider (Jan. 26, 2022), available at https://businessinsider.mx/amazon-shut-down-twitter-ambassador-program-reports-2022-1/.................19

Arthur Allen Leff, *Unconscionability and the Code—The Emperor's New Clause*, 115 U. PA. L. REV. 485, 487 (1965)…………………………………………………………………………………………..21

*Market share of leading retail e-commerce companies in the United States as of June 2022*, available at https://www.statista.com/statistics/274255/market-share-of-the-leading-retailers-in-us-e-commerce/....................................................................................................................................................22

Restatement (Second) of Contracts § 356 Illustration (term providing that "if either party fails to perform as agreed in any respect, he will pay $10,000 as liquidated damages" is an unenforceable penalty) …………………………………………………………………………………………………30

5

Petitioner COWIN TECHNOLOGY CO., LTD., herewith submits the following Memorandum of Law and Authorities in Support of its Petition to vacate the arbitration order in the case of *Cowin Technology Co., Ltd. v. Amazon.com Services, LLC, et al.*, AAA Case No. 01-21-0018-0880.

## I.    PRELIMINARY STATEMENT

1. According to the *Majority Staff Report and Recommendations, House Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary,* of which Petitioner requests the Court to take judicial notice, each day, millions of consumers use the Amazon Platform to search for and purchase products. Indeed, it is where most people begin their online product searches and make their online purchases (Exhibit P-4).[1] ***Actually, Amazon is the first and only shopping destination for many consumers.***

2. Amazon is the dominant online marketplace. It reportedly controls about 65% to 70% of all U.S. online marketplace sales.[2] Amazon is the most-visited website in the world for e-commerce and shopping.[3] In fact, Amazon's marketplace enjoys a market share that is more than the next ten biggest competitors combined.[4] Amazon has monopoly power over most third-party sellers and many of its suppliers.[5] Sellers feel forced to be on Amazon because that is where the buyers are.[6] ***With such kind of e-commerce dominance, small retailers do not have any viable or***

---

[1] "Investigation of Competition in Digital Markets," *Majority Staff Report and Recommendations, House Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary*, (Oct. 6, 2020) [hereinafter the "House Report"], available at https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf?utm_campaign=4493-519.

[2] *Id.* at 255.

[3] *Id.* at 256.

[4] Melissa Repko, *Walmart is using its thousands of stores to battle Amazon for e-commerce market share*, CNBC (June 2, 2022), available at https://www.cnbc.com/2022/06/02/walmart-bets-its-stores-will-give-it-an-edge-in-amazon-e-commerce-duel.html.

[5] House Report, *supra note* 1, at 256.

[6] *Id.*

Case 1:23-cv-03054-ALC    Document 1-1    Filed 04/12/23    Page 25 of 129

*meaningful choice other than accepting Amazon's terms* if they want to get their products in front of online consumers.[7]

3.  In addition to providing online retail platform services and referring customers to third-party sellers, Amazon provides sellers with Fulfillment by Amazon ("FBA") program services. Third-party sellers who use FBA services ship their product inventory to Amazon's warehouses or "fulfillment centers." After a customer places an order online, Amazon fulfills the order by picking, packing, and shipping those products. Due to a lack of alternatives, third-party sellers have no choice but to purchase fulfillment services from Amazon. More than 73% of all marketplace sellers worldwide reportedly rely on FBA services.[8] For a seller's products to get the Prime badge, which is essential to appear anywhere in the top search results in the Amazon marketplace, a seller must either qualify for Amazon's Seller Fulfilled Prime ("SFP") program or use Amazon's FBA service.[9]

4.  *The majority of third-party sellers not only use but also rely on FBA services to maintain a favorable search position afforded to them by Amazon's algorithm*. At the Subcommittee's sixth hearing, Representative Mary Gay Scanlon (D-PA) asked then-CEO Jeff Bezos whether there is a connection between a seller's use of FBA and its ability to win the Buy Box. In response, Mr. Bezos said: "I'm not sure if it's direct, but indirectly, I think the Buy Box does favor products that can be shipped with Prime." Given that FBA is effectively the only way for sellers to get a Prime badge, this indicates that Amazon does favor sellers who use FBA over those who do not for both its search rankings and the Buy Box.[10] Thus, FBA provides another

---

[7] Marcia Savage, *Amazon's e-commerce dominance: Is the price too high?* The Future of Commerce (January 28, 2022), available at https://www.the-future-of-commerce.com/2022/01/28/amazons-e-commerce-dominance-is-the-price-too-high
[8] House Report, *supra note* 1, at 288.
[9] *Id.* at 287.
[10] *Id.* at 288.

7

Case 1:23-cv-03054-ALC   Document 1-1   Filed 04/12/23   Page 26 of 129

avenue for Amazon to access competing sellers' third-party data.[11] Once Amazon suspends a seller's account or delists its products, the business is left with largely ineffective remedies as they watch its sales disappear.[12]

5.  As Amazon continues to amass more of the e-commerce market, scrutiny of its practices has grown over the past few years. Sellers have accused Amazon of arbitrarily blocking their seller accounts and withholding sales proceeds, spying on them, copying their best-selling products, and giving Amazon's own products—first-party sales—preferential search results.

6.  The Federal Cartel Office in Germany **considers Amazon dominant in its marketplace services for third-party merchants**.[13] On November 2020, the European Commission issued a Statement of Objections alleging that Amazon uses data relating to our marketplace sellers in a manner that infringes E.U. competition rules. On July 2021, the Luxembourg National Commission for Data Protection ("CNPD") issued a decision against Amazon Europe Core S.à r.l., claiming that Amazon's processing of personal data did not comply with the E.U. General Data Protection Regulation. The decision imposes a fine of €746 million and corresponding practice revisions.[14] In the U.S., the Securities and Exchange Commission ("SEC") is investigating **Amazon for misuse of third-party seller data to benefit its own product sales** (Exhibit P-20).[15] On May 2021, the Attorney General of Washington D.C. filed an antitrust lawsuit against Amazon, accusing it of thwarting competition with pricing policies that prevent its sellers from selling their products for lower prices on other e-commerce marketplaces. A month after that, the House Judiciary Committee passed a package of legislation, including the *Ending Platform Monopolies*

---

[11] *Id.* at 268.
[12] *Id.* at 268.
[13] *German antitrust watchdog subjects Amazon to stricter supervision rules*, REUTERS (July 6, 2022), available at https://www.reuters.com/business/german-antitrust-watchdog-subjects-amazon-stricter-supervision-rules-2022-07-06/.
[14] Amazon 10-K Annual Report 2021, available at https://sec.report/Document/0001018724-22-000005/.
[15] Dana Mattioli and Dave Michaels, *SEC Is Investigating How Amazon Disclosed Business Practices*, WSJ NEWS EXCLUSIVE (Apr. 6, 2022), available at https://www.wsj.com/articles/sec-is-investigating-how-amazon-disclosed-business-practices-11649271819.

8

*Act*, which aimed to rein in tech giants by eliminating "the conflicts of interest that arise from a dominant platform's ownership and reach across multiple business lines."[16] ***That is what exactly Amazon is doing, running a dominant online retailer platform for third-party sellers and, at the same time, having its own private sales on the Amazon marketplace as well.***

7. Sales on Amazon fall into one of two categories: (1) first-party sales, which refer to the sales of Amazon's own private-label products or wholesale products sourced by Amazon, and (2) third-party sales, which refer to sales by independent merchants who sell their own products through the Amazon Platform ("third-party sellers"). Since Amazon reaps 34% of the sales proceeds of the average third-party seller, one might wonder why Amazon continually fails to treat third-party sellers fairly. The reason is that both compete to gain more customers and sales on the same platform. Therefore, ***competition is present between first-party sales (Amazon's direct sales) and third-party sales***. In its internal documents, Amazon refers to third-party sellers as "internal competitors."[17]

8. Amazon relies on automated mechanisms and error-prone fraud detection software to identify and punish third-party sellers Amazon suspects of violating the BSA and its incorporated policies.[18] ***Algorithmic errors can and do lead to abrupt account deactivation and removal of product listings, which can be financially devastating for third-party sellers.***[19] For example, on July 2021, Amazon falsely blocked the seller account of Chukar Cherries ("Chukar")—a Washington-based company that had been selling on Amazon since 2003, causing Chukar to

---

[16] Savage, *supra note* 7.

[17] House Report, *supra note* 1, at 268.

[18] Katherine Anne Long, *Amazon abruptly banned Washington state treat-maker Chukar Cherries. Months of appeals went unheeded*, THE SEATTLE TIMES (Sept. 27, 2021), available at https://www.seattletimes.com/business/amazon/amazon-abruptly-banned-washington-state-treat-maker-chukar-cherries-months-of-appeals-went-unheeded.

[19] *Id.;* See also House Report, *supra note* 1, at 270, n. 1670 ("Among the most egregious examples of Amazon's arbitrary treatment of sellers are its abrupt suspensions of their Account, frequently made without explanation. Once Amazon suspends a third-party seller's Account or delists its products, its business is left with largely ineffective remedies as it watches its sales disappear."); *Id.* at 271 ("Because of the severe financial repercussions associated with suspension or delisting, many Amazon's third-party sellers live in fear of the company.").

9

Case 1:23-cv-03054-ALC   Document 1-1   Filed 04/12/23   Page 28 of 129

sustain substantial financial losses (Exhibit P-3). Chukar is only one of the victims of Amazon's mass account blocking in 2021. ***Without presenting evidence to sellers to support its allegations of term violations, Amazon blocked over 55,000 seller accounts in 2021, seizing all the sales proceeds, amounting to billions of dollars.***[20]

9. Through abrupt seller account deactivations under Section 3 of the BSA (Exhibit P-2), Amazon ***removes the selling privileges of third-party sellers at will***, thus reducing the competition between third-party sellers and Amazon's own sales. Upon account deactivation, ***Amazon also confiscates the entire sales proceeds in the third-party seller's account***, which ranges from thousands to even millions of dollars in cash, representing two weeks to two months of a seller's sales for the seller's sold merchandise on Amazon. ***Through this scheme, Amazon further boosts its corporate profit by confiscating the proceeds found in third-party sellers' accounts.***

10. Amazon accomplishes this unwarranted money grab through Section 2 of the BSA. Before an independent merchant can open a third-party seller account ("Account") on the Amazon Platform, ***all third-party sellers must fully accept the terms and conditions set forth in the BSA, having no negotiation power regarding the fairness and enforceability of the contract terms***.

11. Section 2 of the BSA provides in pertinent part: "*If we **determine** that your account—or any other account you have operated—has been used to engage in **deceptive, fraudulent, or illegal activity** (including the sale of counterfeit goods), or to **repeatedly violate our Program Policies**, then we may in our sole discretion **permanently** withhold **any payments** to you.*"

12. Several key arbitration cases decided prior in time have ruled against the validity and enforceability of Section 2 of the BSA with collateral estoppel effect, including but not limited to:

---

[20] Long, *supra note* 18.

10

Case 1:23-cv-03054-ALC   Document 1-1   Filed 04/12/23   Page 29 of 129

1) On February 25, 2021, Washington Arbitrator James Smith ruled in the Arbitration Award of Amazon seller *Mobile Galaxy* that **Section 2 of the BSA is procedurally and substantively unconscionable and is unenforceable as a penalty and confiscation clause—rather than a proper liquidated damages clause** (Exhibit P-5), *See* "Final Arbitration Award" in *Mobile Galaxy, LLC v. Amazon.com, LLC* (AAA Commercial Arbitration No. 01-19-0002-2648) dated February 25, 2021 ("Mobile Galaxy Award");

2) On April 3, 2022, Arbitrator Evan Gray ruled in the Amazon seller *Sanyixiang* case that "*the sales proceeds withholding provisions in* **Section 2 of the BSA constitute an unenforceable penalty**. *And Claimant has a serious claim on the merits that the funds withholding provisions of* **Section 2 of the BSA are unenforceable as procedurally and substantively unconscionable**" (Exhibit P-6), *See* "Award" in *Sanyixiang v. Amazon et al.* (ICDR Case No. 01-22-0000-3330) dated April 3, 2022 ("Sanyixiang Order");

3) On August 12, 2022, Arbitrator Charles Barr ruled in the Final Award of Amazon seller *Yanqiude* case that Section 2 of the BSA was substantively unconscionable and an unenforceable penalty clause under the Washington law (Exhibit P-7), *See* "Final Award" in *Dongguan Yanqiude Trading Co., Ltd. v. Amazon, et al.* (ICDR Case No, 01-21-0018-1509) dated August 12, 2022 ("Yanqiude Award");

4) On September 12, 2022, Arbitrator Frederic Wilf implied in Amazon seller *Longxiang* case that **Section 2 is an unenforceable penalty clause under Washington law** (Exhibit P-8), *See* "Award" in *Longxiang v. Amazon, et al.* (ICDR Case No. 01-22-0000-3814), dated September 12, 2022 ("Longxiang Award"); and

5) On January 3, 2023, more recently, Arbitrator Wilf ruled in the *Himalaya* Final Award that **Section 2 of the BSA was a substantively unconscionable and unenforceable penalty clause**

11

Case 1:23-cv-03054-ALC   Document 1-1   Filed 04/12/23   Page 30 of 129

*under Washington law. See* "Award" in *Himalaya Trading Inc. v. Amazon et al.* (ICDR Case No, 01-22-0001-2440) dated January 3, 2023. (Exhibit P-9)

## II.   SUMMARY OF FACTS (SEE VERIFIED PETITION FOR DETAILED STATEMENT OF FACTS)

13. Petitioner became a third-party seller on Amazon.com on November 30, 2020, by adhering to Amazon's "Business Solutions Agreement" (the "BSA" or "Agreement", Exhibit P-2). Before the deactivation of Petitioner's Account by Amazon, Petitioner regularly paid Amazon a subscription fee to use and maintain its Account.

14. Petitioner enrolled in Amazon's FBA services program, stored inventory in Amazon's warehouse, and regularly paid Amazon a fee for the use of Amazon's FBA services.

15. On June 24, 2021, without prior warning, Amazon suddenly deactivated the Petitioner's accounts and accused Petitioner of "manipulating customer reviews of Petitioner's products." *See* Amazon's notice of the account deactivation, attached as Exhibit P-11. The notice stated that, after 90 days, Petitioner could contact the disbursement team to appeal for the return of its funds.

16. On October 6, 2021, Petitioner received another notice from Amazon stating that its account was in the funds appeal period and declaring that it "believe[s] that [Petitioner's] account may have been used to engage in deceptive, fraudulent, or illegal activity that harms our customers, other selling partners, and our store." (Exhibit P-12) Subsequently, Petitioner filed an appeal for funds disbursement on October 6, 2021. (Exhibit P-13)

17. On October 14, 2021, Amazon sent Petitioner a notice indicating that "[t]o make a final decision on your funds disbursement, we need to verify information related to your identity and the authenticity of your supply chain." Petitioner then supplied information verifying its identity and the authenticity of its supply chain.

12

Case 1:23-cv-03054-ALC   Document 1-1   Filed 04/12/23   Page 31 of 129

18. On November 15, 2021, Amazon denied Petitioner's funds appeal and confiscated Petitioner's funds, notifying Petitioner of the following: "After completing the investigation and reviewing the information you provided, we determined that your Amazon seller account was used to engage in deceptive, fraudulent or illegal activities that harmed our buyers, other sales partners, and our stores. What will happen now? The funds in your account will not be paid to you. This is the final decision made after reviewing the information you provided." (Exhibit P-14)

19. Amazon has failed and refused to disburse Petitioner's funds, as required by the BSA. Upon deactivating Petitioner's seller account, Amazon simultaneously froze Petitioner's entire sales proceeds in its seller account, amounting to $1,092,018.67. Later on, Amazon deducted unauthorized charges from Petitioner's frozen sales proceeds after account deactivation. *See* Petitioner's Frozen Funds Records, attached as Exhibit P-15. These funds are net proceeds Amazon holds under the BSA that belong to Petitioner for the Petitioner's inventory that Petitioner sent to FBA.

20. Petitioner has also incurred revenue losses and other losses due to improper account deactivation by Amazon. Section 8 of the BSA limits Amazon's liability for such damages to the last six months of payments made by sellers to Amazon. Considering the Petitioner's average monthly sales is  $1 million, and an average of 34% of sales revenue were payments to Amazon for Amazon's sales commissions and other fees, the total amount paid to Amazon in the prior six months before activation is $3,960,000. Petitioner demands that Amazon refund such payments. (Exhibit P-10)

21. Amazon has already collected and deducted from Petitioner's entire sales proceeds all costs and commissions it is entitled to under the BSA. Therefore, ***the remainder of the sales proceeds***

13

*belongs to Petitioner, not Amazon*. However, at present, Amazon still holds Petitioner's sales proceeds and refuses to release them to Petitioner.

22. On December 21, 2022, Petitioner filed a Demand for Arbitration before the American Arbitration Association ("AAA"), seeking the release of funds Amazon holds representing customer payments for Petitioner's sold merchandise on Amazon marketplaces (Exhibit P-16). Petitioner's representative also submitted a declaration on behalf of Petitioner. (Exhibit P-17)

23. On December 15, 2022, the Arbitrator appointed by the AAA ("Arbitrator") entered an Award denying Petitioner's claims and allowing Amazon to keep the entire sales proceeds in Petitioner's seller account, which is Petitioner's property. (Exhibit P-1)

24. Petitioner seeks an order from this Court vacating the Award of the Arbitrator dated December 15, 2022, rendered before the AAA in the arbitration of *Cowin Technology Co v. Amazon.com Services, LLC, et al.*, AAA Case No. 01-21-0018-0880.

25. The award of the Arbitrator should be vacated for *exceeding the arbitrator's power, completely irrational and manifest disregard of the law* under Civil Practice Law and Rules ("CPLR") §7511(b)(i) for corruption, fraud, or misconduct in procuring the award, or, alternatively, on the ground that the arbitrator exceeded his power under CPLR §7511(b)(iii).

26. The Award exhibited the partiality and misconduct of the arbitrator and his manifest disregard for the law, and it was in excess of the Arbitrator's power in that:

    a. The arbitrator's act in the Cowin Arbitration gave rise to justifiable doubts as to his impartiality in the Chinese sellers v. Amazon cases since *the arbitrator demonstrated obvious favor for Amazon, bias, and prejudice over Chinese sellers* by 1) improperly shifting Amazon's proof duty to the Chinese sellers, 2) coped and pasted Amazon's

14

Case 1:23-cv-03054-ALC   Document 1-1   Filed 04/12/23   Page 33 of 129

"naked" declaration as his factual findings, 3) disregarded the Chinese seller's declaration and credible evidence from government agencies.

b. ***Amazon did not suffer any damages and did not file a counterclaim for damages. Still, the Award allowed Amazon to retain $1,092,018.67 of Petitioner's entire sales proceeds*** for alleged minor breaches—soliciting sponsored reviews (sending gift card inserts to the customers in the shipping package to solicit honest reviews), ***which Petitioner did not commit or admit***. Also, the sponsored reviews are not even illegal under the Federal Trade Commission laws (Exhibit P-18).  Even Amazon itself did the same conduct-paying its workers to tweet Amazon positively—under its ambassador program (Exhibit P-19). The Award allows Amazon to retain over $1,092,018.67 of Petitioner's entire sales proceeds as compensation for Amazon's liquidated damages that did not even actually incur and that Amazon did not even file a counterclaim for. This blatantly ***exceeds the Arbitrator's power***.

c. It upheld Section 2 of the BSA, granting Amazon the ***sole discretion*** to determine whether to ***permanently*** withhold ***any amount*** of Petitioner's net proceeds for the sale of its products on the Amazon site, even though under the governing law (Washington law), Section 2 is substantively unconscionable, an invalid liquidated damages clause, as well as an unenforceable penalty clause. This is a ***manifest disregard for the law***.

d. It failed to rule that a post-contractual IPI was not a condition precedent for the disbursement of funds in the BSA—to emphasize, such a condition does not appear anywhere in the BSA. Undoubtedly, the withholding of the funds is equivalent to the full confiscation of the Petitioner's entire sales proceeds in its seller account. ***This is completely irrational***.

15

## III. STANDARD OF REVIEW

27. New York Consolidated Laws, Civil Practice Law and Rules ("CPLR")- CVP § 7511. Vacating or modifying award

    (b) Grounds for vacating.

    1. The award shall be vacated on the application of a party who either participated in the arbitration or was served with a notice of intention to arbitrate if the court finds that the rights of that party were prejudiced by:

    (i) corruption, fraud, or *misconduct in procuring the award*; or

    (ii) *partiality of an arbitrator* appointed as a neutral, except where the award was by confession; or

    (iii) an arbitrator, agency, or person making the award *exceeded his power* or so imperfectly executed it that a final and definite award upon the subject matter submitted was not made…

28. CPLR 7511(b)(1)(iii) provides that a court may vacate an arbitrator's (or arbitration panel's) award: [I]f it is clearly violative of a strong public policy, if it is *totally or completely irrational*, or if it manifestly *exceeds a specific, enumerated limitation on the arbitrator's power*. *See Matter of Erin Constr. & Dev. Co., Inc. v. Meltzer,* 58 A.D.3d 729, 729, 873 N.Y.S.2d 315.

29. In addition, an arbitration award may be vacated "if the court finds that the rights of [a] party were prejudiced by ... corruption, fraud or *misconduct in procuring the award*" (§7511(b)(i)).

30. Arbitration awards found to be made manifestly disregard *the law*, "manifestly disregarded both contract law and the applicable agreements...," warrant vacatur. *Wien & Malkin Llp v. Helmsley-Spear, Inc*., 846 N.E.2d 1201, 6 N.Y.3d 471, 813 NYS2d 691 (N.Y. 2006).

16

## IV.    THE AWARD SHALL BE VACATED BECAUSE OF THE PARTIALITY AND MISCONDUCT OF THE ARBITRATION.

31. The arbitrator's act in the Cowin Arbitration gave rise to justifiable doubts as to his impartiality in the Chinese sellers v. Amazon cases since **he demonstrated obvious favor for Amazon, bias, and prejudice over Chinese sellers** by 1) improperly shifting Amazon's proof duty to the Chinese sellers, 2) copied and pasted Amazon's "naked" declaration as his factual findings, 3) disregarded the Chinese seller's declaration and credible evidence from government agencies.

32. In the Cowin arbitration, Amazon alleged that the Petitioner breached the BSA by soliciting sponsored reviews. Amazon also alleged that the Petitioner is under common control with other sellers. Thus, its corporate veil shall be pierced and liable for other seller breaches.

33. As the Washington Court of Appeals recently observed, A burden of production and persuasion may shift depending on which party forwards the affirmative allegation. Since Amazon is the one who forwarded the affirmative allegation, Amazon has the burden of proof.

34. However, for the common control accusation, Amazon did not produce a shred of evidence other than Amazon staff's "naked" declarations that had no any business record of supporting, in which Amazon told a story regarding how the brand and all the distributor sellers conspired to conduct the review abuse together. Any qualified legal professional would then ask Amazon what the business records or documentary evidence to prove the alleged common control are. Like shareholding information or alter ego evidence? But the arbitrator asked Amazon for nothing for Amazon to prove its allegations in its "naked declaration." If this dispute should be decided based purely on Amazon's own "naked" declaration, without requesting Amazon to produce any business records and documentary evidence to prove its accusations or stories in its declaration, why bother to have an arbitrator arbitrate this case?

17

Case 1:23-cv-03054-ALC   Document 1-1   Filed 04/12/23   Page 36 of 129

35. For the sake of argument, if we argue that the arbitrator can decide a case mainly based on the declarations. Then Petitioner Cowin's director also produced a declaration, which is supported by business license and shareholding information from the secretary of state and business records from Amazon seller central. Should the arbitrator give the Chinese director's declaration more or at least the same weight? Unfortunately, he did not. The arbitrator completely disregarded the Petitioner's declaration and credible evidence; he copied and pasted Amazon's "naked" declaration, which showed his bias and prejudice over Cowin, a Chinese seller company with a Chinese director. The arbitrator perceived Chinese sellers as untrustworthy liars and crooks, completely disregarding the Chinese sellers' declaration and credible evidence, including business records from government agencies and Amazon seller central.

36. Since Amazon could not prove its accusation with business records and documentary evidence, the arbitrator improperly shifted Amazon's burden of proof to the Petitioner, requesting the Petitioner prove it is innocent- not being under common control with other distributors or the brand. **First**, under evidence rules, Amazon is the one who made affirmation allegations; thus, it has proof duty. The Petitioner does not have the burden to prove it is innocent. **Second**, the arbitrator or judges cannot assume one party is guilty and let that party prove it is innocent. **Third**, it is almost impossible to prove a negative: a company is NOT under common control with another company.

37. In summary, the arbitrator manifestly disregarded the evidence rules and the credible evidence Cowin produced and improperly shifted Amazon's proof burden to Cowin, which showed the arbitrator's favor for Amazon, bias, and prejudice over Chinese-controlled companies.

18

## V. THE AWARD SHALL BE VACATED BECAUSE THE ARBITRATOR EXCEEDED HIS POWER WHEN HE AWARDED AMAZON THE COMPENSATION OF DAMAGES.

38. Amazon argued that Amazon suffered damages from the Petitioner's alleged term violations-soliciting sponsored reviews. Thus, it is entitled to retain Petitioner's sales proceeds in the seller's account as compensatory damages. First, for the sake of argument, even if Petitioner did send gift card inserts to solicit sponsored reviews and obtain sponsored reviews, the sponsored reviews are ***not illegal*** under Federal Trade Commission regulations.

39. Second, ***even Amazon solicited sponsored reviews by paying its workers to tweet about it positively on Twitter under Amazon's Ambassador Program*** (Exhibit P-19).[21]

40. Third, Amazon did not present any evidence regarding its damages, the causation between the alleged breach, and damages. Amazon did not file any counterclaim for damages. However, the arbitrator still awarded Amazon $1,092,018.67 for its compensation of damages. ***By doing so, the Arbitrator blatantly exceeded his power***.

41. Last, for the sake of argument, even if Amazon had proved its damages, Amazon did not prove the causation between the alleged breaches and damages. There is ***no direct relationship between the alleged violations and damages***. Also, the amount of funds withheld by Amazon is disproportionate to the alleged damages, assuming any were claimed. Notably, Amazon blocked over 55,000 seller accounts in 2021; the withholding fund amount ranges from $1,000 to $1 million, which are the sellers' sales proceeds from two weeks to two months. ***Amazon cannot prove that the withheld amount for each seller is in proportion to the alleged violations by each seller.*** Basically, Amazon just grabs whatever amount it desires from the sales proceeds in the seller account, without any regard for the type and gravity of the BSA term violation Amazon

---

[21] Isobel Asher Hamilton, *Amazon shut down its program that paid warehouse 'ambassadors' to tweet positively about the company, report says*, The Business Insider (Jan. 26, 2022), available at https://businessinsider.mx/amazon-shut-down-twitter-ambassador-program-reports-2022-1/

19

accused the seller of. ***It is completely irrational that the Arbitrator allowed Amazon to do so by awarding Amazon the sales proceeds of Petitioner for non-existing and non-counterclaimed damages.***

## VI. THE AWARD SHALL BE VACATED BECAUSE THE AWARD WAS RENDERED IN MANIFEST DISREGARD OF THE LAW.

### A. The Award was rendered in manifest disregard of the law because Section 2 of the BSA is <u>unenforceable</u> under Washington laws.

42. To modify or vacate an award on the ground of manifest disregard of the law, a court must find "both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case". *See Wallace v. Buttar*, 378 F.3d 182, 189 (2d Cir.2004), quoting *Banco de Seguros del Estado v. Mutual Mar. Off., Inc.*, 344 F.3d 255, 263 (2d Cir. 2003).

43. In this case, the key legal issue is whether Section 2 of the BSA is enforceable. Section 2 of the BSA provides in pertinent part: "*If we **<u>determine</u>** that your account—or any other account you have operated—has been used to engage in deceptive, fraudulent, or illegal activity (including the sale of counterfeit goods), or to repeatedly violate our Program Policies, then we may in our sole discretion **<u>permanently</u>** withhold **<u>any payments</u>** to you.*"

44. The arbitrator, in this case, ruled that Section 2 of the BSA was enforceable and allowed Amazon to keep $1,092,018.67 of Petitioner's sales proceeds on Amazon. However, Section 2 is not enforceable under Washington laws because Section 2 allows Amazon to **<u>*permanently*</u>** withhold **<u>*any payment*</u>** to the Petitioner, which is substantively unconscionable and does not meet the reasonable forecast standard of a liquidated damages clause. Thus, it is an invalid liquidated

20

damages clause and an unenforceable penalty clause. The Arbitrator's ruling that Section 2 is enforceable is a manifest disregard for the law.

**B.       Section 2 of the BSA is unenforceable as it is _procedurally_ unconscionable.**

45. Although factual analysis shall be taken into consideration, unconscionability is a question of law. *See Burnett v. Pagliacci Pizza, Inc.*, 470 P.3d 386 (Wash. 2020), *see also Zuver v. Airtouch Comm'n, Inc.*, 103 P.3d 753, 759 (Wash. 2004). In his seminary Article on unconscionability, Prof. Arthur Allen Leff distinguished two kinds of unconscionability of contract: procedural unconscionability and substantive unconscionability.[22] ***Washington common law followed this approach and declared __either__ kind of unconscionability if established for a contract term, __sufficient to void the contractual provision__***. *Gandee v. LDL Freedom Enters., Inc.*, 293 P.3d 1197, 1199 (Wash. 2013) (citing *Adler v. Fred Lind Manor*, 103 P.3d 773, 782 (Wash. 2004)).

46. ***The crux of procedural unconscionability is the deprivation of meaningful choice.*** *See Schroeder*, 544 P.2d at 23. "The principle is one of prevention of oppression and unfair surprise and not of disturbance of allocation of risks because of superior bargaining power." *See* Wash. Rev. Code § 62A.2-302; *see also Milford Fin. Corp. v. Lucas*, 45 Mass. App. Dec. 53, 61 (Mass. Dist. Ct. 1970). In considering "all the circumstances surrounding the transaction," three elements are pertinent. First, "the manner in which the contract was entered"; second, whether each party had "a reasonable opportunity to understand the terms of the contract"; and third, whether "the important terms were hidden in a maze of fine print." *Id.* It should be noted, however, that all these elements are not cumulative but rather a criterion for ***assessing the degree of deprivation of meaningful choice***. *See Adler*, 103 P.3d at 781 (cautioning that the factors should not be "applied mechanically without regard to whether in truth a meaningful choice

---

[22] Arthur Allen Leff, *Unconscionability and the Code—The Emperor's New Clause*, 115 U. Pa. L. Rev. 485, 487 (1965).

21

Case 1:23-cv-03054-ALC   Document 1-1   Filed 04/12/23   Page 40 of 129

existed"). Further, normal business habits and traditional business dealing covenants should also be taken into consideration. *Schroeder*, 544 P.2d at 23.

47. Amazon marketplace is the single largest online retailer in the U.S. Combined with the retail business that is run by Amazon.com itself, in 2022, Amazon.com retail accounted for more than 37% of the total U.S. e-commerce market.[23] The second to the seventh largest sellers cannot reach the market occupation rate of Amazon. Com—even combined in size, they cannot compete with the market share of Amazon.com.[24] This makes the diversification of small businesses through various online retailers not feasible. A modern-era seller who needs to sell their product online has *no meaningful choice but to adhere to the BSA* and every policy incorporated within it and let Amazon hold its proceeds on any suspicion that such a seller has committed fraudulent or illegal activities that violated its policies. *See Mobile Galaxy Award*.

**C.     Section 2 of the BSA is unenforceable as it is _substantively_ unconscionable.**

48. Section 2 of the BSA is likewise substantively unconscionable. A term is substantively unconscionable if it is one-sided, overly harsh, shocking to the conscience, monstrously harsh, or exceedingly calloused. *See Gandee*, 293 P.3d at 1199 (citing Adler, 103 P.3d at 781). When a contractual clause causes undue financial burden or hardship to the other party, then the clause shall be pronounced invalid. *See M.A. Mortenson Co., Inc. v. Timberline Software Corp.*, 998 P.2d 305, 315 (Wash. 2000).

49. Substantive unconscionability occurs when a contract clause is *one-sided* or *overly harsh, which is the case in Section 2 of the BSA*. *Id. See also Mobile Galaxy Award.* As observed in *Dongguan Yanqiude Trading Co., Ltd. v. Amazon, et al.*:

---

[23] *Market share of leading retail e-commerce companies in the United States as of June 2022*, available at https://www.statista.com/statistics/274255/market-share-of-the-leading-retailers-in-us-e-commerce/
[24] *Id.*

*...As just discussed, **the provision in section 2 of the BSA purporting to authorize Amazon to withhold sale proceeds as compensation for a third-party seller's alleged policy violation or other misbehavior is, at the bottom, an unabashed money grab**...*

*Given these circumstances, **the contract provision in question shocks my conscience. Under Washington law, the substantive law chosen under the BSA, substantive unconscionability alone is sufficient to void an agreement or a term thereof."*** (Citing *Burnett v. Pagliacci Pizza, Inc., supra at* 196 Wash. 2d 38, ¶ 27, 470 P.3d 486 (2020) (emphasis supplied)).

As discussed below, both decisions collaterally estop Amazon from raising these issues in this case.

50. In *Brown v. MHN Gov't Servs., Inc*., 306 P.3d 948 (2013), the court ruled that requiring consumers to arbitrate in a financially prohibitive forum is substantively unconscionable. *See Brower v. Gateway 2000*, Inc., 676 N.Y.S.2d 569, 574 (N.Y. App. Div. 1998). In *McKee v. At & T Corp.,* 191 P.3d 845, 164 Wn.2d 372 (Wash. 2008), the Court of Appeal held that a limit on attorney's fees, a provision shortening a statute of limitations, a confidentiality provision, and a class action waiver (such is also present in the BSA in this case) in an arbitration agreement were substantively unconscionable. *See also Gandee v. LDL Freedom Enters., Inc.*, 176 Wash.2d 598, 293 P.3d 1197 (Wash. 2013).

51. In this case, if the Arbitrator were to uphold the clause in question, it would not matter what Amazon showed at a hearing in this matter to justify it keeping the proceeds. All Amazon would have to do is state that it has **<u>determined</u>** that either Petitioner has engaged in fraudulent or illegal activities or violated its policies. ***The power to hold proceeds is invoked by this sole***

23

*determination of Amazon alone, which makes it too one-sided and overly harsh as a matter of law. See Mobile Galaxy Award.*

52. When a contractual clause will cause undue financial burden or hardship to the other party, the clause shall be pronounced invalid. *See M.A. Mortenson Co., Inc. v. Timberline Software Corp.*, 998 P.2d 305, 315 (Wash. 2000). ***The confiscation of Petitioner's sales proceeds in the seller account caused <u>undue financial burden or hardship</u> to Petitioner. Without a fund release ordered by the Arbitrator in the final award, the consequences to Petitioner were devastating.*** Thus, Section 2 of the BSA is substantively unconscionable.

53. Under *Zuver v. Airtouch Comm'n, Inc.*, 103 P.3d 753, 759 (Wash. 2004), the court observed that these terms are used to define substantive unconscionability, but these were not exclusive. The lexical definition of unconscionable is: a) shockingly unfair or unjust; b) excessive, unreasonable; and c) not guided or controlled by conscience: unscrupulous. ***Unconscionability is simply the lack of fundamental fairness.***

54. Also, in *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 450 (D.C. Cir. 1965), the unconscionability should be determined ***when the contract was formed in 2020***, not according to the Petitioner's post-contractual performance in 2021 when the account was blocked, and the BSA was terminated by Amazon. ***The unconscionability is a matter of law, not a matter of fact.***

55. Under Section 2 of the BSA, regardless if it is a small infraction, *e.g.*, soliciting of sponsored reviews, or a major infraction, *e.g.*, selling counterfeit goods, the forfeiture by Amazon is the same—confiscating the seller's entire sales proceeds for one month or even longer, which can amount to thousands of or millions of dollars, depending on the size of the seller account and what time Amazon chose to block the seller account. It is like a jaywalker, and a murderer is sentenced on the same terms, which is totally against the fundamental legal principle that the

24

remedy or punishment shall be in proportion to the nature of the violation. Here, Petitioner is only liable for a minor violation, *i.e.*, inserting cards in its product packages to solicit customer reviews. The aforesaid hardly solicits the total confiscation of Petitioner's sales proceeds, which is worth $1,092,018.67, especially when Amazon failed to claim any monetary damages on its part. ***For Amazon, through Section 2 of the BSA, whether there is a small or large infraction or no infraction at all, one cash seizure fits all ... with no sense of proportionality; all sellers, including Petitioner, get the "death penalty" of account deactivation and theft of their money.*** Thus, Section 2 is substantively unconscionable ***against the fundamental proportionality principle***.

D.     **Section 2 of the BSA is unenforceable as it is an <u>invalid liquidated damage clause and unenforceable penalty clause.</u>**

56. Amazon's BSA Section 2 allows Amazon to retain ***all and any*** of Petitioner's proceeds irrespective of its potential invalidity as unconscionable. Amazon will argue that Section 2 is a valid liquidated damages clause. This must be struck down.

57. The proper function of a liquidated damages provision is to *limit the non-breaching party's recovery of **<u>monetary damages</u>***. *See Paradise Orchards Gen. P'ship v. Fearing,* 122 Wash. App. 507, 518, 94 P.3d 372, 378 (2004). The enforceability of a liquidated damages clause in a commercial transaction rests on ***whether Amazon has filed a claim for damages***. Here, Amazon is not seeking monetary damages at all through a counterclaim. **Since Amazon has *not* filed a counterclaim in this case and *claims no monetary damages, Amazon should not be awarded damages, liquidated or not.***

58. Even if Amazon has monetary damages, **Section 2 of the BSA is not a valid liquidated damages clause** under Washington law. It is ***an unenforceable penalty clause***. Under

Washington law, liquidated damages clauses are only enforceable if: (1) the amount is a "**reasonable forecast** of just compensation for the harm caused by the breach, **and** (2) "[t]he harm caused by the breach is incapable or very difficult of accurate estimation." *Wallace Real Estate Inv, Inc. v. Groves*, 124 Wash. 2d 881, 889 (1994). To determine whether a contract contains a liquidated damages clause or a penalty clause, the court must assess "the reasonableness of the parties' estimate of the loss **at the time the contract was formed**." Importantly, "one relevant factor is whether damages were easy or difficult to estimate in advance, and another is **whether the damages actually incurred**, if any, **is so disproportionate to the estimate that to enforce the estimate would be unconscionable**." *Buchanan v. Kettner*, 984 P.2d 1047 (Wash.App. Div. 2 1999). Here, Amazon does not claim any monetary damages, which means no actual damages have been incurred by Amazon. Moreover, the withholding fund amount is disproportionate to the damages, even if any were claimed.

59. The Cowin Award contains a faulty analysis of the enforceability of the clause as a liquidated damages clause. While it contains a proper recitation of the law, *i.e.*, under Washington law, "the parties may provide for liquidated damages where the amount is a reasonable forecast of a party's losses, and the amount of the loss is difficult to determine," it makes a finding of only the difficulty of accurate estimation of damages and makes *a wrong* finding whether the BSA contains a reasonable forecast of just compensation. To make Section 2 a valid liquidated damages clause, **BOTH requirements of "reasonable forecast" and "difficult to estimate" must be met.** For the sake of argument, even if we agree that Amazon did suffer damages and it is difficult to estimate, Section 2 is still an invalid damages clause because **it does not meet the reasonable forecast requirement**. There is no way "**any payment**" in section 2 could meet reasonable forecast requirements.

60. More importantly, its analysis regarding the clause's enforceability as a liquidated damages clause is wrong because the Cowin Arbitrator based his analysis on the post-contractual performance in 2021 when the seller account was blocked, ***not the time when the contract was formed in 2020.*** In *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 450 (D.C. Cir. 1965), Washington law provides: "in determining reasonableness or fairness, the primary concern must be with the terms of the contract considered in light of the circumstances existing ***when the contract was made.***" **When the contract was made in 2020, Section 2 of the BSA allowed Amazon to withhold <u>*any payment*</u> to the sellers, not two weeks' sales proceeds. *The "any payment" in Section 2 at the contract formation could not meet the reasonable forecast requirement.* The Cowin Arbitrator *manifestly disregarded Washington case law* and made the wrong rulings.

61. Evidently, Washington law imposes a reasonableness test "in determining reasonableness or fairness, the primary concern must be with the terms of the contract considered in light of the circumstances existing ***when the contract was made.***" *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 450 (D.C. Cir. 1965). Under Section 2 of the BSA, Amazon is permitted to withhold ***any payments*** to Petitioner at the contract formation in this case. The "any payment" in Section 2 at the contract formation could not meet the reasonable forecast requirement. Also, when the BSA was entered between the parties, Petitioner was a small new seller and could not have foreseen that Amazon could and would withhold $1,092,018.67 of its sales proceeds.

62. Amazon will argue that its reputation has been damaged by Petitioner's alleged review manipulation, and the damages to its reputation from this activity are incapable or very difficult of accurate estimation. This must not be given any merit. First, Amazon did not claim any monetary damages, which means it has none. Moreover, for the sake of argument, the

27

reputational damage is difficult to estimate, as explained and argued above. Amazon cannot prove that the payment provision in Section 2 and the amount withheld in this case (or, for that matter, all other seller proceeds in every deactivation) is a "reasonable forecast of just compensation for the harm," which is required to demonstrate the validity of any liquidated damages clause.

63. Again, Section 2 of the BSA allows Amazon to retain a third-party seller's entire proceeds—*any payment*. This can't act as a "reasonable forecast of just compensation for the harm caused by the breach." *See Yanqiude Award.* "It is a well-accepted principle of contract law that the purpose of awarding damages for breach of contract is to place the damaged party, as nearly as possible, in the position he would be in had the contract been performed. He is not entitled to more than he would have received had the contract been performed." *Id.* citing *Platts v. Arney*, 50 Wash.2d 42, 46, 309 P.2d 372 (1957); *Lind Bldg. Corp. v. Pacific Bellevue Developments,* 776 P.2d 977, 55 Wn.App. 70 (Wash.App., 1989). In *Brower Company v. Garrison*, 2 Wn.App. 424, 468 P.2d 469 (1970), the Washington Court of Appeals held that the amount of liquidated damages must be a reasonable estimation of compensation for damages caused by a contractual breach. *The clause becomes a penalty when the amount fixed is stipulated irrespective of the damage sustained*, or in other words, when the amount fixed has the effect of inducing performance rather than compensating the loss.

64. *The ad-hoc and arbitrary formula of confiscation of <u>any and all</u> seller proceeds is a money grab that puts Amazon in a better position than if the contract had been performed. Thus, it can be regarded as confiscatory.* *See Yanqiude Award.*

65. In this case, the forfeiture of all sales proceeds is punitive. A whole confiscation of sales proceeds, which, under the contract, Amazon has an obligation to turn over to Petitioner, is

28

neither reasonable nor just compensation for the speculative harm that Amazon has allegedly suffered. Moreover, since the claimed amount bears no relationship to the actual damages suffered, *it is a penalty and, thus, is unenforceable*. *Walter Implement, Inc. v. Focht*, 709 P.2d 1215, 42 Wn.App. 104 (Wash.App., 1985).

66. As observed in *Mobile Galaxy, LLC v. Amazon.com, LLC, supra*, **"Section 2 of the BSA is an adhesion contract that is procedurally and substantively unconscionable; whose operation is circumscribed by the duty of good faith and fair dealing; and whose provision for indefinitely withholding sales revenues, whether legitimate or not, constitutes both a breach of that duty and <u>an unenforceable penalty clause</u> rather than a proper liquidated damages clause."** (Emphasis supplied). *See also Dongguan Yanqiude Trading Co., Ltd. v. Amazon, et al., supra*, wherein the Arbitrator found:

However, Amazon cannot seriously argue that the amount of a third-party seller's funds to which it has access at a time of Amazon's choosing just so happens in every case to be "a reasonable forecast of just compensation for the harm that is caused by the breach." The amounts of sale proceeds that await disbursement in accounts of third-party sellers vary by orders of magnitude due to differences in sales volumes. At any particular moment in time, some accounts will contain a minuscule amount awaiting disbursement, some will contain thousands of dollars, some (like Yanqiude's in this instance) will contain tens of thousands, some will contain hundreds of thousands, and some may even contain millions. The amounts of sale proceeds that await disbursement also vary according to the point in time at which Amazon announces its decision to withhold funds. Of course, Amazon is in complete control of this variable. It would be surprising that it does not routinely time that action to correspond to the date a disbursement would

29

otherwise have been due, thereby maximizing its take. **This illustrates that what Amazon presents as a liquidated damages provision is, in reality, a money grab, pure and simple. Put differently; it is an unenforceable penalty** (emphasis supplied). *See also Mobile Galaxy Award*.

67. The Arbitrator in Cowin did not even analyze how "***any payment***" in Section 2 of BSA can be a reasonable forecast of just compensation when the contract was formed in 2020. Also, in its declaration and briefs, Amazon claimed it seized only two weeks' sales proceeds but did not provide any business records to support its claim of two weeks. The Arbitrator just took Amazon's words and did not even bother checking the more credible evidence-the business record and the actual numbers. Also, even if Amazon did seize only two weeks of sales proceeds in practice, Section 2 still does not meet the "reasonable test" because 1) for the same seller, the amount of two weeks of sale proceeds can vary significantly in the holiday sales or regular time sales; 2) for the different sellers with the same alleged breaches, that amount varied from 1000 dollars to 1 million dollars, it is not proportional; 3) there is no direct relationship between the alleged breach and two weeks of sales proceeds. Why two weeks, not one week, four weeks, or two months? Amazon claimed that Amazon only seized two weeks of sales proceeds just because Amazon disbursed the payment to some sellers bi-weekly.

68. In summary, **Section 2 of the BSA is an unenforceable penalty clause rather than a proper liquidated damages clause because it essentially allows retention by Amazon of all generated revenues, irrespective of its potential invalidity and the size of the claimed wrongdoing or payments withheld. As such, it is <u>not</u> a reasonable forecast of just compensation for the harm**

*caused by a breach.*[25] In this case, the forfeiture of all the sales proceeds of $1,092,018.67 would be punitive.

## VII.  IT IS COMPLETELY IRRATIONAL TO RULE THAT AN IPI IS A CONDITION PRECEDENT TO DISBURSE THE PETITIONER'S SALES PROCEEDS BECAUSE THE BSA HAS NO SUCH CONDITIONS.

69. A condition precedent is a fact or event that must occur before there is a right to immediate performance. For example, a mortgage usually has a condition precedent that an inspection to assess the condition and value of the property must occur before the contract takes effect, and pensions typically contain conditions that an employee completes a certain number of years of work before the company is obligated to pay the same. The BSA contains no such conditions. The BSA provisions are not conditions but covenants or promises that give Amazon the right to terminate the BSA or seek damages for a breach. They are not conditions precedent to Amazon's performance under the contract to pay the funds it holds for Petitioner, which is Amazon's primary duty under the contract. Indeed, they are promises rather than conditions precedent because they do not state any event required before disbursement will occur.

70. The IPI cannot be a condition precedent to disbursement because an IPI is not even stated in the BSA. Also, for the sake of argument, its existence cannot be implied as Amazon contends. In fact, Amazon did not even try to impose this alleged "condition" until the contract had been terminated and was stone-cold dead six feet under the ground, and only after it had engaged in months of litigation with Petitioner. This is nothing but an attempt to gain an advantage in litigation. It is just like firing someone and then expecting them to come back to undergo an evaluation interview to determine if they are disqualified from obtaining unemployment benefits.

---

[25] *See* Restatement (Second) of Contracts § 356 Illustration (term providing that "if either party shall fail to perform as agreed in any respect, he will pay $10,000 as liquidated damages" is unenforceable penalty).

31

Case 1:23-cv-03054-ALC   Document 1-1   Filed 04/12/23   Page 50 of 129

71. In summary, neither participating in or passing the IPI nor compliance with Amazon's policies is a condition precedent to the fund disbursement to Petitioner. Amazon has an obligation to disburse the funds to Petitioner, regardless if Petitioner participated in or passed the IPI or complied with Amazon's policies or not.

## VIII.   CONCLUSION

72. As can be seen from the foregoing, the Arbitrator both: "(1) knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." *Wallace v. Buttar, supra.* Therefore, the award should be vacated based on the ground of manifest disregard for the law.

73. **The award exhibited the partiality and misconduct of the arbitrator and his manifest disregard for the law, and it was in excess of the arbitrator's power in that:**

   a. The arbitrator's act in the Cowin Arbitration gave rise to justifiable doubts as to his impartiality in the Chinese sellers v. Amazon cases since ***he demonstrated obvious favor for Amazon, bias, and prejudice over Chinese sellers*** by 1) improperly shifting Amazon's proof duty to the Chinese sellers, 2) copied and pasted Amazon's "naked" declaration as his factual findings, 3) disregarded the Chinese seller's declaration and credible evidence from government agencies.

   b. ***Amazon did not suffer any damages and did not file a counterclaim for damages. Still, the Award allowed Amazon to retain $1,092,018.67 of Petitioner's entire sales proceeds*** for alleged minor breaches—soliciting sponsored reviews (sending gift card inserts to the customers in the shipping package to solicit honest reviews), ***which Petitioner did not commit or admit***. Also, for the alleged breaches-soliciting sponsored reviews, sponsored reviews are not even illegal under the Federal Trade Commission laws (Exhibit P-18).

32

Amazon did the same conduct—paying its workers to tweet it positively—under its ambassador program (Exhibit P-19). The Award allows Amazon to retain over $1,092,018.67 of Petitioner's entire sales proceeds as compensation for Amazon's liquidated damages that did not even actually incur and that Amazon did not even file a counterclaim for. This blatantly **exceeds the Arbitrator's power**.

c. It upheld Section 2 of the BSA, granting Amazon the **sole discretion** to determine whether to **permanently** withhold **any amount** of Petitioner's net proceeds for the sale of its products on the Amazon site, even though under the governing law (Washington law), Section 2 is substantively unconscionable, an invalid liquidated damages clause, as well as an unenforceable penalty clause. This is a **manifest disregard for the law**.

d. It failed to rule that a post-contractual IPI was not a condition precedent for the disbursement of funds in the BSA—to emphasize, such a condition does not appear anywhere in the BSA. Undoubtedly, the withholding of the funds is equivalent to the full confiscation of the Petitioner's entire sales proceeds in its seller account. **This is completely irrational**.

74. **WHEREFORE**, by reason of the foregoing, Petitioner hereby respectfully requests that this Court enter an Order:

a. Vacating the arbitration award entered in the arbitration captioned *Cowin Technology Co., Ltd. v. Amazon.com Services, LLC, et al.*, AAA Case No. 01-21-0018-0880;

b. Ruling Section 2 of the BSA is procedurally and substantively unconscionable and an invalid liquidated damages clause and unenforceable penalty clause;

c. Ordering Amazon to release the entire sales proceeds in the seller account at the account blocking time on June 24, 2021, $1,092,018.67, plus annual interest at the rate of

33

12.000%, via Petitioner's attorney's escrow account, within 15 days of the issuance of court rulings *(according to the Washington State Register, the interest rate required by RCW 19.52.020 is 12.000%)*;

d.  Ordering Amazon to refund $3,960,000 of Petitioner's prior six-month period payment to Amazon as compensation for losses for improper account blocking;

e.  Reimbursing Petitioner's arbitration and petition cost, approximately $40,000, and attorney's fees, approximately $50,000 for the arbitration and $50,000 for the petition, which was caused by Amazon's improper sales proceeds confiscation; and

f.  Granting such other and further relief as the court deems just and proper.

Dated: March 13, 2023
      New York, New York

                              Respectfully submitted,

                              /s/ Julie Guo
                              ZHIHUI JULIE GUO (NY State Bar)
                              JS Law
                              legal@jslawglobe.com
                              jslawusa@gmail.com
                              Tel.: (917) 773-1868
                              *Attorney for Petitioner*

34

Case 1:23-cv-03054-ALC Document 1-1 Filed 04/12/23 Page 53 of 129

SUPREME COURT OF THE STATE OF

NEW YORK COUNTY OF NEW YORK

COWIN TECHNOLOGY CO., LTD.,

Petitioner,

v.                                                      Case No.

AMAZON.COM SERVICES, LLC, et al.

Respondents.

**EXHIBIT LIST TO PETITION TO VACATE THE AWARD**

| No. | EXHIBIT DESCRIPTION |
| --- | --- |
| P1 | Cowin v. Amazon Final Award dated December 15, 2022 |
| P2 | Amazon Services Business Solutions Agreement-BSA |
| P3 | Amazon abruptly banned Washington State Treat-Maker Chukar Cherries-The Seattle Times |
| P4 | Majority Staff Report and Recommendations, House Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary (House Antitrust Report) |
| P5 | Mobile Galaxy v. Amazon, Final Award dated February 25, 2021 |
| P6 | Sanyixiang v. Amazon Decision and Interim Order concerning ER process dated April 3, 2022 |
| P7 | Yanqiude v. Amazon, Final Award, dated August 12, 2022 |
| P8 | Longxiang v. Amazon Final Award dated September 12, 2022 |
| P9 | Himalaya v. Amazon, Final Award, dated January 3, 2023 |
| P10 | Petitioner Sales Revenue from June 1, 2020, to May 31, 2021 |
| P11 | Petitioner's account deactivation notice |
| P12 | Amazon's notice regarding the reason for deactivation and appeal period |
| P13 | Petitioner's appeal letter |
| P14 | Amazon's final decision regarding Petitioner's appeal |
| P15 | Petitioner's Frozen Funds in the seller account at accountunt blocking time dated July 2021 |
| P16 | Petitioner Demand for Arbitration and Request for ER dated December 21, 2021 |
| P17 | Declaration of Liang Zhou dated November 4, 2022 |

| P18 | Revised Endorsement Guides By FTC |
| P19 | Amazon Shut Program paying its worker to tweet positively-Insider |
| P20 | SEC is investigating how Amazon disclosed business practices - WSJ |

## INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
### International Arbitration Tribunal

In the Matter of the Arbitration between


Re: 01-21-0018-0880


COWIN TECHNOLOGY CO., LTD.,                          Claimant,


         -against-


AMAZON.COM SERVICES, LLC; et al.,

                                                     Respondents.


## FINAL AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration provision of the Amazon Services Business Solutions Agreement (the "BSA Agreement") entered into by the parties in or about November, 2020, and having been duly sworn and the parties having consented to a hearing based upon written submissions, and having fully reviewed and considered the submissions filed on or about November 4, 2022 by Claimant, represented by Julie Guo, Esq from the JS Law Firm, P.C., and Kenneth G. Eade, Esq., from the Law Office of Kenneth G. Eade, and by Respondents, represented by John Goldmark, Esq. and Rachel Herd, Esq. from the law firm of Davis Wright Tremaine LLP, as well as the reply submissions filed by both parties on or about November 18, hereby, AWARD, as follows:


### FACTUAL FINDINGS

Claimant Cowin Technology Co., Ltd. ("Cowin") became a third-party seller on Amazon.com by agreeing to the BSA Agreement with Respondents (Amazon.com Services LLC, Amazon.com, Inc., Amazon.com CA, Inc., and Servicios Comerciales Amazon Mexico S. De. R.L. De C.V., together referred to as "Amazon"). The BSA Agreement incorporates by reference certain of Amazon's policies and guidelines

1

Case 1:23-cv-03054-ALC   Document 1-1   Filed 04/12/23   Page 56 of 129

published on the Amazon.com website.  They included the Customer Product Reviews Policies which forbid sellers from offering any third party a financial reward, discount, free product, or other compensation in exchange for their review of the seller and its product.   Amazon also requires sellers to provide accurate and complete information about the identity of the party operating their account and can require a seller to provide additional financial, business, and personal information when necessary to verify its identity.

The above ensures Amazon will know who has access to its store and to its customers and be better able to provide protection against deceptive and fraudulent conduct that could damage customer trust, goodwill, and the Amazon brand.

Section 2 of the BSA Agreement allows Amazon to withhold the disbursement of sale proceeds if a seller engages in deceptive or fraudulent activity in violation of the incorporated policies. In this case, Amazon determined that Claimant had engaged in reviews abuse and did not provide accurate and complete identity information.  Amazon withheld approximately fourteen (14) days of sale proceeds or $976,103.19, which Claimant is now seeking to recover.

Cowin branded products were sold on Amazon through different seller accounts, including one operated under the store name Cosmonic (the "Cosmonic Account") which was owned by Claimant.  The same products were also sold through another account (the "Cowin Account") which turned out to be closely related to Claimant.  Both accounts were registered as "brand owners" of the Cowin brand in Amazon's brand registry; both sold Cowin-branded products; both shared the same phone number; both had the same email address registered as a user on the account; and both used the same custom software created by the same developer to manage their Amazon seller accounts.

The two accounts appear to have engaged in or benefited from reviews abuse. Customers who left negative reviews were contacted and offered incentives, such as refunds and new products, to delete them.  Amazon suspended the Cowin Account for this reason on January 13, 2021, and after further investigation and appeals, terminated it on February 15, 2021.

It appears that sales were promptly shifted to the "Cosmonic" account. In the month before the Cowin Account was terminated, the Cosmonic Account had approximately $137,000 in sales of Cowin-branded products. The month after Amazon terminated the Cowin Account, sales of the Cowin-branded products on the Cosmonic Account jumped to approximately $600,000 and over the next three months averaged $2,000,000 per month. Amazon suspended Claimant and its Cosmonic Account on or about June 24, 2021, for the same reason it had suspended the Cowin Account and withheld the trailing two-weeks of sales receipts.

I am convinced based on the submissions by the parties that Claimant participated in and/or benefitted from the use of customer incentives to manipulate product reviews with the goal of boosting sales. Bribing customers to post positive reviews for products or to remove negative ones is clearly the kind of reviews abuse barred by the BSA Agreement. I was not convinced by Claimant's argument that addressing negative reviews in the manner alleged was not improper, nor prohibited by the BSA Agreement.

I am also persuaded that the Cowin Account was closely related to the Cosmonic Account and that the information supplied by Claimant in creating the Cosmonic Account was suspect. The claim by Claimant that any reviews manipulation should be attributed to the Cowin Account, or to a rogue employee, and not the Claimant, was unconvincing considering, among other things, the close relationship between the two accounts.

Amazon was still willing to reconsider Claimant's request for release of the withheld funds on the condition that Claimant passed a virtual "in person identity verification interview" ("IPI") to verify that the true account holder was the actual individual seeking the release of the funds. The IPI interview is a procedure Amazon uses to help avoid fraud and to ensure it is only releasing funds to the real business operator and not to a seller operating under a fake identity. Sellers who fail the IPI interview are not eligible for the disbursement of withheld funds.

It is not unreasonable for Amazon to know who it is doing business with. It prevents unknown third parties from hiding their identities and laundering money through Amazon, it prevents identity theft, it allows Amazon to better identify the source of counterfeit or stolen merchandise, and it allows Amazon to comply with

state and federal laws banning business with certain sanctioned individuals and companies.

A person purporting to be Claimant's legal representative, Liang Zhou, appeared for the IPI interview, but his lack of knowledge concerning basic information about Claimant and the Cosmonic Account raised questions about the identity of the true account operator.

Based on the submissions by Respondents, I find that Amazon had the factual basis necessary to exercise its contractual right to suspend and terminate Claimant and withhold certain funds in the account. The evidence to the contrary submitted by Claimant did not convince me otherwise.

The second issue raised by Claimant is whether the BSA Agreement is legally unenforceable, notwithstanding the above facts.

## LEGAL FINDINGS

Claimant argues that Section 2 of the BSA Agreement is not a proper liquidated damages clause, but an unlawful penalty because it allows retention by Amazon of revenues without regard to the actual harm. Washington law favors liquidated damage provisions and courts routinely uphold them where (1) the amount is "a reasonable forecast of just compensation for the harm that is caused by the breach," and (2) the harm is "incapable or very difficult of ascertainment." Watson v. Ingram, 124 Wn.2d 845, 850 (1994).

The harm caused by a seller engaging in reviews abuse in Amazon's store is very difficult, if not impossible, to quantify. Amazon is required to defend suits by unhappy customers, to expend time and effort to detect, uncover and combat deceptive seller behavior, and to provide refunds where appropriate. This damages customer goodwill, as well as Amazon's brand and reputation for trustworthiness and reliability.

In addition, Amazon has no reliable way to protect itself from the risk of liability for product claims or refunds that may arise in the future as the result of reviews abuse. Section 2, in effect, limits the amount of funds withheld to the seller's

4

INDEX NO. 651309/2023
Case 1:23-cv-03054-ALC   Document 1-1   Filed 04/12/23   Page 59 of 129
RECEIVED NYSCEF: 03/13/2023

most recent 14-days of accrued proceeds since the BSA Agreement provides for Amazon to remit balances on a bi-weekly basis. Under the circumstances, that amount is a reasonable forecast of the damage and appropriate compensation.

Claimant also seeks to invoke collateral estoppel based on the rulings in two other arbitrations. For collateral estoppel to apply, Claimant must show that the factual issues decided in the prior arbitrations were identical and the application would not work an injustice. The burden of proof is on the party asserting the estoppel. Claimant has not satisfied its burden of showing that the unique factual circumstances in this case are identical to the two prior arbitrations, nor that the legal issues must be applied the same way in this matter.

Moreover, Claimant has picked two decisions that allegedly support its desired outcome while neglecting the numerous other arbitral awards that have enforced Section 2 of the BSA Agreement rejecting the same legal arguments Claimant advances here.

## CONCLUSION

Claimant has not established that Section 2 of the BSA is procedurally or substantively unconscionable. It has not proved that Section 2 as applied is an unenforceable liquidated damage or penalty clause. Claimant has not established that Respondents breached the contract, or the implied covenant of good and fair dealing, nor has it proven that Respondents converted their sale proceeds. The facts establish that Claimant breached its obligations under the BSA Agreement, and the Amazon policies incorporated therein, and the procedures set up to address it were reasonable and enforceable. Accordingly, Cowin's claims are denied in their entirety.

The administrative fees of the International Centre for Dispute Resolution and the compensation of the arbitrator shall be borne as incurred.

This Award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

INDEX NO. 651309/2023

Case 1:23-cv-03054-ALC   Document 1-1   Filed 04/12/23   Page 60 of 129

RECEIVED NYSCEF: 03/13/2023

I hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, United States of America.

_Dec 15, 2022_
Date

_____
Howard R. Reiss

I, Howard R. Reiss, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_Dec 15 2022_
Date

_____
Howard R. Reiss

6

From: https://sellercentral.amazon.com/gp/help/external/G1791?language=en_US

Amazon Services Business Solutions Agreement

The version of this Agreement in English is the definitive legal version. A translation into Chinese is available for your ease of reference.

**General Terms**

Welcome to **Amazon Services Business Solutions**, a suite of optional services for sellers including: Selling on Amazon, Fulfillment by Amazon, Amazon Advertising, Transaction Processing Services, and the Selling Partner API.

THIS AMAZON SERVICES BUSINESS SOLUTIONS AGREEMENT (THE **"AGREEMENT"**) CONTAINS THE TERMS AND CONDITIONS THAT GOVERN YOUR ACCESS TO AND USE OF THE SERVICES AND IS AN AGREEMENT BETWEEN YOU OR THE BUSINESS YOU REPRESENT AND AMAZON. BY REGISTERING FOR OR USING THE SERVICES, YOU (ON BEHALF OF YOURSELF OR THE BUSINESS YOU REPRESENT) AGREE TO BE BOUND BY THE TERMS OF THIS AGREEMENT, INCLUDING THE SERVICE TERMS AND PROGRAM POLICIES THAT APPLY FOR EACH COUNTRY FOR WHICH YOU REGISTER OR ELECT TO USE A SERVICE (IN EACH CASE, THE **"ELECTED COUNTRY"**).

As used in this Agreement, **"we," "us,"** and **"Amazon"** means the applicable Amazon Contracting Party and any of its applicable Affiliates, and **"you"** means the applicant (if registering for or using a Service as an individual), or the business employing the applicant (if registering for or using a Service as a business) and any of its Affiliates. Capitalized terms have the meanings given to them in this Agreement. If there is any conflict between these General Terms and the applicable Service Terms and Program Policies, the General Terms will govern and the applicable Service Terms will prevail over the Program Policies.

1. **Enrollment.**

   To begin the enrollment process, you must complete the registration process for one or more of the Services. Use of the Services is limited to parties that can lawfully enter into and form contracts under applicable Law (for example, the Elected Country may not allow minors to use the Services). As part of the application, you must provide us with your (or your business') legal name, address, phone number and e-mail address, as well as any other information we may

request. Any personal data you provide to us will be handled in accordance with Amazon's Privacy Notice.

2.      **Service Fee Payments; Receipt of Sales Proceeds.**

Fee details are described in the applicable Service Terms and Program Policies. You are responsible for all of your expenses in connection with this Agreement. To use a Service, you must provide us with valid credit card information from a credit card or credit cards acceptable by Amazon (**"Your Credit Card"**) as well as valid bank account information for a bank account or bank accounts acceptable by Amazon (conditions for acceptance may be modified or discontinued by us at any time without notice) (**"Your Bank Account"**). You will use only a name you are authorized to use in connection with a Service and will update all of the information you provide to us in connection with the Services as necessary to ensure that it at all times remains accurate, complete, and valid. You authorize us (and will provide us documentation evidencing your authorization upon our request) to verify your information (including any updated information), to obtain credit reports about you from time to time, to obtain credit authorizations from the issuer of Your Credit Card, and to charge Your Credit Card or debit Your Bank Account for any sums payable by you to us (in reimbursement or otherwise). All payments to you will be remitted to Your Bank Account through a banking network or by other means specified by us.

**If we determine that your actions or performance may result in returns, chargebacks, claims, disputes, violations of our terms or policies, or other risks to Amazon or third parties, then we may in our sole discretion withhold any payments to you for as long as we determine any related risks to Amazon or third parties persist. For any amounts that we determine you owe us, we may (a) charge Your Credit Card or any other payment instrument you provide to us; (b) offset any amounts that are payable by you to us (in reimbursement or otherwise) against any payments we may make to you or amounts we may owe you; (c) invoice you for amounts due to us, in which case you will pay the invoiced amounts upon receipt; (d) reverse any credits to Your Bank Account; or (e) collect payment or reimbursement from you by any other lawful means. If we determine that your account—or any other account you have operated—has been used to engage in deceptive, fraudulent, or illegal activity (including the sale of counterfeit goods), or to repeatedly violate our Program Policies, then we may in our sole discretion permanently withhold any payments to you.** Except as provided otherwise, all amounts contemplated in this Agreement will be expressed and displayed in the Local Currency, and all payments contemplated by this Agreement will be made in the Local Currency.

C-007

Case 1:23-cv-03054-ALC   Document 1-1   Filed 04/12/23   Page 63 of 129

In addition, we may require that you pay other amounts to secure the performance of your obligations under this Agreement or to mitigate the risk of returns, chargebacks, claims, disputes, violations of our terms or policies, or other risks to Amazon or third parties. These amounts may be refundable or nonrefundable in the manner we determine, and failure to comply with terms of this Agreement, including any applicable Program Policies, may result in their forfeiture.

As a security measure, we may, but are not required to, impose transaction limits on some or all customers and sellers relating to the value of any transaction or disbursement, the cumulative value of all transactions or disbursements during a period of time, or the number of transactions per day or other period of time. We will not be liable to you: (i) if we do not proceed with a transaction or disbursement that would exceed any limit established by us for a security reason, or (ii) if we permit a customer to withdraw from a transaction because an Amazon Site or Service is unavailable following the commencement of a transaction.

3.    **Term and Termination.**

The term of this Agreement will start on the date of your completed registration for use of a Service and continue until terminated by us or you as provided below. You may at any time terminate your account or this Agreement immediately on notice to us via Seller Central, email, the Contact Us form, or similar means. We may terminate your account or this Agreement for convenience with 30 days' advance notice. We may suspend or terminate your account or this Agreement immediately if we determine that (a) you have materially breached the Agreement and failed to cure within 7 days of a cure notice unless your breach exposes us to liability toward a third party, in which case we are entitled to reduce, or waive, the aforementioned cure period at our reasonable discretion; (b) your account has been, or our controls identify that it may be used for deceptive or fraudulent, or illegal activity; or (c) your use of the Services has harmed, or our controls identify that it might harm, other sellers, customers, or Amazon's legitimate interests. We will promptly notify you of any such termination or suspension via email or similar means including Seller Central, indicating the reason and any options to appeal, except where we have reason to believe that providing this information will hinder the investigation or prevention of deceptive, fraudulent, or illegal activity, or will enable you to circumvent our safeguards. On termination of this Agreement, all related rights and obligations under this Agreement immediately terminate, except that (d) you will remain responsible for performing all of your obligations in connection with transactions entered into before termination and for any liabilities that accrued before or as a result of termination, and (e) Sections 2, 3, 4, 5, 6, 7, 8, 9, 11, 14, 15, and 18 of these General Terms survive.

4.    **License.**

You grant us a royalty-free, non-exclusive, worldwide right and license for the duration of your original and derivative intellectual property rights to use any and all of Your Materials for the Services or other Amazon product or service, and to sublicense the foregoing rights to our Affiliates and operators of Amazon Associated Properties; provided, however, that we will not alter any of Your Trademarks from the form provided by you (except to re-size trademarks to the extent necessary for presentation, so long as the relative proportions of such trademarks remain the same) and will comply with your removal requests as to specific uses of Your Materials (provided you are unable to do so using standard functionality made available to you via the applicable Amazon Site or Service); provided further, however, that nothing in this Agreement will prevent or impair our right to use Your Materials without your consent to the extent that such use is allowable without a license from you or your Affiliates under applicable Law (e.g., fair use under United States copyright law, referential use under trademark law, or valid license from a third party).

5.     **Representations.**

Each party represents and warrants that: (a) if it is a business, it is duly organized, validly existing and in good standing under the Laws of the country in which the business is registered and that you are registering for the Service(s) within such country; (b) it has all requisite right, power, and authority to enter into this Agreement, perform its obligations, and grant the rights, licenses, and authorizations in this Agreement; (c) any information provided or made available by one party to the other party or its Affiliates is at all times accurate and complete; (d) it is not subject to sanctions or otherwise designated on any list of prohibited or restricted parties or owned or controlled by such a party, including but not limited to the lists maintained by the United Nations Security Council, the US Government (e.g., the US Department of Treasury's Specially Designated Nationals list and Foreign Sanctions Evaders list and the US Department of Commerce's Entity List), the European Union or its member states, or other applicable government authority; and (e) it will comply with all applicable Laws in performance of its obligations and exercise of its rights under this Agreement.

6.     **Indemnification.**

**6.1 Your indemnification obligations**. You will defend, indemnify, and hold harmless Amazon, and our officers, directors, employees, and agents, against any third-party claim, loss, damage, settlement, cost, expense, or other liability (including, without limitation, attorneys' fees) (each, a "Claim") arising from or related to (a) your non-compliance with applicable Laws; (b) Your Products, including the offer, sale, fulfillment (except to the extent attributable to the FBA service), refund, cancellation, return, or adjustments thereof, Your Materials, any actual or alleged infringement of any Intellectual Property Rights by any of the foregoing, and any

**C-009**

Case 1:23-cv-03054-ALC    Document 1-1    Filed 04/12/23    Page 65 of 129

personal injury, death (to the extent the injury or death is not caused by Amazon), or property damage related thereto; (c) Your Taxes and duties or the collection, payment, or failure to collect or pay Your Taxes or duties, or the failure to meet tax registration obligations or duties; or (d) actual or alleged breach of any representations you have made.

**6.2 Amazon's indemnification obligations**. Amazon will defend, indemnify, and hold harmless you and your officers, directors, employees, and agents against any third-party Claim arising from or related to: (a) Amazon's non-compliance with applicable Laws; or (b) allegations that the operation of an Amazon Site infringes or misappropriates that third party's intellectual property rights.

**6.3 Process**. If any indemnified Claim might adversely affect us, we may, to the extent permitted by applicable Law, voluntarily intervene in the proceedings at our expense. No party may consent to the entry of any judgment or enter into any settlement of an indemnified Claim without the prior written consent of the other party, which may not be unreasonably withheld; except that a party may settle any claim that is exclusively directed at and exclusively affects that party.

7.    **Disclaimer & General Release.**

**a.** THE AMAZON SITES AND THE SERVICES, INCLUDING ALL CONTENT, SOFTWARE, FUNCTIONS, MATERIALS, AND INFORMATION MADE AVAILABLE ON OR PROVIDED IN CONNECTION WITH THE SERVICES, ARE PROVIDED "AS-IS." AS A USER OF THE SERVICES, YOU USE THE AMAZON SITES, THE SERVICES, AND SELLER CENTRAL AT YOUR OWN RISK. EXCEPT THOSE SET FORTH IN SECTION 5 ABOVE, TO THE FULLEST EXTENT PERMISSIBLE BY LAW, WE AND OUR AFFILIATES DISCLAIM: (i) ANY REPRESENTATIONS OR WARRANTIES REGARDING THIS AGREEMENT, THE SERVICES OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT; (ii) IMPLIED WARRANTIES ARISING OUT OF COURSE OF DEALING, COURSE OF PERFORMANCE, OR USAGE OF TRADE; AND (iii) ANY OBLIGATION, LIABILITY, RIGHT, CLAIM, OR REMEDY IN TORT, WHETHER OR NOT ARISING FROM OUR NEGLIGENCE. WE DO NOT WARRANT THAT THE FUNCTIONS CONTAINED IN THE AMAZON SITES AND THE SERVICES WILL MEET YOUR REQUIREMENTS OR BE AVAILABLE, TIMELY, SECURE, UNINTERRUPTED, OR ERROR FREE, AND WE WILL NOT BE LIABLE FOR ANY SERVICE INTERRUPTIONS, INCLUDING BUT NOT LIMITED TO SYSTEM FAILURES OR OTHER INTERRUPTIONS

Case 1:23-cv-03054-ALC   Document 1-1   Filed 04/12/23   Page 66 of 129

THAT MAY AFFECT THE RECEIPT, PROCESSING, ACCEPTANCE, COMPLETION, OR SETTLEMENT OF ANY TRANSACTIONS.

**b.** BECAUSE AMAZON IS NOT INVOLVED IN TRANSACTIONS BETWEEN CUSTOMERS AND SELLERS OR OTHER PARTICIPANT DEALINGS, IF A DISPUTE ARISES BETWEEN ONE OR MORE PARTICIPANTS, EACH PARTICIPANT RELEASES AMAZON (AND ITS AGENTS AND EMPLOYEES) FROM CLAIMS, DEMANDS, AND DAMAGES (ACTUAL AND CONSEQUENTIAL) OF EVERY KIND AND NATURE, KNOWN AND UNKNOWN, SUSPECTED AND UNSUSPECTED, DISCLOSED AND UNDISCLOSED, ARISING OUT OF OR IN ANY WAY CONNECTED WITH SUCH DISPUTES.

8.    **Limitation of Liability.**

WE WILL NOT BE LIABLE (WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE, PRODUCT LIABILITY, OR OTHER THEORY), OR OTHERWISE) TO YOU OR ANY OTHER PERSON FOR COST OF COVER, RECOVERY, OR RECOUPMENT OF ANY INVESTMENT MADE BY YOU OR YOUR AFFILIATES IN CONNECTION WITH THIS AGREEMENT, OR FOR ANY LOSS OF PROFIT, REVENUE, BUSINESS, OR DATA OR PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT, EVEN IF AMAZON HAS BEEN ADVISED OF THE POSSIBILITY OF THOSE COSTS OR DAMAGES. FURTHER, OUR AGGREGATE LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED WILL NOT EXCEED AT ANY TIME THE TOTAL AMOUNTS DURING THE PRIOR SIX MONTH PERIOD PAID BY YOU TO AMAZON IN CONNECTION WITH THE PARTICULAR SERVICE GIVING RISE TO THE CLAIM.

9.    **Insurance.**

If the gross proceeds from Your Transactions exceed the applicable Insurance Threshold during any month if the Elected Country is the United States, or each month over any period of three (3) consecutive months if the Elected Country is Canada or Mexico, or otherwise if requested by us, then within thirty (30) days thereafter, you will maintain at your expense throughout the remainder of the Term for each applicable Elected Country commercial general, umbrella or excess liability insurance with the Insurance Limits per occurrence and in aggregate covering liabilities caused by or occurring in conjunction with the operation of your business, including products, products/completed operations and bodily injury, with policy(ies) naming Amazon and its assignees as additional insureds. At our request, you will provide to us certificates of insurance, the full insurance policy, or other documents we may request for the coverage to the

following address: c/o Amazon, P.O. Box 81226, Seattle, WA 98108-1226, Attention: Risk Management.

10. **Tax Matters.**

As between the parties, you will be responsible for the collection, reporting, and payment of any and all of Your Taxes, except to the extent that (i) Amazon automatically calculates, collects, or remits taxes on your behalf according to applicable law; or (ii) Amazon expressly agrees to receive taxes or other transaction-based charges on your behalf in connection with tax calculation services made available by Amazon and used by you. You agree to and will comply with the Tax Policies. All fees and payments payable by you to Amazon under this Agreement or the applicable Service Terms are exclusive of any applicable taxes, deductions or withholding (including but not limited to cross-border withholding taxes), and you will be responsible for paying Amazon any of Your Taxes imposed on such fees and any deduction or withholding required on any payment.

11. **Confidentiality and Personal Data.**

During the course of your use of the Services, you may receive Confidential Information. You agree that for the term of the Agreement and 5 years after termination: (a) all Confidential Information will remain Amazon's exclusive property; (b) you will use Confidential Information only as is reasonably necessary for your participation in the Services; (c) you will not otherwise disclose Confidential Information to any other Person except as required to comply with the Law; (d) you will take all reasonable measures to protect the Confidential Information against any use or disclosure that is not expressly permitted in this Agreement; and (e) you will retain Confidential Information only for so long as its use is necessary for participation in the Services or to fulfill your statutory obligations (e.g. tax) and in all cases will delete such information upon termination or as soon as no longer required for the fulfillment of statutory obligations. The foregoing sentence does not restrict your right to share Confidential Information with a governmental entity that has jurisdiction over you, provided that you limit the disclosure to the minimum necessary and explicitly indicate the confidential nature of the shared information to the governmental entity. You may not issue any press release or make any public statement related to the Services, or use our name, trademarks, or logo, in any way (including in promotional material) without our advance written permission, or misrepresent or embellish the relationship between us in any way. You may only use the "Available at Amazon" badge as defined in and according to the Trademark Usage Guidelines available in Seller Central; you may not use our name, trademarks, or logos in any way (including in promotional material) not covered by the Trademark Usage Guidelines without our advance written permission.

C-012

Generally, you may not use customer personal data in any way inconsistent with applicable Law. You must keep customer personal data confidential at all times (the above 5 years' term limit does not apply to customer personal data).

12.    **Force Majeure.**

We will not be liable for any delay or failure to perform any of our obligations under this Agreement by reasons, events or other matters beyond our reasonable control.

13.    **Relationship of Parties.**

Subject to the Transaction Processing Service Terms (if the Elected Country for a Service is the United States), you and we are independent contractors, and nothing in this Agreement will create any partnership, joint venture, agency, franchise, sales representative, or employment relationship between us. You will have no authority to make or accept any offers or representations on our behalf. This Agreement will not create an exclusive relationship between you and us. Nothing expressed or mentioned in or implied from this Agreement is intended or will be construed to give to any person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or in respect to this Agreement. This Agreement and all of the representations, warranties, covenants, conditions, and provisions in this Agreement are intended to be and are for the sole and exclusive benefit of Amazon, you, and customers. As between you and us, you will be solely responsible for all obligations associated with the use of any third party service or feature that you permit us to use on your behalf, including compliance with any applicable terms of use. You will not make any statement, whether on your site or otherwise, that would contradict anything in this section.

14.    **Suggestions and Other Information.**

If you or any of your Affiliates elect to provide or make available suggestions, comments, ideas, improvements, or other feedback or materials to us in connection with or related to any Amazon Site or Service (including any related Technology), we will be free to use, disclose, reproduce, modify, license, transfer and otherwise distribute, and exploit any of the foregoing information or materials in any manner. In order to cooperate with governmental requests, to protect our systems and customers, or to ensure the integrity and operation of our business and systems, we may access and disclose any information we consider necessary or appropriate, including but not limited to user contact details, IP addresses and traffic information, usage history, and posted content. If we make suggestions on using the Services, you are responsible for any actions you take based on our suggestions.

15.    **Modification.**

15.1. We will provide at least 15 days' advance notice in accordance with Section 18 for changes to the Agreement.

15.2 However, we may change or modify the Agreement at any time with immediate effect (a) for legal, regulatory, fraud and abuse prevention, or security reasons; (b) to change existing features or add additional features to the Services (where this does not materially adversely affect your use of the Services); or (c) to restrict products or activities that we deem unsafe, inappropriate, or offensive. We will notify you about any change or modification in accordance with Section 18.

15.3 Your continued use of the Services after the effective date of any change to this Agreement in accordance with this Section 15 will constitute your acceptance of that change. If any change is unacceptable to you, you agree not to use the Services and to end the Agreement as described in Section 3.

16.     **Password Security.**

Any password we provide to you may be used only during the Term to access Seller Central (or other tools we provide, as applicable) to use the Services, electronically accept Your Transactions, and review your completed transactions. You are solely responsible for maintaining the security of your password. You may not disclose your password to any third party (other than third parties authorized by you to use your account in accordance with this Agreement) and are solely responsible for any use of or action taken under your password. If your password is compromised, you must immediately change your password.

17.     **Export.**

You will not directly or indirectly export, re-export, transmit, or cause to be exported, re-exported or transmitted, any commodities, software or technology to any country, individual, corporation, organization, or entity to which such export, re-export, or transmission is restricted or prohibited, including any country, individual, corporation, organization, or entity under sanctions or embargoes administered by the United Nations, US Departments of State, Treasury or Commerce, the European Union, or any other applicable government authority.

18.     **Miscellaneous.**

The Governing Laws will govern this Agreement, without reference to rules governing choice of laws or the Convention on Contracts for the International Sale of Goods. If the Elected Country is the United States, Canada, or Mexico, **Amazon and you both consent that any dispute with Amazon or its Affiliates or claim relating in any way to this Agreement or your use of the Services will be resolved by binding arbitration as described in this paragraph, rather than**

Case 1:23-cv-03054-ALC   Document 1-1   Filed 04/12/23   Page 70 of 129

**in court**, except that (i) you may assert claims in a small claims court that is a Governing Court if your claims qualify; (ii) you or we may bring suit in the Governing Courts, submitting to the jurisdiction of the Governing Courts and waiving our respective rights to any other jurisdiction, to enjoin infringement or other misuse of intellectual property rights; and (iii) we may bring any claims related to your sale of counterfeit products on the Amazon Site in the Governing Courts and seek any remedy available under law related to those claims. **There is no judge or jury in arbitration, and court review of an arbitration award is limited. However, an arbitrator can award on an individual basis the same damages and relief as a court (including injunctive and declaratory relief or statutory damages), and must follow the terms of this Agreement as a court would.** Before you may begin an arbitration proceeding, you must send a letter requesting arbitration and describing your claim to our registered agent, CSC 300 Deschutes Way SW, Suite 208 MC-CSC1, Tumwater, WA 98501. The arbitration will be conducted by the American Arbitration Association (AAA) under its commercial rules. Payment of all filing, administration and arbitrator fees will be governed by the AAA's rules. We will reimburse those fees for claims totaling less than $10,000 unless the arbitrator determines the claims are frivolous. The expedited procedures of the AAA's rules will apply only in cases seeking exclusively monetary relief under $50,000, and in such cases the hearing will be scheduled to take place within 90 days of the arbitrator's appointment. Likewise, Amazon will not seek attorneys' fees and costs from you in arbitration unless the arbitrator determines the claims are frivolous. You may choose to have the arbitration conducted by telephone, based on written submissions, or in person at a mutually agreed location. **Amazon and you each agree that any dispute resolution proceedings will be conducted only on an individual basis and not in a class, consolidated or representative action.** If for any reason a claim proceeds in court rather than in arbitration **Amazon and you each waive any right to a jury trial.**

You may not assign this Agreement, by operation of law or otherwise, without our prior written consent. Any attempt to assign or otherwise transfer in violation of this section is void; provided, however, that upon notice to Amazon, you may assign or transfer this Agreement, in whole or in part, to any of your Affiliates as long as you remain liable for your obligations that arose prior to the effective date of the assignment or transfer under this Agreement. You agree that we may assign or transfer our rights and obligations under this Agreement: (a) in connection with a merger, consolidation, acquisition or sale of all or substantially all of our assets or similar transaction; or (b) to any Affiliate or as part of a corporate reorganization; and effective upon such assignment, the assignee is deemed substituted for Amazon as the party to this Agreement. Subject to that restriction, this Agreement will be binding on, inure to, and be enforceable against the parties and their respective successors and assigns. We may perform any of our obligations or

Case 1:23-cv-03054-ALC    Document 1-1    Filed 04/12/23    Page 71 of 129

exercise any of our rights under this Agreement through one or more of our Affiliates. Amazon retains the right to immediately halt any of Your Transactions, prevent or restrict access to the Services or take any other action to restrict access to or availability of any inaccurate listing, any inappropriately categorized items, any unlawful items, or any items otherwise prohibited by applicable Program Policies. Because Amazon is not your agent (except for the limited purpose set out in the Transaction Processing Service Terms (if the Elected Country for a Service is the United States)), or the customer's agent for any purpose, Amazon will not act as either party's agent in connection with resolving any disputes between participants related to or arising out of any transaction.

Amazon will provide notice to you under this Agreement by posting changes to Seller Central or to the applicable Amazon Services site to which the changes relate (such as the Developer Site accessible through your account), by sending you an email notification, or by similar means. You must send all notices and other communications relating to Amazon to our Selling Partner Support team via Seller Central, email, the Contact Us form, or similar means. We may also communicate with you electronically and in other media, and you consent to such communications. You may change your e-mail addresses and certain other information in Seller Central, as applicable. You will ensure that all of your information is up to date and accurate at all times.

If any provision of this Agreement is deemed unlawful, void, or for any reason unenforceable, then that provision will be deemed severable from these terms and conditions and will not affect the validity and enforceability of any remaining provisions. If the Elected Country is Canada, then it is the express wish of the parties that this Agreement and the applicable Service Terms and Program Policies have been drafted in English. (The following is a French translation of the preceding sentence: Si le pays de service est le Canada, les parties conviennent que la présente autorisation et tous les termes et conditions applicables s'y rattachant soient rédigés en anglais.) We may make available translations to this Agreement and the applicable Service Terms and Program Policies, but the English version will control. This Agreement represents the entire agreement between the parties with respect to the Services and related subject matter and supersedes any previous or contemporaneous oral or written agreements and understandings.

**Definitions**

As used in this Agreement, the following terms have the following meanings:

**"Affiliate"** means, with respect to any entity, any other entity that directly or indirectly controls, is controlled by, or is under common control with that entity.

Case 1:23-cv-03054-ALC   Document 1-1   Filed 04/12/23   Page 72 of 129

**"Amazon Associated Properties"** means any website or other online point of presence, mobile application, service or feature, other than an Amazon Site, through which any Amazon Site, or products or services available on any of them, are syndicated, offered, merchandised, advertised, or described.

**"Amazon Contracting Party"** means the party outlined below.

- If the Elected Country is Canada:

| Service | Amazon Contracting Party |
|---------|--------------------------|
| Selling on Amazon | Amazon.com.ca, Inc. |
| Selling on Amazon (if your account is enabled to list Optional Coverage Plans) | Amazon.com.ca, Inc. |
| Fulfillment by Amazon | Amazon.com.ca, Inc. |
| Amazon Advertising | Amazon Advertising Canada, Inc. |

- If the Elected Country is Mexico:

| Service | Amazon Contracting Party |
|---------|--------------------------|
| Selling on Amazon | Servicios Comerciales Amazon México S. de R.L. de C.V. |
| Fulfillment by Amazon | Servicios Comerciales Amazon México S. de R.L. de C.V. |
| Amazon Advertising | Servicios Comerciales Amazon México S. de R.L. de C.V. |

- If the Elected Country is the United States:

| Service | Amazon Contracting Party |
|---------|--------------------------|
| Selling on Amazon | Amazon.com Services LLC |
| Selling on Amazon (if your account is enabled to list Optional Coverage Plans) | Amazon.com Services LLC |
| Fulfillment by Amazon | Amazon.com Services LLC |
| Amazon Advertising | Amazon.com Services LLC |
| Transaction Processing Services | Amazon Payments, Inc., Amazon |

|  | Capital Services, Inc., or Amazon.com Services LLC, according to the Transaction Processing Services Terms |
| --- | --- |

If you register for or use the Selling Partner API, the Amazon Contracting Party is the Contracting Party that provides the applicable Service you use in connection with the Selling Partner API.

**"Amazon Site"** means, as applicable, the CA Amazon Site, the MX Amazon Site, or the US Amazon Site.

**"CA Amazon Site"** means the website, the primary home page of which is identified by the url www.amazon.ca, and any successor or replacement of such website.

**"Confidential Information"** means information relating to us, to the Services, or Amazon customers that is not known to the general public including, but not limited to, any information identifying or unique to specific customers; reports, insights, and other information about the Services; data derived from the Services except for data (other than customer personal data) arising from the sale of your products comprising of products sold, prices, sales, volumes and time of the transaction; and technical or operational specifications relating to the Services. For the purposes of this Agreement, customer personal data constitutes Confidential Information at all times.

**"Content"** means copyrightable works under applicable Law and content protected by database rights under applicable Law.

**"Excluded Products"** means the items described on the applicable Restricted Products pages in Seller Central, any other applicable Program Policy, or any other information made available to you by Amazon.

**"Governing Courts"** means the applicable one of the following:

- the state or Federal court in King County, Washington (if the Elected Country is Canada, Mexico, or the United States),

**"Governing Laws"** means the applicable one of the following:

- the laws of the State of Washington, United States together with the Federal Arbitration Act and other applicable federal law (if the Elected Country is Canada, Mexico, or the United States),

**"Insurance Limits"** means the applicable one of the following:

**C-018**

- One Million Canadian Dollars ($1,000,000) (if the Elected Country is Canada),
- Ten Million Mexican Pesos ($10,000,000) (if the Elected Country is Mexico),
- One Million U.S. Dollars ($1,000,000) (if the Elected Country is the United States).

**"Insurance Threshold"** means the applicable one of the following:

- Ten Thousand Canadian Dollars ($10,000) (if the Elected Country is Canada),
- One Hundred Thousand Mexican Pesos ($100,000) (if the Elected Country is Mexico),
- Ten Thousand U.S. Dollars ($10,000) (if the Elected Country is the United States).

**"Intellectual Property Right"** means any patent, copyright, Trademark, domain name, moral right, trade secret right, or any other intellectual property right arising under any Laws and all ancillary and related rights, including all rights of registration and renewal and causes of action for violation, misappropriation or infringement of any of the foregoing.

**"Law"** means any law, ordinance, rule, regulation, order, license, permit, judgment, decision, or other requirement, now or in the future in effect, of any governmental authority (e.g., on a federal, state, or provincial level, as applicable) of competent jurisdiction.

**"Local Currency"** means the applicable one of the following:

- U.S. Dollars (if the Elected Country is the United States),
- Canadian Dollars (if the Elected Country is Canada),
- Mexican Pesos (if the Elected Country is Mexico),

**"MX Amazon Site"** means the website, the primary home page of which is identified by the url www.amazon.com.mx, and any successor or replacement of such website.

**"Optional Coverage Plans"** means warranties, extended service plans and related offerings, in each case as determined by us, that you offer.

**"Order Information"** means, with respect to any of Your Products ordered through an Amazon Site, the order information and shipping information that we provide or make available to you.

**"Person"** means any individual, corporation, partnership, limited liability company, governmental authority, association, joint venture, division, or other cognizable entity, whether or not having distinct legal existence.

**"Program Policies"** means all policies and program terms provided on the Program Policies page.

**"Sales Proceeds"** means the gross proceeds from any of Your Transactions, including (a) all shipping and handling, gift wrap and other charges; (b) taxes and customs duties to the extent

**C-019**

specified in the applicable Tax Policies; and (c) in the case of invoiced orders, any amounts that customers fail to pay to us or our Affiliates on or before the applicable invoice due date.

**"Seller Central"** means the online portal and tools made available by Amazon to you, for your use in managing your orders, inventory, and presence on a particular Amazon Site or any other online point of presence.

**"Service"** means each of the following services: Selling on Amazon, Fulfillment by Amazon, Amazon Advertising (including Amazon Sponsored Products), the Selling Partner APIs, and, if the Elected Country for a Service is the United States, the Transaction Processing Services, together in each case with any related services and materials we make available.

**"Service Terms"** means the service terms applicable to each Service, which are made part of this Agreement upon the date you elect to register for or use the applicable Service, and any subsequent modifications we make to those terms.

**"Technology"** means any: (a) ideas, procedures, processes, systems, methods of operation, concepts, principles, and discoveries protected or protectable under the Laws of any jurisdiction; (b) interfaces, protocols, glossaries, libraries, structured XML formats, specifications, grammars, data formats, or other similar materials; and (c) software, hardware, code, technology, or other functional item.

**"Trademark"** means any trademark, service mark, trade dress (including any proprietary "look and feel"), trade name, other proprietary logo or insignia, or any other source or business identifier, protected or protectable under any Laws.

**"US Amazon Site"** means that website, the primary home page of which is identified by the URL www.amazon.com, and any successor or replacement of such website.

**"Your Materials"** means all Technology, Your Trademarks, Content, Your Product information, data, materials, and other items or information provided or made available by you or your Affiliates to Amazon or its Affiliates.

**"Your Personnel"** means any third party warranting, administering or otherwise involved in the offer, sale, performance, or fulfillment of Your Products, including any of your employees, representatives, agents, contractors, or subcontractors.

**"Your Product"** means any product or service (including Optional Coverage Plans) that you: (a) have offered through the Selling on Amazon Service; (b) have made available for advertising

**C-020**

through the Amazon Advertising Service; or (c) have fulfilled or otherwise processed through the Fulfillment by Amazon Service.

**"Your Sales Channels"** means all sales channels and other means through which you or any of your Affiliates offers products or services, other than physical stores.

**"Your Taxes"** means any and all sales, goods and services, use, excise, premium, import, export, value added, consumption, and other taxes, regulatory fees, levies (specifically including environmental levies), or charges and duties assessed, incurred, or required to be collected or paid for any reason (a) in connection with any advertisement, offer or sale of products or services by you on or through or in connection with the Services; (b) in connection with any products or services provided for which Your Products are, directly or indirectly, involved as a form of payment or exchange; or (c) otherwise in connection with any action, inaction, or omission of you or your Affiliates, or any Persons providing products or services, or your or their respective employees, agents, contractors, or representatives, for which Your Products are, directly or indirectly, involved as a form of payment or exchange. Also, if the Elected Country is the United States, Mexico, or Canada as it is used in the Fulfillment by Amazon Service Terms, this defined term also means any of the types of taxes, duties, levies, or fees mentioned above that are imposed on or collectible by Amazon or any of its Affiliates in connection with or as a result of fulfillment services including the storage of inventory or packaging of Your Products and other materials owned by you and stored by Amazon, shipping, gift wrapping, or other actions by Amazon in relation to Your Products pursuant to the Fulfillment by Amazon Service Terms.

**"Your Trademarks"** means Trademarks of yours that you provide to us: (a) in non-text form for branding purposes; and (b) separate from (and not embedded or otherwise incorporated in) any product specific information or materials.

**"Your Transaction"** means any sale of Your Product(s) through an Amazon Site.

**Selling on Amazon Service Terms**

The Selling on Amazon Service (**"Selling on Amazon"**) is a Service that allows you to offer certain products and services directly on the Amazon Sites.

These Selling on Amazon Service Terms are part of the Agreement, but, unless specifically provided otherwise, concern and apply only to your participation in Selling on Amazon. BY REGISTERING FOR OR USING THE SELLING ON AMAZON SERVICE, YOU (ON BEHALF OF YOURSELF OR THE BUSINESS YOU REPRESENT) AGREE TO BE BOUND BY THE AGREEMENT, INCLUDING THESE SELLING ON AMAZON SERVICE

TERMS. **NOTWITHSTANDING THE PREVIOUS SENTENCE, IF YOU HAVE ENTERED INTO A SEPARATE AGREEMENT THAT PERMITS YOU TO OFFER YOUR PRODUCTS THROUGH A PARTICULAR AMAZON SITE (E.G., A MERCHANTS@ AMAZON.COM PROGRAM AGREEMENT, MERCHANTS @AMAZON.CO.JP PROGRAM AGREEMENT OR ANY PREDECESSOR OF THOSE AGREEMENTS), THEN TO THE EXTENT THAT YOU CONTINUE TO LIST AND SELL YOUR PRODUCTS ON THAT AMAZON SITE PURSUANT TO SUCH SEPARATE AGREEMENT, TRANSACTIONS OF YOUR PRODUCTS ON THAT AMAZON SITE AND ANY TAX SERVICES WE MAKE AVAILABLE UNDER THAT AGREEMENT ARE GOVERNED BY THE TERMS OF THAT AGREEMENT AND NOT BY THESE SELLING ON AMAZON SERVICE TERMS.**

**S-1 Your Product Listings and Orders.**

**S-1.1 Products and Product Information.** You will provide accurate and complete Required Product Information for each product or service that you offer through any Amazon Site and promptly update that information as necessary to ensure it at all times remains accurate and complete. You will also ensure that Your Materials, Your Products (including packaging) and your offer and subsequent sale of any of the same on any Amazon Site comply with all applicable Laws (including all minimum age, marking and labeling requirements) and do not contain any sexually explicit (except to the extent expressly permitted under our applicable Program Policies), defamatory or obscene materials. You may not provide any information for, or otherwise seek to offer any Excluded Products on any Amazon Sites; or provide any URL Marks for use, or request that any URL Marks be used, on any Amazon Site. If you offer a product for sale on an Amazon Site that requires a warning under California Health & Safety Code Section 25249.6 (a "Proposition 65 Warning") you (a) will provide us with such warning in the manner specified in our Program Policies, (b) agree that our display of a Proposition 65 Warning on a product detail page is confirmation of our receipt of that warning, and (c) will only revise or remove a Proposition 65 Warning for a product when the prior warning is no longer legally required.

**S-1.2 Product Listing; Merchandising; Order Processing.** We will enable you to list Your Products on a particular Amazon Site, and conduct merchandising and promote Your Products in accordance with the Agreement (including via the Amazon Associated Properties or any other functions, features, advertising, or programs on or in connection with the applicable Amazon Site). We may use mechanisms that rate, or allow shoppers to rate, Your Products and your performance as a seller and Amazon may make these ratings and feedback publicly available.

**C-022**

We will provide Order Information to you for each order of Your Products through the applicable Amazon Site. We will also receive all Sales Proceeds on your behalf for each of these transactions and will have exclusive rights to do so, and will remit them to you in accordance with these Selling on Amazon Service Terms. We may permit certain customers to place invoiced orders for Your Products, in which case remittance of Sales Proceeds may be delayed according to each customer's invoicing terms. You will accept and fulfill invoiced orders in the same manner as you accept and fulfill non-invoiced orders, except as otherwise provided in this Agreement.

**S-1.3 Shipping and Handling Charges.** For Your Products ordered by customers on or through an Amazon Site that are not fulfilled using Fulfillment by Amazon, you will determine the shipping and handling charges subject to our Program Policies and standard functionality (including any category-based shipping and handling charges we determine, such as for products offered by sellers on the Individual selling plan and BMVD Products generally). When we determine the shipping and handling charges, you will accept them as payment in full for your shipping and handling. Please refer to the Fulfillment by Amazon Service Terms for Your Products that are fulfilled using Fulfillment by Amazon.

**S-1.4 Credit Card Fraud and Unpaid Invoices.** We will bear the risk of (a) credit card fraud (i.e., a fraudulent purchase arising from the theft and unauthorized use of a third party's credit card information) occurring in connection with Your Transactions, and (b) late payments or defaults by customers in connection with invoiced orders for Your Products, except, in each case, in connection with Seller-Fulfilled Products that are not fulfilled strictly in accordance with the Order Information and Shipment Information. You will bear all other risk of fraud or loss.

**S-2 Sale and Fulfillment; Refunds and Returns.**

**S-2.1 Sale and Fulfillment.** Other than as described in the Fulfillment by Amazon Service Terms for each Amazon Site for which you decide to register or use the Selling on Amazon Service, you will: (a) source, offer, sell, and fulfill your Seller-Fulfilled Products, and source, offer, and sell your Amazon-Fulfilled Products, in each case in accordance with the terms of the applicable Order Information, this Agreement, and all terms provided by you or us and displayed on the applicable Amazon Site at the time of the order and be solely responsible for and bear all risk for those activities; (b) package each of Your Products in a commercially reasonable manner complying with all applicable packaging and labeling requirements, including any warnings or instructions necessary to safely use Your Products, and ship each of Your Products on or before its Expected Ship Date; (c) retrieve Order Information at least once each business day; (d) only

**C-023**

Case 1:23-cv-03054-ALC   Document 1-1   Filed 04/12/23   Page 79 of 129

cancel Your Transactions as permitted pursuant to your terms and conditions appearing on the applicable Amazon Site at the time of the applicable order or as may be required under this Agreement; (e) fulfill Your Products throughout the Elected Country (except to the extent prohibited by Law or this Agreement); (f) provide to Amazon information regarding fulfillment and order status and tracking (to the extent available), in each case as requested by us using the processes designated by us, and we may make any of this information publicly available; (g) comply with all Street Date instructions; (h) ensure that you are the seller of each of Your Products; (i) include an order-specific packing slip, and, if applicable, any tax invoices, within each shipment of Your Products; (j) identify yourself as the seller of each of Your Products on all packing slips or other information included or provided in connection with Your Products and as the Person to which a customer may return the applicable product; and (k) not send customers emails confirming orders or fulfillment of Your Products. If any of Your Products are fulfilled using Fulfillment by Amazon, the Fulfillment by Amazon Service Terms for the applicable Amazon Site will apply to the storage, fulfillment, and delivery of such Amazon-Fulfilled Products.

**S-2.2 Cancellations, Returns, and Refunds.** The Amazon Refund Policies for the applicable Amazon Site will apply to Your Products. Subject to <u>Section F-6</u>, for any of Your Products fulfilled using Fulfillment by Amazon, you will promptly accept, calculate, and process cancellations, returns, refunds, and adjustments in accordance with this Agreement and the Amazon Refund Policies for the applicable Amazon Site, using functionality we enable for your account. Without limiting your obligations, we may in our sole discretion accept, calculate, and process cancellations, returns, refunds, and adjustments for the benefit of customers. You will route any payments to customers in connection with Your Transactions through Amazon. We will make any payments to customers in the manner we determine, and you will reimburse us for all amounts we pay.

**S-3 Problems with Your Products.**

**S-3.1 Delivery Errors and Nonconformities; Recalls.** You are responsible for any non-performance, non-delivery, misdelivery, theft, or other mistake or act in connection with the fulfillment of Your Products, except to the extent caused by: (a) credit card fraud for which we are responsible under <u>Section S-1.4</u>; or (b) our failure to make available to you Order Information as it was received by us or resulting from address verification. Notwithstanding the previous sentence, for those of Your Products that are fulfilled using Fulfillment by Amazon, if any, the Fulfillment by Amazon Service Terms for the applicable Amazon Site will apply to non-delivery, misdelivery, theft, or other mistake or act in connection with the fulfillment of those of

Case 1:23-cv-03054-ALC   Document 1-1   Filed 04/12/23   Page 80 of 129

Your Products. You are also responsible for any non-conformity or defect in, any public or private recall of, or safety alert of any of Your Products or other products provided in connection with Your Products. You will notify us promptly as soon as you have knowledge of any public or private recalls, or safety alerts of Your Products or other products provided in connection with Your Products.

**S-3.2 A-to-z Guarantee and Chargebacks if the Elected Country is Canada or Mexico.** If we inform you that we have received or initiated a claim under the "A-to-z Guarantee" offered on a particular Amazon Site or other dispute relating to the offer, sale or fulfillment of Your Products (other than a chargeback), concerning one of Your Transactions, you will have 30 days to appeal our decision of the claim. If we find that a claim, chargeback, or dispute is your responsibility, you (a) will not take recourse against the customer, and (b) are responsible for reimbursing us in accordance with the Service Fee Payments section of this Agreement for the amount paid by the customer (including taxes and shipping and handling charges, but excluding any Referral Fees that we retained as defined in Section S-4), and all other fees and expenses associated with the original transaction (such as credit card, bank, payment processing, re-presentment, or penalty fees) and any related chargebacks or refunds, to the extent payable by us.

**S-3.3 A-to-z Guarantee, A-to-z Claims Process, and Chargebacks if the Elected Country is the United States.** Claims that we receive or initiate under the "A-to-z Guarantee" or the "A-to-z Claims Process for Property Damage and Personal Injury" will be governed by the Program Policy for such claims.

If we find that any claim, chargeback, or dispute is your responsibility, (i) you will not take recourse against the customer, and (ii) if Amazon resolves the claim directly with the customer and does not waive its right of indemnification, you will reimburse us in accordance with Section 2 of this Agreement to the extent of your responsibility (not to exceed the amount paid by Amazon to resolve the claim), including taxes and shipping and handling charges (but excluding any Referral Fees that we retained as defined in Section S-4), and all other fees and expenses associated with the original transaction (such as credit card, bank, payment processing, re-presentment, or penalty fees) and any related chargebacks or refunds.

**S-4 Compensation.**

You will pay us: (a) the applicable Referral Fees; (b) any applicable Variable Closing Fee; (c) the non-refundable Selling on Amazon Subscription Fee in advance each month; and (d) any other applicable fees described in this Agreement (including any applicable Program Policies). **"Selling on Amazon Subscription Fee"** means the fee specified as such on the

Selling on Amazon Fee Schedule for the applicable Amazon Site at the time such fee is payable. With respect to each of Your Transactions: (i) **"Sales Proceeds"** has the meaning set out in this Agreement; (ii) **"Variable Closing Fee"** means the applicable fee, if any, as specified on the Variable Closing Fee Schedule for the applicable Amazon Site; and (iii) **"Referral Fee"** means the applicable fee based on the Sales Proceeds from Your Transaction through the applicable Amazon Site specified on the Selling on Amazon Fee Schedule for that Amazon Site at the time of Your Transaction, based on the categorization by Amazon of the type of product that is the subject of Your Transaction; provided, however, that Sales Proceeds will not include any shipping charges set by us in the case of Your Transactions that consist solely of products fulfilled using Fulfillment by Amazon.

**S-5 Remittance of Sales Proceeds & Refunds.**

Except as otherwise stated in this Agreement, we will remit to you your available balance on a bi-weekly (14 day) (or at our option, more frequent) basis, which may vary for each Elected Country. For each remittance, your available balance is equal to any Sales Proceeds not previously remitted to you as of the applicable Remittance Calculation Date (which you will accept as payment in full for Your Transactions), less: (a) the Referral Fees; (b) the applicable Variable Closing Fee; (c) any Selling on Amazon Subscription Fees; (d) any other applicable fees described in this Agreement (including any applicable Program Policies); (e) any amounts we require you to maintain in your account balance pursuant to this Agreement (including payments withheld pursuant to Section 2 of the General Terms, Section S-1.4, Section S-3.2, Section S-3.3, and applicable Program Policies); and (f) any taxes that Amazon automatically calculates, collects and remits to a tax authority according to applicable law, as specified in the Tax Policies.

We may establish a reserve on your account based on our assessment of risks to Amazon or third parties posed by your actions or performance, and we may modify the amount of the reserve from time to time at our sole discretion.

When you either initially provide or later change Your Bank Account information, the Remittance Calculation Date may be deferred by up to 14 days. For sellers that registered after October 30, 2011 and are on the Individual selling plan, the remittance amount will not include Sales Proceeds from the 14-day period before the date of remittance. If you refund money to a customer in connection with one of Your Transactions, and the refund is routed through us (or our Affiliate), on the next available Remittance Calculation Date we will refund to you the amount of the Referral Fee paid by you to us attributable to the amount of the customer refund

**C-026**

(including refunded taxes and customs duties only to the extent specified in the applicable Tax Policies), less the Refund Administration Fee for each of Your Products refunded that is not a BMVD Product, which amount we may retain as an administrative fee; provided, however, that in the case of a complete refund of Sales Proceeds for a Media Product, we will refund to you the full amount of any Variable Closing Fee paid by you to us (and in the case of a partial refund of Sales Proceeds for a Media Product, we will not refund to you any portion of any Variable Closing Fee paid by you to us). We will remit any amounts to be refunded by us pursuant to this subsection from time to time together with the next remittance to be made by us to you. **"Refund Administration Fee"** means the applicable fee described on the Refund Administration Fee Schedule for the applicable Amazon Site.

Net Sales Proceeds from non-invoiced orders will be credited to your available balance when they are received by us or our Affiliates. Sales Proceeds from invoiced orders will be credited to your available balance: (a) if you have elected in advance to pay a fee to accelerate remittance of Sales Proceeds from invoiced orders, on the day all of Your Products included in an invoiced orders are shipped; or (b) otherwise, no later than the seventh day following the date that an invoiced order becomes due.

**S-6 Amazon's Websites and Services.**

Amazon has the right to determine, the design, content, functionality, availability and appropriateness of its websites, selection, and any product or listing in the Amazon Stores, and all aspects of each Service, including your use of the same. Amazon may assign any of these rights or delegate any of its responsibilities.

**S-7 Continuing Guarantees**

Guarantees. We require the following continuing guarantees from you.

S-7.1 Pesticides. If any of Your Products is a "pesticide" being offered or sold in the United States or other product regulated under the US Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") or its implementing regulations, then you provide to us the following continuing guaranty that: (a) you are a resident of the United States; and (b) with respect to each such product, the pesticides and other FIFRA regulated products comprising each sale, shipment, or other delivery made previously or hereafter are: (i) lawfully registered with the US Environmental Protection Agency at the time of sale, shipment, or delivery, or fully qualified for a specific exemption from the FIFRA registration requirements at the time of sale, shipment, or

delivery, (ii) compliant with all requirements of FIFRA and its implementing regulations at the time of sale, shipment, or delivery, and (iii) provided by you in the original, unbroken packaging.

S-7.2 Foods, Drugs, Medical Devices, and Cosmetics. If any of Your Products is a "food", "drug", "medical device", or "cosmetic" being offered or sold in the United States or other product regulated under the U.S. Federal Food, Drug, and Cosmetic Act ("FFDCA") or its implementing regulations, then you provide us with the following continuing guaranty that with respect to all such products comprising each sale, shipment, or other delivery made previously or hereafter are: (i) not adulterated or misbranded within the meaning of the FFDCA, (ii) compliant with all requirements of FFDCA and its implementing regulations at the time of sale, shipment, or delivery, and (iii) provided by you in the original, unbroken packaging.

**Selling on Amazon Definitions**

**"Amazon-Fulfilled Products"** means any of Your Products that are fulfilled using the Fulfillment by Amazon Service.

**"Amazon Refund Policies"** means the return and refund policies published on the applicable Amazon Site and applicable to products and services offered via that Amazon Site.

**"BMVD Product"** means any book, magazine or other publication, sound recording, video recording, and/or other media product in any format, including any subscription, in each case excluding any software product, computer game, and/or video game.

**"Excluded Offer"** means any discount, rebate, promotional offer, or other term of offer and/or sale that you: (a) have attempted to make available through a particular Amazon Site but that we do not honor or support (but only until such time as we honor or support the same on such Amazon Site); or (b) make available solely to third parties that either (i) purchase products solely for resale and who are not end users of such products (i.e., wholesale purchasers), or (ii) if the Elected Country is Canada, Mexico, or the United States, have affirmatively elected and opted-in to participate in your or one of your Affiliates' membership-based customer loyalty or customer incentive programs.

**"Expected Ship Date"** means, with respect to any of Your Products, either: (a) the end of the shipping availability period (which begins as of the date on which the relevant order is placed by the customer), or the shipping availability date, as applicable, specified by you in the relevant inventory/product data feed for Your Product; or (b) if you do not specify shipping availability information in such inventory/product data feed or that Your Product is in a product category

that Amazon designates as requiring shipment within two (2) business days, two (2) business days after the date on which the relevant order is placed by the customer.

**"Media Product"** means any book, magazine or other publication, sound recording, video recording, software product, computer game, videogame, or other media product in any format, including any related subscription, offered through an Amazon Site.

**"Purchase Price"** means the total amount payable or paid for Your Product (including taxes and shipping and handling charges only to the extent specified in the applicable Tax Policies).

**"Remittance Calculation Date"** is the date that is two (2) business days prior to the date of remittance (the **"Remittance Calculation Date"**).

**"Required Product Information"** means, with respect to each of Your Products in connection with a particular Amazon Site, the following (except to the extent expressly not required under the applicable Program Policies): (a) description, including as applicable, location-specific availability and options, scheduling guidelines and service cancellation policies; (b) SKU and UPC/EAN/JAN numbers, and other identifying information as Amazon may reasonably request; (c) information regarding in-stock status and availability, shipping limitations or requirements, and Shipment Information (in each case, in accordance with any categorizations prescribed by Amazon from time to time); (d) categorization within each Amazon product category and browse structure as prescribed by Amazon from time to time; (e) digitized image that accurately depicts only Your Product, complies with all Amazon image guidelines, and does not include any additional logos, text or other markings; (f) Purchase Price; (g) shipping and handling charge (in accordance with our standard functionality); (h) any text, disclaimers, warnings, notices, labels, warranties, or other content required by applicable Law to be displayed, or that are necessary for the safe use of Your Product, in connection with the offer, merchandising, advertising, or sale of Your Product; (i) any vendor requirements, restocking fees or other terms and conditions applicable to such product that a customer should be aware of prior to purchasing the product; (j) brand; (k) model; (l) product dimensions; (m) weight; (n) a delimited list of technical specifications; (o) SKU and UPC/EAN/JAN numbers (and other identifying information as we may reasonably request) for accessories related to Your Product that is available in our catalog; (p) the state or country Your Product ships from; and (q) any other information reasonably requested by us (e.g., the condition of used or refurbished products; and invoices and other documentation demonstrating the safety and authenticity of Your Products).

**"Seller-Fulfilled Products"** means any of Your Products that are not fulfilled using the Fulfillment by Amazon Service.

C-029

Case 1:23-cv-03054-ALC   Document 1-1   Filed 04/12/23   Page 85 of 129

**"Shipment Information"** means, with respect to any of Your Products, the estimated or promised shipment and delivery date.

**"Street Date"** means the date(s), if any, specified by the manufacturer, distributor, and/or licensor of a product as the date before which specified information regarding such product (e.g., title of a book) should not be disclosed publicly, or such product should not be delivered or otherwise made available to customers.

**"URL Marks"** means any Trademark, or any other logo, name, phrase, identifier, or character string, that contains or incorporates any top level domain (e.g., .com, .edu, .ca, .fr, .jp) or any variation of a top level domain (e.g., dot com, dotcom, net, or com).

**"Your Transaction"** is defined in the General Terms of this Agreement; however, as used in these Selling on Amazon Service Terms, it means any and all such transactions through Selling on Amazon only.

### Fulfillment by Amazon Service Terms

Fulfillment by Amazon (**"FBA"**) provides fulfillment and associated services for Your Products.

These FBA Service Terms are part of the Agreement, and, unless specifically provided otherwise, concern and apply only to your participation in FBA. BY REGISTERING FOR OR USING FBA, YOU (ON BEHALF OF YOURSELF OR THE BUSINESS YOU REPRESENT) AGREE TO BE BOUND BY THE AGREEMENT, INCLUDING THESE FBA SERVICE TERMS. You expressly agree that Amazon may engage its Affiliate(s) or a third party in order to complete one or more of the fulfillment and associated services outlined below.

### Fulfillment Services

### F-1 Your Products

Once you are accepted into FBA, you must apply to register each product you offer that you wish to include in the FBA program. We may refuse registration in FBA of any product, including on the basis that it is an FBA Excluded Product or that it violates applicable Program Policies. You may at any time withdraw registration of any of Your Products from FBA.

### F-2 Product and Shipping Information

You will, in accordance with applicable Program Policies, provide accurate and complete information about Your Products registered in FBA, and will provide Fulfillment Requests for

any Units fulfilled using FBA that are not sold through an Amazon Site (**"Multi-Channel Fulfillment Units"**). You will promptly update any information about Your Products in accordance with our requirements and as necessary so that the information is at all times accurate and complete.

**F-3 Shipping to Amazon**

**F-3.1** Except as otherwise provided in Section F-3.4 and Section F-5, FBA is limited to Units that are shipped to and from fulfillment centers located within the applicable Elected Country, to be delivered to customers in the same Elected Country only. You will ship Units to us in accordance with applicable Program Policies. You will be responsible for all costs incurred to ship the Units to the shipping destination (including costs of freight and transit insurance) and Amazon will not pay any shipping costs. You are responsible for payment of all customs, duties, taxes, and other charges. In the case of any improperly packaged or labeled Unit, we may return the Unit to you at your expense (pursuant to Section F-7) or re-package or re-label the Unit and charge you an administrative fee.

**F-3.2** You will not deliver to us any Unsuitable Unit; we may reject any shipment of Your Products.

**F-3.3** We may, at our option, allow you to ship Units at your expense (as described in Section F-9.2) to fulfillment centers using discounted shipping rates that we may make available to you for certain carriers. In such event, you will use the processes and supply the information that we require for you to obtain such discounted rates. You also must comply with standard operating procedures, weight and size restrictions, and other shipping requirements of the applicable carriers. If we provide you with the estimated shipping costs prior to shipment, you acknowledge and agree that actual shipping costs may vary from such estimates. In addition, if the weight of the Unit, as determined by the applicable carrier, differs from that submitted by you to us for purposes of determining the estimated shipping costs, then: (a) you may be charged more than the estimated shipping costs if the carrier determines that such Unit weighs more than as submitted by you; or (b) you may be charged the full amount of the estimated shipping costs even if the carrier determines the weight to be less than that submitted by you. You will not use carrier account information (e.g., carrier account number, amount of shipping rates, etc.) for any purpose, nor disclose such information to any third party, and you will protect such information as Amazon's confidential information in accordance with Section 11 of the General Terms of this Agreement. As between you, us, and the applicable carrier, you will be the shipper of record, and we will make payment to the carrier with respect to the shipment of all Units using such

discounted rates. Title and risk of loss for any Unit shipped using discounted rates provided by us under this Section will remain with you, and our provision of such shipping rates will not create any liability or responsibility for us with respect to any delay, damage, or loss incurred during shipment. You authorize the applicable carrier to provide us with all shipment tracking information.

**F-3.4** If you ship Units from outside the applicable Elected Country to fulfillment centers, you will list yourself as the importer/consignee and nominate a customs broker. If Amazon is listed on any import documentation, Amazon reserves the right to refuse to accept the Units covered by the import documents and any costs assessed against or incurred by Amazon will be collected from Your Bank Account, deducted from amounts payable to you, or by other method at our election.

**F-4 Storage**

We will provide storage services as described in these FBA Service Terms once we confirm receipt of delivery. We will keep electronic records that track inventory of Units by identifying the number of Units stored in any fulfillment center. We will not be required to physically mark or segregate Units from other inventory units (e.g., products with the same Amazon standard identification number) owned by us, our Affiliates or third parties in the applicable fulfillment center(s). If we elect to commingle Units with such other inventory units, both parties agree that our records will be sufficient to identify which products are Units. We may move Units among facilities. If there is a loss of or damage to any Units while they are being stored, we will, compensate you in accordance with the FBA Guidelines, and you will, at our request, provide us a valid tax invoice for the compensation paid to you. If we compensate you for a Unit, we will be entitled to dispose of the Unit pursuant to Section F-7. At all other times, you will be solely responsible for any loss of, or damage to, any Units. Our confirmed receipt of delivery does not: (a) indicate or imply that any Unit has been delivered free of loss or damage, or that any loss or damage to any Unit later discovered occurred after confirmed receipt of delivery; (b) indicate or imply that we actually received the number of Units of Your Product(s) specified by you for such shipment; or (c) waive, limit, or reduce any of our rights under this Agreement. We reserve the right to change scheduling restrictions and volume limitations on the delivery and storage of your inventory in fulfillment centers in accordance with Section 15 of the General Terms, and you will comply with any of these restrictions or limitations.

**F-5 Fulfillment**

C-032

As part of our fulfillment services, we will ship Units from our inventory of Your Products to the shipping addresses in the Elected Country included in valid customer orders, or submitted by you as part of a Fulfillment Request. We may ship Units together with products purchased from other merchants, including any of our Affiliates. We also may ship Units separately that are included in a single Fulfillment Request. If you participate in our export fulfillment services, we will also ship Your Products that we determine to be eligible (each, a **"Foreign-Eligible Product"**) to Foreign Addresses within countries we determine to be eligible for foreign shipments, subject to the additional terms on foreign shipments in the applicable FBA Guidelines.

**F-6 Customer Returns**

**F-6.1** You will be responsible for and will accept and process returns of, and provide refunds and adjustments for, any Multi-Channel Fulfillment Units in accordance with the Agreement (including the applicable Program Policies).

**F-6.2** We will receive and process returns of any Amazon Fulfillment Units that were shipped to addresses within the Elected Country in accordance with the terms of your Seller Agreement, these FBA Service Terms, and the Program Policies. Any Sellable Units that are also Amazon Fulfillment Units and that are properly returned will be placed back into the inventory of Your Products in the FBA Program. We may fulfill customer orders for Your Products with any returned Amazon Fulfillment Units. Except as provided in Section F-7, you will retake title of all Units that are returned by customers.

**F-6.3** Subject to Section F-7, we will, at your direction, either return or dispose of any Unit that is returned to us by a customer and that we determine is an Unsuitable Unit.

**F-6.4** If Amazon receives a customer return of a Multi-Channel Fulfillment Unit, you will direct us to return or dispose of the Unit at your own cost failing which we may dispose of the Unit as provided in Section F-7.

**F-7 Returns to You and Disposal**

**F-7.1** You may, at any time, request that Units be returned to you or that we dispose of Units.

**F-7.2** We may with notice return Units to you, including upon termination of these FBA Service Terms. Returned Units will be sent to your designated shipping address. However, if (a) the designated shipping address we have for you is outdated or incorrect, (b) you have not provided or, upon our request, confirmed a designated shipping address in the Elected Country, or (c) we cannot make arrangements for you to pay for the return shipment, then the Unit(s) will be

**C-033**

Case 1:23-cv-03054-ALC   Document 1-1   Filed 04/12/23   Page 89 of 129

deemed abandoned and we may elect to dispose of them as appropriate based on the inventory (e.g., by selling, recycling, donating, or destroying it) and retain any proceeds we may receive from the disposal.

We may dispose of any Unsuitable Unit (and you will be deemed to have consented to our action): (d) immediately if we determine that (i) the Unit creates a safety, health, or liability risk to Amazon, our personnel, or any third party; (ii) you have engaged in fraudulent or illegal activity; or (iii) we have cause to terminate your use of Services with immediate effect pursuant to Section 3 and are exposed to liability towards a third party; (e) if you fail to direct us to return or dispose of any Unsuitable Unit within thirty (30) days after we notify you that the Unit has been recalled; or (f) if you fail to direct us to return or dispose of any Unsuitable Unit within thirty (30) days (or as otherwise specified in the applicable Program Policies) after we notify you that its removal is required, for instance because your use of FBA is suspended or terminated or your seller account is suspended, terminated or closed. In addition, you will reimburse us for expenses we incur in connection with any Unsuitable Units.

We may dispose of any Unit we are entitled to dispose of (including any Unsuitable Units) in the manner we deem appropriate (e.g., by selling, recycling, donating, or destroying it) and retain any proceeds we may receive from the disposal.

**F-7.3** You may, at any time, request that we dispose of Units. In this case, we may dispose of these Units as appropriate based on the inventory (e.g., by selling, recycling, donating, or destroying it) and retain any proceeds we may receive from the disposal. Title to each disposed Unit will transfer to us (or a third party we select such as a charity) at no cost, free and clear of any liens, claims, security interests or other encumbrances to the extent required to dispose of the Unit, and we may retain any proceeds, we may receive from the disposal.

**F-7.4** You will promptly notify us of any recalls or potential recalls, or safety alerts of any of Your Products and cooperate and assist us in connection with any recalls or safety alerts, including by initiating the procedures for returning items to you under our standard processes. You will be responsible for all costs and expenses you, we or any of our or your Affiliates incur in connection with any recall or potential recall or safety alerts of any of Your Products (including the costs to return, store, repair, liquidate, or deliver to you or any vendor any of these products).

**F-8 Customer Service**

**F-8.1** For Multi-Channel Fulfillment Units we will have no customer service obligations other than to pass any inquiries to your attention at the contact you provide, and to make available a reasonable amount of information regarding the status of the fulfillment of Your Products if you request it and if and to the extent we possess the requested information. You will ensure that all of your policies and messaging to your customers regarding shipping of Your Products and other fulfillment-related matters, reflect our policies and requirements, including with regard to shipping methods, returns, and customer service; and, you will conspicuously display on your website(s), in emails or in other media or communications any specific disclosures, messaging, notices, and policies we require.

**F-8.2** We will be responsible for all customer service issues relating to packaging, handling and shipment, and customer returns, refunds, and adjustments related to Amazon Fulfillment Units. We will determine whether a customer will receive a refund, adjustment or replacement for any Amazon Fulfillment Unit and we will require you to reimburse us where we determine you have responsibility in accordance with the Agreement (including these FBA Service Terms and the Program Policies). We will promptly notify you when you are responsible for a customer refund. You may appeal if you disagree with our finding within thirty (30) days after our notification, in addition to your right to request that Units be returned to you under Section F-7.1. Except as provided in this Section F-8 regarding any Amazon Fulfillment Units, customer service will be handled in accordance with your Seller Agreement.

**F-8.3** In situations relating to Amazon Fulfillment Units where the wrong item was delivered or the item was damaged or lost or is missing, unless we determine that the basis for such request is caused by you or any of your employees, agents, or contractors, we will, at our option: (a) for any Amazon Fulfillment Unit, (i) ship a replacement Unit to the customer and reimburse you in accordance with the FBA Guidelines for the replacement Unit, or (ii) process a refund to the customer and reimburse you in accordance with the FBA Guidelines for the Unit; or (b) for any Multi-Channel Fulfillment Unit, reimburse you in accordance with the FBA Guidelines for the Unit (and you will, at our request, provide us a valid tax invoice for the compensation paid to you). Any customer refund will be processed in accordance with the Selling on Amazon and the Transaction Processing Service Terms (if the Elected Country for a Service is the United States). Notwithstanding the Selling on Amazon Service Terms, we will be entitled to retain the applicable fees payable to us under the Selling on Amazon Service Terms and these FBA Service Terms, respectively. Except as expressly provided in this Section F-8.3, you will be responsible for all costs associated with any replacement or return.

**F-8.4** If we provide a replacement Unit or refund as described in <u>Section F-8.3</u> to a customer and that customer returns the original Unit to us, we will be entitled to dispose of the Unit pursuant to <u>Section F-7</u>, or, if it is a Sellable Unit, we may, at our option, place such Unit back into your inventory in accordance with <u>Section F-6</u>. If we do put a Unit back into your inventory, you will reimburse us for the applicable Replacement Value (as described in the FBA Guidelines) of the returned Unit. Any replacement Unit shipped by us under these FBA Service Terms will be deemed to be, and will be treated in the same manner as, an order and sale of such Unit from you to the customer via the applicable Amazon Site or Service in accordance with, and subject to, the terms and conditions of this Agreement and your Seller Agreement.

**F-9 Compensation for Fulfillment Services**

**F-9.1 Handling and Storage Fees.** You will pay us the applicable fees described in the applicable Fulfillment by Amazon Fee Schedule. You will be charged the Storage Fees beginning on the day (up to midnight) that the Unit arrives at a fulfillment center and is available for fulfillment by Amazon (or in the case of any Unsuitable Unit, the arrival day (up to midnight)), until the earlier of: (a) the day (up to midnight) we receive a valid customer order for such product or a request from you to return or dispose of the Unit; or (b) the day (up to midnight) we actually ship the Unit to your designated return location or dispose of the Unit.

**F-9.2 Shipping and Gift Wrap.** For any Amazon Fulfillment Units we will determine the amounts charged to the customer for shipping and gift wrap services for the Units that we fulfill through the FBA Program. As between you and us, these charges will be your charges to the customer, and we will report them to you. We will charge you (and you will pay us) a fee equal to the amount of such charges to the customer. In the case of shipments of Units sold through the Amazon Site that qualify for the "Free Shipping" promotion, the amounts charged to the customer for shipping the Selling on Amazon Units that Amazon fulfills will first be charged to the customer and will next be deducted from the total charges to the customer as your promotion and Amazon will not charge you the fee described above. If you ship Units to us using the shipping rates that we may make available pursuant to <u>Section F-3.3</u>, you will reimburse us for the actual amounts charged to us by the applicable carrier for such shipments.

**F-9.3 Proceeds.** We may as appropriate keep part of or all proceeds of any Units that we are entitled to dispose of pursuant to F-7 above, or to which title transfers, including returned, damaged, or abandoned Units. You will have no security interest, lien, or other claim to the proceeds that we receive in connection with the sale, fulfillment, and/or shipment of these Units.

**F-10 Indemnity**

In addition to your obligations under Section 6 of the General Terms of this Agreement, you also agree to indemnify, defend, and hold harmless us, our Affiliates, and our and their respective officers, directors, employees, representatives, and agents against any Claim that arises from or relates to: (a) the Units (whether or not title has transferred to us, and including any Unit that we identify as yours pursuant to Section F-4), including any personal injury, death, or property damage; (b) any of Your Taxes or the collection, payment, or failure to collect or pay Your Taxes; and, if applicable (c) any sales, use, value added, personal property, gross receipts, excise, franchise, business, or other taxes or fees, or any customs, duties, or similar assessments (including penalties, fines, or interest on any of the foregoing) imposed by any government or other taxing authority in connection with the shipment of Foreign-Eligible Products to Foreign Addresses (collectively, **"Foreign Shipment Taxes"**).

**F-11 Release**

You, on behalf of yourself and any successors, subsidiaries, Affiliates, officers, directors, shareholders, employees, assigns, and any other person or entity claiming by, through, under, or in concert with them (collectively, the **"Releasing Parties"**), irrevocably acknowledge full and complete satisfaction of and unconditionally and irrevocably release and forever fully discharge Amazon and each of our Affiliates, and any and all of our and their predecessors, successors, and Affiliates, past and present, as well as each of our and their partners, officers, directors, shareholders, agents, employees, representatives, attorneys, and assigns, past and present, and each of them and all Persons acting by, through, under, or in concert with any of them (collectively, the **"Released Parties"**), from any and all claims, obligations, demands, causes of action, suits, damages, losses, debts, or rights of any kind or nature, whether known or unknown, suspected or unsuspected, absolute or contingent, accrued or unaccrued, determined or speculative (collectively, **"Losses"**) which the Releasing Parties now own or hold or at any time have owned or held or in the future may hold or own against the Released Parties, or any of them, arising out of, resulting from, or in any way related to the shipment, export, or delivery of Your Products to Foreign Addresses, including any tax registration or collection obligations. You, on behalf of yourself and all other Releasing Parties, recognize that you, and each of them, may have some Losses, whether in tort, product liability, contract, warranty, or otherwise, against the Released Parties of which you, or any of them, are totally unaware and unsuspecting, or which may arise or accrue after the date you register for or use FBA, which the Releasing Parties are giving up by agreeing to these FBA Service Terms. It is your intention in agreeing to these FBA Service Terms that these FBA Service Terms will deprive the Releasing Parties of each and all such Losses and prevent the Releasing Party from asserting any such Losses against the Released

Parties, or any of them. In addition to the foregoing, you acknowledge, on behalf of yourself and all other Releasing Parties that you are familiar with Section 1542 of the Civil Code of the State of California, as follows:

**"A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."**

You, on behalf of yourself and all other Releasing Parties, expressly waive and relinquish any rights that you had or may have under Section 1542 of the Civil Code of the State of California or any similar provision of the law of any other jurisdiction, to the full extent that you may lawfully waive all such rights pertaining to the subject matter of these FBA Service Terms.

**F-12 Disclaimer**

IN ADDITION TO THE DISCLAIMER IN SECTION 7 OF THE GENERAL TERMS OF THIS AGREEMENT, WE DISCLAIM ANY DUTIES OF A BAILEE OR WAREHOUSEMAN, AND YOU WAIVE ALL RIGHTS AND REMEDIES OF A BAILOR (WHETHER ARISING UNDER COMMON LAW OR STATUTE OR OTHERWISE), RELATED TO OR ARISING OUT OF ANY POSSESSION, STORAGE, OR SHIPMENT OF YOUR PRODUCTS BY US OR OUR AFFILIATES OR ANY OF OUR OR THEIR CONTRACTORS OR AGENTS.

**F-13 Effect of Termination**

Your termination rights are set forth in Section 3 of this Agreement. Following any termination of the Agreement or these FBA Service Terms in connection with a particular Elected Country, we will, as directed by you, return to you or dispose of the Units held in that Elected Country as provided in Section F-7. If you fail to direct us to return or dispose of the Units within thirty (30) days (or as otherwise specified in the applicable Program Policies) after termination, then we may elect to return and/or dispose of the Units in whole or in part, as provided in Section F-7, and you agree to such actions. Upon any termination of these FBA Service Terms in connection with a particular Elected Country, all rights and obligations of the parties under these FBA Service Terms in connection with such Elected Country will be extinguished, except that the rights and obligations of the parties under Sections F-1, F-2, F-3, F-4, F-5, F-6, F-7, F-8, F-9, F-11, F-12, and F-13 with respect to Units received or stored by Amazon as of the date of termination will survive the termination.

**F-14 Tax Matters**

C-038

You understand and acknowledge that storing Units at fulfillment centers may create tax nexus for you in any country, state, province, or other localities in which your Units are stored, and you will be solely responsible for any taxes owed as a result of such storage. If any Foreign Shipment Taxes or Your Taxes are assessed against us as a result of performing services for you in connection with the FBA Program or otherwise pursuant to these FBA Service Terms, you will be responsible for such Foreign Shipment Taxes and Your Taxes and you will indemnify and hold Amazon harmless from such Foreign Shipment Taxes and Your Taxes as provided in Section F-10 of these FBA Service Terms.

**F-15 Additional Representation**

In addition to your representations and warranties in Section 5 of the General Terms of this Agreement, you represent and warrant to us that: (a) you have valid legal title to all Units and all necessary rights to distribute the Units and to perform under these FBA Service Terms; (b) you will deliver all Units to us in new condition (or in such condition otherwise described by you in the applicable Your Product listing) and in a merchantable condition; (c) all Units and their packaging will comply with all applicable marking, labeling, and other requirements required by Law; (d) no Unit is or will be produced or manufactured, in whole or in part, by child labor or by convict or forced labor; (e) you and all of your subcontractors, agents, and suppliers involved in producing or delivering Units will strictly adhere to all applicable Laws of the Elected Country, its territories, and all other countries where Units are produced or delivered, regarding the operation of their facilities and their business and labor practices, including working conditions, wages, hours, and minimum ages of workers; and (f) that all Foreign-Eligible Products (i) can be lawfully exported from Canada, Mexico, or the United States, as applicable, without any license or other authorization; and (ii) can be lawfully imported into, and comply with all applicable Laws of, any eligible country.

**FBA Definitions**

**"Amazon Fulfillment Units"** means Units fulfilled using FBA that are sold through an Amazon Site. For avoidance of doubt, if you have successfully registered for or used both the FBA and Selling on Amazon Services, then the term "Amazon Fulfillment Units" and the defined term "Amazon Fulfilled Products" in the Selling on Amazon Service Terms both refer to the same items.

**"FBA Excluded Product"** means any Unit that is an Excluded Product or is otherwise prohibited by the applicable Program Policies.

**"Foreign Address"** means (a) if the Elected Country is the United States, any mailing address that is not (i) within the fifty states of the United States or Puerto Rico, or (ii) an APO/FPO address; and (b) if the Elected Country is not the United States, any mailing address that is not within the Elected Country.

**"Fulfillment Request"** means a request that you submit to us (in accordance with the standard methods for submission prescribed by us) to fulfill one or more Multi-Channel Fulfillment Units.

**"Multi-Channel Fulfillment Units"** has the meaning in <u>Section F-2</u>.

**"Sellable Unit"** means a Unit that is not an Unsuitable Unit.

**"Seller Agreement"** means the Selling on Amazon Service Terms, the Merchants@ Program Agreement, the Marketplace Participation Agreement, any successor to any of these agreements, or any other similar agreement (as determined by Amazon) between you and us that permits you to offer products and services via a particular Amazon Site.

**"Shipping Information"** means with respect to any purchased Unit(s), the following information: the name of the recipient, the shipping address, the quantity of Units to be shipped, and any other shipping-related information we may reasonably request.

**"Unit"** means a unit of Your Product that you deliver to Amazon in connection with the FBA Program.

**"Unsuitable Unit"** means a Unit: (a) that is defective, damaged, unfit for a particular purpose, or lacking required label(s); (b) the labels for which were not properly registered with Amazon before shipment or do not match the product that was registered; (c) that is an FBA Excluded Product or does not comply with the Agreement (including applicable Service Terms and Program Policies); (d) that Amazon determines is unsellable or unfulfillable; or (e) that Amazon determines is otherwise unsuitable.

**Amazon Advertising Service Terms**

The Amazon Advertising Service Terms govern your use of Amazon Advertising, a Service that allows you to advertise your products. The Amazon Advertising Service Terms apply to your use of the Ad Services.

Your use of the Ad Services (as defined in the Amazon Advertising Agreement) is governed by the Amazon Advertising Agreement. You accept the Amazon Advertising Agreement, which may be updated from time to time by Amazon in accordance with its terms. The Amazon

Case 1:23-cv-03054-ALC    Document 1-1    Filed 04/12/23    Page 96 of 129

Advertising Agreement is available at https://advertising.amazon.com/terms. In the event of any conflict between the General Terms or Program Policies and the Amazon Advertising Agreement with respect to the Ad Services, the Amazon Advertising Agreement will prevail to the extent of the conflict. If the Amazon Advertising Agreement is deemed unlawful, void, or for any reason unenforceable, then the General Terms will govern your access to and use of the Ad Services.

**Transaction Processing Service Terms**

BY REGISTERING FOR OR USING ANY SERVICE OTHER THAN AMAZON ADVERTISING FOR WHICH THE ELECTED COUNTRY IS THE UNITED STATES, YOU (ON BEHALF OF YOURSELF OR THE BUSINESS YOU REPRESENT) AGREE TO BE BOUND BY THESE TRANSACTION PROCESSING SERVICE TERMS FOR THAT SERVICE. **NOTWITHSTANDING THE FOREGOING, IF A SEPARATE AGREEMENT GOVERNS THE OFFER, SALE OR FULFILLMENT OF YOUR PRODUCTS ON THE US AMAZON SITE, THE TERMS OF THAT AGREEMENT WILL CONTINUE TO GOVERN THE PROCESSING OF YOUR TRANSACTIONS TO THE EXTENT DESCRIBED IN THAT AGREEMENT.**

**P-1 Payments Processing Agency Appointment**

For non-invoiced orders, you authorize Amazon Payments, Inc. to act as your agent for purposes of processing payments, refunds and adjustments for Your Transactions, receiving and holding Sales Proceeds on your behalf, remitting Sales Proceeds to Your Bank Account, charging your Credit Card, and paying Amazon and its Affiliates amounts you owe in accordance with this Agreement or other agreements you may have with Amazon Affiliates. For invoiced orders, you authorize: (a) Amazon Capital Services, Inc. to act as your agent for purposes of processing payments, refunds and adjustments for Your Transactions, and receiving and holding Sales Proceeds on your behalf; and (b) Amazon.com Services LLC to act as your agent for purposes of remitting Sales Proceeds to Your Bank Account, charging your Credit Card, and paying Amazon and its Affiliates amounts you owe in accordance with this Agreement or other agreements you may have with Amazon Affiliates. Amazon Payments, Inc., Amazon Capital Services, Inc., and Amazon.com Services LLC are each an **"Amazon Payments Agent"**. The applicable Amazon Payments Agents provide the services described in these Transaction Processing Service Terms and the related services described in Sections S-1.4, S-2.2, S-5, and F-8.3 of the Agreement (collectively, the **"Transaction Processing Services"**).

When a buyer instructs us to pay you, you agree that the buyer authorizes and orders us to commit the buyer's payment (less any applicable fees or other amounts we may collect under this

Agreement) to you. You agree that buyers satisfy their obligations to you for Your Transactions when we receive the Sales Proceeds. We will remit funds to you in accordance with this Agreement.

## P-2 Remittance

Subject to Section 2 of the General Terms of this Agreement, the applicable Amazon Payments Agents will remit funds to you in accordance with Section S-5 of the Agreement and these Transaction Processing Service Terms. Each applicable Amazon Payments Agent's obligation to remit funds collected or received by it or otherwise credited to your available balance in connection with Your Transactions is limited to funds in your available balance that have become available in accordance with this Agreement less amounts owed to Amazon and any taxes that Amazon automatically calculates, collects and remits to a tax authority according to applicable law, as specified in the Tax Policies, subject to chargeback or reversal or withheld for anticipated claims in accordance with this Agreement. Without limiting Amazon's rights to collect any amounts you owe, the applicable Amazon Payments Agent's receipt of Sales Proceeds or crediting of Sales Proceeds to your available balance discharges your obligation to pay applicable fees and other amounts under this Agreement to the extent the Sales Proceeds received or credited equal or exceed the fees and other amounts you owe and the Sales Proceeds are applied to the payment of those fees and amounts.

## P-3 Your Funds

Your Sales Proceeds will be held in an account with the applicable Amazon Payments Agent (a **"Seller Account"**) and will represent an unsecured claim against that Amazon Payments Agent. Your Sales Proceeds are not insured by the Federal Deposit Insurance Corporation, nor do you have any right or entitlement to collect Sales Proceeds directly from any customer. Prior to disbursing funds to you, an Amazon Payments Agent may combine Sales Proceeds held with the funds of other users of the Services, invest them, or use them for other purposes permitted by applicable Laws. You will not receive interest or any other earnings on any Sale Proceeds. To the extent required by applicable Laws, an Amazon Payments Agent will not use any funds held on your behalf for its corporate purposes, will not voluntarily make such funds available to its creditors in the event of bankruptcy or for any other purpose, and will not knowingly permit its creditors to attach such funds.

## P-4 Verification

We may at any time require you to provide any financial, business or personal information we request to verify your identity. You authorize us to obtain from time to time consumer credit reports to establish or update your Seller Account or in the event of a dispute relating to this Agreement or the activity under your Seller Account. You agree to update all Seller Account information promptly upon any change. The Amazon Payments Privacy Notice applies to transactions processed by Amazon Payments, Inc.

**P-5 Dormant Accounts**

If there is no activity (as determined by us) in connection with your Seller Account for the period of time set forth in applicable unclaimed property laws and we hold Sales Proceeds on your behalf, we will notify you by means designated by us and provide you the option of keeping your Seller Account open and maintaining the Sales Proceeds in your Seller Account. If you do not respond to our notice(s) within the time period we specify, we will send the Sales Proceeds in your Seller Account to your state of residency, as determined by us based on the information in your Seller Account. If we are unable to determine your state of residency or your Seller Account is associated with a foreign country, your funds may be sent to the State of Delaware.

**Selling Partner API Terms**

**API-1 Description of the Selling Partner APIs**

The "Selling Partner APIs" enable your systems to interface with certain features or functionality we make available to you. These Selling Partner API Terms concern and apply only to your use of the Selling Partner APIs unless specifically provided otherwise. Under the Selling Partner API Terms, you may authorize parties who (a) develop Applications to support you using the Selling Partner APIs or the API Materials, (b) have registered with us as Developers, and (c) who have agreed to the Marketplace Developer Agreement ("Developers") to access Confidential Information and Your Materials via the Selling Partner APIs provided, in each case, that where Confidential Information is disclosed to Developers, you shall remain liable for the acts or omissions of such Developers as if such acts or omissions were your own. If you wish to use the Selling Partner APIs directly or develop software or a website that interfaces with the Selling Partner APIs or the API Materials (an "Application"), you must register as a Developer.

We may make available Selling Partner APIs (including the Marketplace Web Services APIs) and software, data, text, audio, video, images, or other content we make available in connection with the Selling Partner APIs, including related documentation, software libraries, and other supporting materials, regardless of format (collectively the "API Materials") that permit your

**C-043**

Case 1:23-cv-03054-ALC   Document 1-1   Filed 04/12/23   Page 99 of 129

systems to interface with certain features or functionality available to you. You may authorize Developers to access Confidential Information and Your Materials via the Selling Partner APIs solely for the purpose of supporting your business on Amazon and provided, in each case, that where Confidential Information is disclosed to Developers, you shall remain liable for the acts or omissions of such Developers as if such act or omissions were your own. All terms and conditions applicable to the Selling Partner APIs and the API Materials in this Agreement are solely between you and us. API Materials that are public or open source software ("Public Software") may be provided to you under a separate license, in which case, notwithstanding any other provision of this Agreement, that license will govern your use of those API Materials. For the avoidance of doubt, except to the extent expressly prohibited by the license governing any API Materials that are Public Software, all of the non-license provisions of this Agreement will apply.

**API-2 License and Related Requirements**

**API-2.1 Generally.**

We grant you a limited, revocable, non-exclusive, non-sublicenseable, nontransferable license during the term of the Agreement to allow Developers to access and use Confidential Information and Your Materials through the Selling Partner APIs and the API Materials solely in support of your use of the Services covered by this Agreement. As between you and us, we or our licensors own all right, title, and interest in and to the Confidential Information, the Selling Partner APIs, the API Materials, any technical and operational specifications, security protocols and other documentation or policies provided or made available by us with respect to the Selling Partner APIs or the API Materials (the "Selling Partner API Specifications"), and our internal data center facilities, servers, networking equipment, and host software systems that are within our or their reasonable control and are used to provide the Selling Partner APIs or the API Materials (the "Amazon Network").

**API-2.2 License Restrictions.**

You may authorize Developers to access Confidential Information and Your Materials through the Selling Partner APIs and the API Materials only through APIs documented and communicated by us in accordance with any applicable Selling Partner API Specifications. You may not authorize any other party to do any of the following with the Confidential Information, the Selling Partner APIs and the API Materials: (a) reverse engineer, decompile, or disassemble them; (b) modify or create derivative works based upon them in whole or in part; (c) distribute copies of them; (d) remove any proprietary notices or labels on them; (e) use any Public

Software in any manner that requires, pursuant to the license applicable to such Public Software, that the Confidential Information, the Selling Partner APIs and the API Materials be disclosed, licensed, distributed, or otherwise made available to anyone; (f) resell, lease, rent, transfer, sublicense, or otherwise transfer rights to them; (g) access or use them in a way intended to avoid incurring any applicable fees or exceeding usage limits or quotas; (h) access or use them for any purpose unrelated to your use of Services; or (i) access or use them for fraudulent or illegal activities or activities that violate our policies or are otherwise harmful to us or any third parties. The limitations regarding Data Use in Section 11 above apply to any information you disclose or receive by the direct or indirect use of the Selling Partner APIs.

**API-2.3 No License for Direct Access.**

For the avoidance of doubt, these Selling Partner API Terms do not provide you a license to directly access or use the Selling Partner APIs, or install, copy, use, or distribute API Materials. Direct use of the Selling Partner APIs may only be licensed to Developers.

**API-2.4 Account Identifiers and Credentials.**

You must use the account IDs and any unique public key/private key pair issued by us to provide access to your data via the Selling Partner APIs ("Account Identifiers and Credentials") in accordance with these Selling Partner API Terms to authorize Developers to access the Selling Partner APIs on your behalf. You may only authorize access to Confidential Information and Your Materials via the Selling Partner APIs in the way that we prescribe. Your Account Identifiers and Credentials are for your personal use only and you must maintain their secrecy and security. You are solely responsible for all activities that occur using your Account Identifiers and Credentials, regardless of whether the activities are undertaken by you or a third party (including your employees, contractors, or agents). You will provide us with notice immediately if you believe an unauthorized third party may be using your Account Identifiers and Credentials or if your Account Identifiers and Credentials are lost or stolen. We are not responsible for unauthorized use of your Account Identifiers and Credentials.

**API-2.5 Security of Your Materials and Confidential Information.**

You are solely responsible for authorizing others to access the Selling Partner APIs on your behalf and taking your own steps to maintain appropriate security, protection, and backup of the Confidential Information and Your Materials processed pursuant to your access to the Selling Partner APIs and the API Materials, including any Confidential Information you have disclosed to Developers in accordance with this Agreement. We are not responsible for any unauthorized

access to, alteration of, or deletion, destruction, damage, loss, or failure to store any of the Confidential Information or Your Materials in connection with the Selling Partner APIs (including as a result of your or any third party's errors, acts, or omissions). If you believe (acting reasonably) that a personal data breach has occurred in relation to any customer personal data in your possession or otherwise under your control (including in the possession of a Developer), you shall immediately notify Amazon of such personal data breach (in sufficient detail) for information purposes, and promptly take any actions (or require a Developer take such actions, if relevant) as applicable to you under data privacy Laws.

**API-3 Termination**

**API-3.1 Termination of Your Access to the Selling Partner APIs and the API Materials.**

Without limiting the parties' rights and obligations under this Agreement, the Amazon Marketplace Developer Agreement, or the Amazon Marketplace API License Agreement, we may limit, suspend, or terminate your access to the Selling Partner APIs and the API Materials for convenience with 30 days' notice. We may terminate immediately if (a) we determine that you have materially breached this Agreement and failed to cure within 7 days of a cure notice; (b) you or your account have been engaged in deceptive, fraudulent, or illegal activity; or (c) your use of the Selling Partner APIs and the API Materials may harm our customers.

Upon any suspension or termination of your access to the Selling Partner APIs and the API Materials, you will immediately cease authorizing others to use the Selling Partner APIs and the API Materials. Upon any termination of your access to the Selling Partner APIs and the API Materials, you will also immediately destroy all API Materials. Upon any suspension or termination of your access to the Selling Partner APIs and the API Materials, we may cause your Account Identifiers and Credentials to cease to be recognized by the Amazon Network for the purposes of the Selling Partner APIs and the API Materials.

**API-4 Modifications to the Selling Partner APIs and the API Materials**

We may change or discontinue the Selling Partner APIs or the API Materials (including by changing or removing features or functionality of the Selling Partner APIs or the API Materials) from time to time. For any material changes that will negatively affect your business, we will provide notice under Section 18.

**API-5 Disclaimers**

**C-046**

Case 1:23-cv-03054-ALC   Document 1-1   Filed 04/12/23   Page 102 of 129

THE SELLING PARTNER APIS AND THE API MATERIALS ARE PROVIDED "AS IS". WE AND OUR AFFILIATE COMPANIES AND LICENSORS MAKE NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE REGARDING THE SELLING PARTNER APIS OR THE API MATERIALS, INCLUDING ANY WARRANTY THAT THE SELLING PARTNER APIS OR THE API MATERIALS WILL BE UNINTERRUPTED, ERROR FREE, OR FREE OF HARMFUL COMPONENTS, OR THAT ANY MATERIALS OR DATA YOU ACCESS, USE, STORE, RETRIEVE, OR TRANSMIT IN CONNECTION WITH THE SELLING PARTNER APIS, INCLUDING YOUR MATERIALS, WILL BE SECURE OR NOT OTHERWISE LOST OR DAMAGED. EXCEPT TO THE EXTENT PROHIBITED BY LAW, WE AND OUR AFFILIATE COMPANIES AND LICENSORS DISCLAIM ALL WARRANTIES, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, OR QUIET ENJOYMENT, AND ANY WARRANTIES ARISING OUT OF ANY COURSE OF DEALING OR USAGE OF TRADE. FURTHER, NEITHER WE NOR ANY OF OUR AFFILIATE COMPANIES OR LICENSORS WILL BE RESPONSIBLE FOR ANY COMPENSATION, REIMBURSEMENT, OR DAMAGES ARISING IN CONNECTION WITH: (A) THE INABILITY TO USE THE SELLING PARTNER APIS OR THE API MATERIALS FOR ANY REASON; (B) THE COST OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES; OR (C) ANY INVESTMENTS, EXPENDITURES, OR COMMITMENTS BY YOU IN CONNECTION WITH THIS AGREEMENT OR YOUR USE OF OR ACCESS TO THE SELLING PARTNER APIS OR THE API MATERIALS.

C-047

Case 1:23-cv-10004 Washington DC treat-maker Chukar Filed 04/12/23 appeared 103 of 129 The Seattle Times

Amazon                    *The Seattle Times*

# Amazon abruptly banned Washington state treat-maker Chukar Cherries. Months of appeals went unheeded

Sep. 27, 2021 at 6:01 am | *Updated Sep. 27, 2021 at 5:49 pm*



📷 **2 of 3** | Employee Michael Bjerkhoel picks a truffle cherry sample on a spoon to give to a customer at the Chukar Cherries stand at Pike Place on Thursday. (Daniel Kim / The Seattle Times)

By Katherine Anne Long 🐦

*Seattle Times business reporter*

Chukar Cherries suddenly couldn't sell a single cherry on Amazon.com.

The Prosser, Benton County, company, whose chocolate-covered fruits and nuts have become gift-basket and trail-mix standbys among Washingtonians since the company's founding 33 years ago, was kicked off the Amazon marketplace on July 19, courtesy of an automated email.

"Your Amazon.com selling privileges have been removed," the email read. "Your listings have been disabled. Funds will not be transferred to you but will be held in your account."

Amazon's fraud-prevention algorithms had concluded that Chukar — which has been selling on Amazon's marketplace since 2003 — was linked to another account, based just north of Shanghai, that the commerce giant had deactivated for violating Amazon's policies. The seller account Chukar was supposedly associated with, DBING, doesn't sell fruits, nuts or seemingly much of anything at all: It has just nine customer reviews, nearly all of them negative, with six shoppers saying they never received what they ordered. (DBING did not respond to questions sent through Amazon's customer-service portal; no other records of the company could be found.)

Nor does Chukar have business ties to China. The company uses U.S. ingredients and employs local workers.

"The whole thing just doesn't make sense," Chukar Cherries founder Pam Montgomery said. "But that's kind of Amazon for you."

Chukar's experience exemplifies how even as Amazon makes public-relations hay out of third-party sellers' successes, it locks sellers into what can be a precarious, automated business relationship. Algorithmic errors and malicious competitors can lead to financially devastating account suspensions, or suck sellers into a grueling appeals process. Sellers may never be told what they did wrong or how to fix it.

"It is really critical to be on Amazon. It identifies you as a substantial business," Montgomery said. "But it's not easy."

Amazon reinstated Chukar's account on Friday, after The Seattle Times asked why Chukar hadn't been able to sell any merchandise on Amazon.com for 67 days. In a statement, a spokesperson blamed a "bad actor" who had "created a false relationship with this seller, which led us to take action on this account."

Amazon declined to specify who the bad actor was, what steps the person had taken to link the two accounts or what they might have hoped to gain from doing so.

"We are sorry for the poor experience," Amazon spokesperson Cecilia Fan said in a statement.

Three marketplace consultants who spoke with The Seattle Times about Chukar's case said whether or not a "bad actor" was at the root of the problem, much of the blame nevertheless lies with Amazon's error-prone fraud detection software, difficult appeals system and paucity of human-powered account review, they said.

The Amazon marketplace's sheer size — there are an estimated six million third-party sellers on Amazon.com, generating nearly $300 billion in annual sales — has led Amazon to rely on automated mechanisms for catching and punishing sellers breaking the law or violating its terms of service.

Amazon says it spent more than $700 million last year fighting fraud, abuse and counterfeit products on its platform. In recent months, it has taken a particularly close look at Chinese sellers. Since May, Amazon has banned nearly 55,000 Chinese sellers from the platform, largely for soliciting fake reviews.

## Talk to us

Share your questions, tips and insights about Amazon.com with business reporter Katherine Anne Long by email at kalong@seattletimes.com or via the encrypted Signal messaging app at 206-375-9280. To learn more about how to contact reporters confidentially, visit https://st.news/newstips.

Amazon's crime-fighting technology isn't perfect, though. In its quest to uproot nefarious sellers operating through multiple accounts, Amazon's algorithms generate "a tremendous number of false positives," said Lesley Hensell, the co-founder of third-party seller advisory firm Riverbend Consulting. "We work with clients on a daily basis who have been linked to accounts where either there's a tangential linkage or there's really no link at all."

Amazon's software looks for connections between accounts by trying to match business and warehouse addresses, banking information, internet service providers, IP addresses and the identities of sellers' vendors, said Chris McCabe, the founder of consulting firm ecommerceChris and a former investigator of Amazon seller fraud.

Sometimes Amazon's software can be overzealous. Hensell was able to get one of her client's accounts back online, for instance, after explaining to Amazon that the business likely operated out of the same coworking space as another seller that had violated Amazon's policies. Another client was suspended after Amazon linked the account with an account owned by the client's ex-boyfriend of many years.

"Amazon's technology to detect this definitely has flaws," Hensell said.

Once Amazon has determined that two accounts are connected, it can be difficult to prove that they're not, McCabe said. That's what happened to Chukar Cherries.

Chukar general manager Tim Oten spent more than two months trying to prove his company had no relationship with the Chinese seller, DBING. Oten filed near-weekly appeals with Amazon, sending the retail behemoth information about Chukar's business license, physical locations, authorized resellers and employees.

Over and over, he received an automated response: Amazon had "received your submission but (did) not have enough information to reactivate your account at this time," according to correspondence reviewed by The Seattle Times. Oten called a helpline for sellers, only to be told by the representative that there was no one he could speak with who could help him understand what information Amazon needed to reinstate his account, Oten said.

Meanwhile, the threat of being permanently banned from selling on Amazon loomed.

Case 2:23-cv-00648 Document 1 Filed 04/12/23 Page 105 of 129

"If we cannot substantiate the claim, your account will not be reinstated and this account will not be allowed to do business on Amazon in the future," Amazon told Chukar.

Sales on Amazon make up less than 5% of the company's revenue, an amount equivalent to "losing one of our No. 1 customers," Oten said. "Like losing Bartell's, REI or Whole Foods." (Amazon purchased Whole Foods in 2017; Montgomery said Chukar's relationship with Whole Foods remains positive.)

Bad actors do exist on Amazon, including many that have learned to weaponize Amazon's fraud-detection systems against their competitors.

Federal prosecutors last year alleged that 10 Amazon employees took bribes as part of a conspiracy to boost the sales of some third-party sellers, in part by flagging their competitors' accounts for fraud, which had the effect of suspending those accounts. A marketplace consultant and former Amazon employee pleaded guilty to involvement in the scheme earlier this month.

"Amazon has created a system where sellers know how to get away with abuse," said a former Amazon retail executive-turned consultant, who asked not to be named so as not to jeopardize his clients' relationships with Amazon. Amazon's decision to rely primarily on algorithms, rather than human beings, to police the platform is understandable, given its sheer size, he said. But, he said, "the system is not working well."

Chukar Cherries founder Montgomery said she's not sure how much the company lost in sales while the company was blacklisted from the platform. Regardless, she's not interested in seeking monetary compensation from Amazon. The company does the bulk of its business in the lead-up to the holidays, so she said she's mostly just glad to be back on the platform before the shopping season begins in earnest.

She would, though, like Amazon to reexamine its fraud detection algorithms and hire more people to work directly with sellers whose accounts have been deactivated. (Amazon says sellers can call support representatives 24/7, and that 80% of sellers' issues are resolved in less than a day.)

Amazon founder Jeff Bezos may also have some soul-searching to do, Montgomery added.

"He's hurting a Seattle business, and Seattle has supported him," she said. "Washington has supported him. That's terrible."

*Katherine Anne Long: 206-464-3229 or kalong@seattletimes.com; on Twitter: @_katya_long.*


View 165 Comments

misleading, and possibly criminally false or perjurious."[1553] In light of this concern, Subcommittee staff views Amazon's other claims and representations with a degree of skepticism in instances where they conflict with credible sources, such as investigative reporting, interviews with market participants, or other evidence uncovered by Subcommittee staff during the investigation.

2. Amazon.com

a. Market Power

Amazon has significant and durable market power in the U.S. online retail market.[1554] The company's actual share of U.S. e-commerce is unknown outside of Amazon because it does not report the gross merchandise volume of third-party sales made on its marketplace. A frequently cited analysis by market research company eMarketer estimates that Amazon's share in this market is 38.7%.[1555] eMarketer's estimate, however, is likely understated because its definition of e-commerce is overly broad. For example, under eMarketer's approach to e-commerce, the Auto and Parts category includes online sales of cars.[1556] In contrast, marketing analytics company Jumpshot estimates that Amazon captures an average of 74% of digital transactions across a wide range of product categories.[1557] The Jumpshot analysis may overstate Amazon's share because it calculates market share as a percentage of transactions made on well-known market participants' websites, like Amazon, Walmart, and Target, but excludes small, online retailers.[1558] Based on the information Subcommittee staff gathered during its investigation, estimates that place Amazon's share of U.S. e-commerce at about 50% or higher are more credible than lower estimates of 30-40%.[1559]

[1553] Bipartisan Letter from the Chairman, Ranking Member, and Members of H. Comm. on the Judiciary to Jeff Bezos, CEO, Amazon.com, Inc. (May 1, 2020), https://judiciary.house.gov/uploadedfiles/2020-05-01_letter_to_amazon_ceo_bezos.pdf.

[1554] See generally Dig. Competition Expert Panel Report at 30 (finding that recent financial indicators suggest Amazon's "dominan[ce] in a meaningfully distinct sector of online retail" will endure and that "investors are expecting it to retain its dominant position, and to earn significantly higher profits in future"); Stigler Report at 78 ("[T]he evidence thus far does suggest that current digital platforms face very little threat of entry . . . . [T]he key players in this industry remained the same over the last two technology waves, staying dominant through the shift to mobile and the rise of AI. In the past, dominant business found it difficult to navigate innovation or disruption waves. By contrast, Facebook, Google, Amazon, Apple, and even Microsoft were able to ride these waves without significant impact on market share or profit margins.").

[1555] ANDREW LIPSMAN, TOP 10 US ECOMMERCE COMPANIES 2020, EMARKETER (Mar. 10, 2020), https://www.emarketer.com/content/top-10-us-ecommerce-companies-2020.

[1556] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00206583 (2019) (on file with Comm.) (eMarketer Inc. – Global Ecommerce 2019 Report).

[1557] See Kimberly Collins, Google + Amazon: Data on Market Share, Trends, Searches from Jumpshot, SEARCH ENGINE WATCH (Aug. 1, 2019), https://www.searchenginewatch.com/2019/08/01/amazon-google-market-share/.

[1558] See id.

[1559] See Submission from Source 11, to H. Comm. on the Judiciary, 2 (Oct. 14, 2019) (on file with Comm.) ("Amazon has amassed at least a 50% share of the ecommerce market and continues to expand, both its market share and the breadth of its offerings."); PYMNTS.COM, WALMART VS. AMAZON, WHOLE PAYCHECK TRACKER: BATTLE FOR THE DIGITAL FIRST CONSUMER 6 (2020), https://securecdn.pymnts.com/wp-content/uploads/2020/09/Amazon-Walmart-Whole-Paycheck-092020.pdf (estimating Amazon's market share at 51.2% in Q1 2020 and 44.4% in Q2 2020, but noting U.S. e-commerce

Case 1:23-cv-03054-ALC   Document 1-1   Filed 04/12/23   Page 107 of 129

In a number of key product categories, ranging from household essentials to sports, fitness and outdoors, Amazon is reported to account for well over 50% of online sales.[1560] The platform also has significant market power over the entire book industry, including sales, distribution, and publishing. In the U.S. market, Amazon accounts for over half of all print book sales and over 80% of e-book sales.[1561]

Amazon is the dominant online marketplace. It reportedly controls about 65% to 70% of all U.S. online marketplace sales.[1562] The platform's market power is at its height in its dealings with third-party sellers, as well as many of its suppliers, which Amazon refers to as vendors. Increasingly, Amazon is also gaining market power in certain business-to-business (B2B) online markets through Amazon Business, its B2B marketplace.[1563]

In response to the Committee's requests for information, Amazon claims that "estimates of total retail share are the most appropriate and relevant method of estimating" Amazon's market share.[1564] This approach is inconsistent with evidence gathered by Subcommittee staff, conventional antitrust analysis of relevant product markets, and common sense. In a recent investigation, for example, the FTC concluded that a "relevant market may be divided by channel of sale, resulting in separate markets for brick-and-mortar sales and online sales."[1565] Illustrating the extent of Amazon's overly broad approach to identifying the relevant market and its top competitors, in response to the

---

increased by 44% over the same period, and that "[f]or Amazon to drop only 7 percent in total eCommerce share with that kind of overall increase is actually quite an achievement.").

[1560] See, e.g., Kimberly Collins, Google + Amazon: Data on Market Share, Trends, Searches from Jumpshot, SEARCH ENGINE WATCH (Aug. 1, 2019), https://www.searchenginewatch.com/2019/08/01/amazon-google-market-share/; see also J.P. MORGAN REPORT: RETAIL VS. AMAZON: LIFE IN A POST COVID-19 WORLD 13 (Amazon's market share of online sales of Books & Magazines is 75%).

[1561] See, e.g., Ben Evans, What's Amazon market share?, BENEDICT EVANS https://www.ben-evans.com/benedictevans/2019/12/amazons-market-share19#:~:text=Amazon%20has%2050%25%20or%20more,it%20has%20over%2050%25 ("Amazon has 50% or more of the US print book market"); Submission from Source 17, to H. Comm. on the Judiciary, 33 (Nov. 14, 2019) (on file with Comm.) ("Amazon accounts for roughly 83 percent of all e-book sales, about 90 percent of online print sales, and about 90 percent of digital audiobook sales."); Dig. Competition Expert Panel Report at 30 ("In the e-book market, Amazon was reported in February 2017 to account for around 88% of total annual unit sales.").

[1562] Submission from Top Shelf Brands, to H. Comm. on the Judiciary, 26 (Oct. 26, 2019) (on file with Comm.) (citing DIG. COMMERCE 360, 2019 ONLINE MARKETPLACES REPORT).

[1563] See MARKETPLACE PULSE, MARKETPLACES YEAR IN REVIEW 48 (2019), https://cdn.marketplacepulse.com/misc/marketplaces-year-in-review-2019.pdf ("Amazon's 'business-to-business', or B2B, marketplace is gaining market share faster than its retail operation."); Phone Interview with Nat'l Ass'n of Wholesaler-Distributors (Sept. 3, 2020); STACY MITCHELL & OLIVIA LAVECCHIA, REPORT: AMAZON'S NEXT FRONTIER: YOUR CITY'S PURCHASING 4 (2018), https://ilsr.org/amazon-and-local-government-purchasing/ ("Amazon is leveraging its growing relationship with local governments to induce more businesses to join its Marketplace.").

[1564] Production of Amazon, to H. Comm. on the Judiciary, 3 (Oct. 14, 2019).

[1565] See Complaint at 4, In the Matter of Edgewell Personal Care Co.& Harry's Inc., No. 9390 (F.T.C., Feb. 2, 2020), https://www.ftc.gov/system/files/documents/cases/public_p3_complaint_-_edgewell-harrys.pdf.

Committee's request for "A list of the Company's top ten competitors," Amazon identified 1,700 companies, including Eero (a company Amazon owns), a discount surgical supply distributor, and a beef jerky company.[1566]

Amazon also included single-category companies in response to the Committee's request for a list of Amazon's top ten competitors. Yet documents produced by Amazon suggest that even in its early days it did not view such retailers as direct competitors. For instance, a recap of an Amazon marketing presentation identified one of its key points as: "No direct competitors, closest competitors would be what you refer to as category driven i.e. Best Buy, Barnes and Noble...etc."[1567]

Regardless of the precise boundaries of e-commerce or online marketplaces, the sum of evidence that Subcommittee staff examined demonstrates that Amazon functions as a gatekeeper for e-commerce. Amazon is the most-visited website in the world for e-commerce and shopping.[1568] In a submission to the Committee, an e-commerce market participant said that "many of the 64% of American households that have Prime memberships are effectively locked into Amazon for their online shopping."[1569] Meanwhile, recent market analysis suggests that over 60% of all online product searches in the U.S. begin on Amazon.com.[1570]

At the Subcommittee's hearing on innovation and entrepreneurship, Stacy Mitchell, the Co-Director of the Institute for Local Self-Reliance, described one independent retailer's attempt to survive in e-commerce independent of Amazon:

> As its customers moved online, so too did the company. Gazelle Sports built a robust e-commerce site. With scores of enthusiastic reviews on Google and Yelp, the site came right up in online searches, yielding a brisk stream of customers and sales.

> But, in 2014, sales began to decline. The problem was that many people in Michigan and across the country were no longer starting their online shopping on a search engine, where they might find Gazelle Sports. Instead, they were going straight to Amazon. By

---

[1566] *See* Production of Amazon, to H. Comm. on the Judiciary, 17 (Oct. 14, 2019) (on file with Comm.).

[1567] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-0059575 (Nov. 22, 2010) (on file with Comm.).

[1568] SIMILARWEB, WORLDWIDE E-COMMERCE AND SHOPPING CATEGORY PERFORMANCE (July 2020), https://pro.similarweb.com/#/industry/overview/E-commerce_and_Shopping/999/1m/?webSource=Total (Amazon had 2.6 billion visits in July 2020 compared to 940.8 million visits for eBay).

[1569] Submission from Source 11, to H. Comm. on the Judiciary, 5 (Oct. 14, 2019) (on file with Comm.).

[1570] Lucy Koch, *Looking for a New Product? You Probably Searched Amazon*, EMARKETER (Mar. 31, 2019), https://www.emarketer.com/content/looking-for-a-new-product-you-probably-searched-amazon (citing FEEDVISOR, THE 2019 AMAZON CONSUMER BEHAVIOR REPORT 14 (2019)); *see also* WUNDERMAN THOMPSON, THE FUTURE SHOPPER REPORT 2020 11 (2020), https://insights.wundermanthompsoncommerce.com/hubfs/@UK/Landing%20Pages/2020/The%20Future%20Shopper%20 2020/WTC%20-%20The%20Future%20Shopper%20Report%202020.pdf?hsCtaTracking=24d37c38-db5d-4797-bd6c- 2ea35127ad21%7C70cdff40-3236-48fb-a2ec-c4b298453df9.

2016, the share of online shoppers bypassing search engines and beginning their product search on Amazon had grown to 55 percent. With sales flagging and staff reductions underway, the owner of Gazelle Sports . . . made what seemed like a necessary decision: Gazelle Sports would join Amazon Marketplace, becoming a third-party seller on the digital giant's platform. "If the customer is on Amazon, as a small business you have to say, 'That is where I have to go,'" he explained. "Otherwise, we are going to close our doors."[1571]

Interviews with sellers, as well as documents that Subcommittee staff reviewed, make clear that Amazon has monopoly power over most third-party sellers and many of its suppliers.[1572] Numerous sellers told Subcommittee staff in interviews that they cannot turn to alternative marketplaces, regardless of how much Amazon may increase their costs of doing business or how badly they are treated. David Barnett, the CEO and Founder of PopSockets, a former third-party seller and current Amazon supplier, testified about Amazon's coercive tactics at one of the Subcommittee's hearings:

> I suspect that Amazon is accustomed to behaving this way because most brands cannot afford to leave Amazon. They evidently have no choice but to endure tactics that would be rejected out of hand in any ordinary relationship whereby the two parties enter into the relationship by preference rather than necessity.[1573]

Sellers feel forced to be on Amazon because that is where the buyers are.[1574] At the Subcommittee's sixth hearing, Representative Lucy McBath (D-GA) noted that the evidence the Subcommittee collected is at odds with how Amazon describes its relationship with third-party sellers. She asked Mr. Bezos:

> [Y]ou referred to third party sellers today as "Amazon's partners" and that your success depends on their success. But, over the past year, we've heard a completely different story. As part of this investigation, we've interviewed many small businesses, and they use the words like "bullying," "fear," and "panic" to describe their relationship with Amazon. . . . . You said that sellers have many other attractive options to reach customers, but that's not at all what we found in our investigation . . . . If Amazon

---

[1571] Innovation and Entrepreneurship Hearing at 3–4 (statement of Stacy F. Mitchell, Co-Dir., Inst. for Local Self-Reliance).

[1572] *See, e.g.*, Submission from Top Shelf Brands, to H. Comm. on the Judiciary, 49 (Oct. 26, 2019) ("98% of all of Top Shelf's transaction has taken place on Amazon's platform."); *see also* Dig. Competition Expert Panel Report at 30 ("Regardless of the view on dominance over a particular defined market, it is clear that for thousands of smaller independent online sellers in particular, Amazon's marketplace is a strategically important gateway to consumers.").

[1573] Competitors Hearing at 3 (statement of David Barnett, CEO & Founder, Popsockets LLC).

[1574] Submission from Source 11, to H. Comm. on the Judiciary, 5 (Oct. 14, 2019) (on file with Comm.).

didn't have monopoly power over these sellers, do you think they would choose to stay in a relationship that is characterized by bullying, fear, and panic?"[1575]

Mr. Bezos responded that "there are a lot of options" for sellers, and that "[t]here are more and more every day."[1576] This claim is inconsistent with the Subcommittee's investigative record. In a submission to the Committee, the Online Merchants Guild, a trade association for small and medium-sized online sellers, said that its members who try to diversify sales across multiple platforms often report that they are unable to generate many sales outside of Amazon.[1577]

An important limit on a seller's ability to switch from selling on Amazon to selling on its own site or a competing platform is that Amazon generally forbids sellers from contacting their customers.[1578] The packaging and even the order confirmation email for third-party sales feature the Amazon brand prominently and do not reference the seller. A typical Amazon customer is unaware of the source of the sale.[1579] According to the Online Merchants Guild, "Many Amazon sellers use websites such as Shopify to try and establish their own eCommerce presence, but without the ability to market to their supposed core customer base, their Amazon customers, it's pretty futile."[1580]

Subcommittee staff heard from several market participants that Amazon also has significant market power over suppliers. For example, third-party sellers told Subcommittee staff that Amazon frequently ignores manufacturer policies that bind sellers.[1581] For example, brand manufacturers may establish minimum advertised pricing guidelines (MAP) to prevent online retailers from freeriding off brick-and-mortar stores' investments in product display or expertise—such as how to fit a running shoe. Amazon's leverage over suppliers gives it the ability to "break" minimum advertised pricing

---

[1575] CEO Hearing Transcript at 88–89 (question of Rep. Lucy McBath (D-GA), Member, Subcomm. On Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary).

[1576] *Id.* at 91 (statement of Jeff Bezos, CEO, Amazon.com, Inc.).

[1577] Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 4 (Oct. 23, 2019) (on file with Comm.) ("Members who sell across multiple platforms often report the amount of revenue generated outside of Amazon including their own eCommerce site, is insignificant, with over 90% of their sales being generated on the platform."); *see also* Submission from Top Shelf Brands, to H. Comm. on the Judiciary, 60–61 (Oct. 26, 2019) (explaining that it has "no viable alternatives" to Amazon, where 98% of its transactions have taken place on Amazon's platform, eBay accounts for 1% of its income, and Walmart accounts for less than 1%).

[1578] *Selling Polices and Seller Code of Conduct*, AMAZON SELLER CENTRAL, https://sellercentral.amazon.com/gp/help/external/G1801?language=en_US&ref=efph_G1801_cont_200386250 (last visited Sept. 28, 2020); *see also* Submission from Source 100, to H. Comm. on the Judiciary (Sept. 26, 2020) (raising concerns that Amazon permits itself to contact customers about negative reviews for Amazon branded products, while third-party sellers are largely barred from customer engagement).

[1579] Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 4 (Oct. 23, 2019) (on file with Comm.); *see also* Submission from Source 11, to H. Comm. on the Judiciary, 3 (Oct. 14, 2019) (on file with Comm.) (explaining that "[w]henever an order is shipped through [Fulfillment by Amazon], even if the purchase is made through another marketplace, it is likely to arrive in an Amazon-branded box, creating confusion" for customers).

[1580] Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 5 (Oct. 23, 2019) (on file with Comm.).

[1581] *See, e.g.*, Phone Interview with Source 84 (Mar. 4, 2020).

rules and undercut competing sellers on price. In contrast, third-party sellers must abide by the rules. As a former third-party seller explained, "Given Amazon's immense clout, we believe that suppliers have no realistic threat to stop selling on Amazon in response to Amazon 'breaking' MAP."[1582] Amazon's internal documents suggest that it does not fear any consequences for failing to comply with most vendor policies.[1583]

Another way that Amazon leverages its market power is to force certain brand manufacturers that would prefer to be third-party sellers into being wholesalers. A discussion among Amazon executives suggests that certain brands may only be allowed to have a wholesale relationship with Amazon even if the brand would prefer to be a third-party seller. In 2016, Sebastian Gunningham, then senior vice president of Amazon Marketplace, commented on a list of proposed seller tenets, "I would add that there are x,000 suppliers around the world that do not get this choice... I am talking about the apple, nikes and p&g, etc... We don't want to open that door, relationship has to be reseller."[1584] Consistent with this stance, Popsockets CEO and Founder David Barnett testified that Amazon attempted to force him into maintaining a wholesale relationship with Amazon Retail despite his preference to be a third-party seller or make sales on the marketplace through an authorized distributor.[1585] A former Amazon employee confirmed that it was not uncommon for Amazon to use its brand standards policy to shut down a brand's third-party seller account and force brands into an exclusive wholesaler relationship.[1586]

Amazon also enjoys significant market power over online consumers. Amazon uses Prime and its other membership programs to lock consumers into the Amazon ecosystem. According to an internal analysis, Amazon was willing to pay a credit card company a significant sum in 2013 for signing up new Prime members under the assumption that each new member would contribute $527 to Amazon's gross merchandise sales and $46 of gross profit.[1587] Amazon estimated that the deal had a five-year net present value of $17 million, assuming that it delivered 100,000 paid Prime members.[1588]

---

[1582] Submission from Source 48, to H. Comm. on the Judiciary, 8 (Nov. 8, 2019) (on file with Comm.).

[1583] *See, e.g.*, Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00151722 (Feb. 9, 2009) (on file with Comm.) ("[P]lease audit that we are price matching . . . any diapers.com pricing. If this puts us in the soup with P&G on their pampers map price, so be it."); AMAZON-HJC-00206714 (Mar. 8, 2018) ("Why did Walmart break MAP and we didn't?").

[1584] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00190108 (June 6, 2016) (on file with Comm.).

[1585] Competitors Hearing at 3 (statement of David Barnett, CEO & Founder, Popsockets LLC).

[1586] Submission from Source 91, to H. Comm. on the Judiciary (Sept. 22, 2020) (on file with Comm.).

[1587] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00199845 (Oct. 23, 2013) (on file with Comm.).

[1588] *Id.*

Once Prime members pay the upfront annual membership fee, they are likely to concentrate their online purchases with Amazon.[1589] According to a recent survey, Prime members spend an average of $1,400 annually on Amazon, versus $600 for non-members.[1590] As one market participant observed, "Prime members will continue to use Amazon and not switch to competing platforms, despite higher prices and lower-quality items on Amazon compared to other marketplaces, and despite recent increases in the price of a Prime membership."[1591]

Other retailers are unable to match Amazon on its ability to provide free and fast delivery for such a large volume and inventory of products. Even Walmart, with its extensive national distribution network, does not come close to matching Amazon on this measure.[1592] Amazon currently offers Prime members free, next-day delivery on over 10 million items anywhere in the continental United States.[1593] Walmart, by contrast, has only about 200,000 products eligible for two-day shipping in select markets.[1594]

Amazon's market power is durable and unlikely to erode in the foreseeable future. There are several factors that make successful entry or expansion by a challenger to Amazon unlikely. Barriers to entry include: (1) network effects, which make it difficult for another marketplace to achieve a comparable number of buyers and sellers; (2) switching costs associated with consumers shopping outside of the Amazon ecosystem; and (3) the steep costs of building a logistics network comparable in size and scope to Amazon's massive international footprint in fulfillment and delivery. Amazon's internal documents recognize that entry into online commerce "require[s] significant incremental investments in brand development, inventory, and marketing/customer acquisition."[1595] Further,

---

[1589] *See* Submission from Source 11, to H. Comm. on the Judiciary, 3 (Oct. 14, 2019) (on file with Comm.) ("Amazon has been quite frank about the reality that once consumers invest in Prime, they do most of their online shopping on Amazon in order to gain value from the investment in shipping, whereas they might otherwise multisource.").

[1590] Tonya Garcia, *Amazon Prime membership exceeds 100 million*, MARKETWATCH (Jan. 17, 2019), https://www.marketwatch.com/story/amazon-prime-membership-exceeds-100-million-2019-01-17; *see also* Brian Olsavsky, Sr. Vice Pres. and Chief Fin. Officer, Amazon.com, Inc., *Q1 2020 Earnings Call* (Apr 30, 2020, 5:30 PM) ("We see our Prime customers are shopping more often and they have larger basket sizes.").

[1591] Submission from Source 11, to H. Comm. on the Judiciary, 3 (Oct. 14, 2019) (on file with Comm.).

[1592] *See* J.P. MORGAN, RETAIL VS. AMAZON: LIFE IN A POST COVID-19 WORLD (2020), https://markets.jpmorgan.com/research/email/-lbk68f4/Alp1kP9tQUPS29jlzW_bOg/GPS-3397412-0 ("We believe there are no comparable unlimited free shipping offerings available at scale, with Amazon's large and growing infrastructure investments serving as a significant barrier to entry.")

[1593] *Prime*, AMAZON, https://www.amazon.com/b?ie=UTF8&node=15247183011 (last visited Sept. 28, 2020) ("Free One-Day Delivery . . . Available coast-to-coast on more than 10 million items with no minimum purchase.").

[1594] Press Release, Marc Lore, Pres. & CEO, Walmart eCommerce US, Free NextDay Delivery Without a Membership Fee (May 14, 2019), https://corporate.walmart.com/newsroom/2019/05/14/free-nextday-delivery-without-a-membership-fee; *Walmart Help Center: NextDay Delivery*, https://www.walmart.com/help/article/nextday-delivery/fd3f1c5cf0ec4682abca8c83f5f0e977 (last visited Sept. 28, 2020) ("Currently, NextDay Delivery is only available in select markets.").

[1595] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00154659 (Nov. 23, 2010) (on file with Comm.).

Amazon expanded its market power by avoiding taxes, extracting state subsidies, and engaging in anticompetitive conduct—tactics that have given the company an unfair advantage over actual and potential competitors.

As the COVID-19 pandemic pushes more American shoppers online, Amazon's market power has grown. Evidence shows that Amazon is willing to use its increased market power in e-commerce during this crisis to exert pressure on suppliers and favor its own first-party products over those sold by third-party sellers. Amazon initially responded to the sudden surge in sales by refusing to accept or deliver non-essential supplies from its third-party sellers—a stance that would seem reasonable except that Amazon continued to ship its own non-essential products while restricting third-party sellers' ability to use alternative distribution channels to continue selling through Prime.[1596] As for suppliers, Subcommittee staff heard concerns that the platform used its power as a large buyer to pressure suppliers into prioritizing Amazon over other retail customers such as independent grocers.[1597] Meanwhile, numerous reports suggest that Amazon is in talks to convert real estate in vacated malls into additional Amazon distribution centers, further highlighting how it will continue to amass further scale even as its brick-and-mortar counterparts crater.[1598]

### b. Merger Activity

Amazon's acquisition strategy has primarily focused on purchasing its competitors and companies that operate in adjacent markets, providing access to additional valuable customer data. This strategy has effectively protected and expanded Amazon's market power in e-commerce and helped Amazon extend that power to other markets.

Over the past two decades, Amazon has acquired at least 100 companies.[1599] It has been particularly aggressive over the past few years, making deals that are bigger and more ambitious

---

[1596] Ron Knox & Shaoul Sussman, *How Amazon Used the Pandemic to Amass More Monopoly Power*, THE NATION (June 26, 2020), https://www.thenation.com/article/politics/amazon-bezos-pandemic-monopoly/.

[1597] Phone Interview with Nat'l Grocers Ass'n (May 28, 2020) (raising concerns that Amazon and some Big Box retailers may have used their buyer power over suppliers during the pandemic to secure inventory at the expense of smaller businesses); Letter from Int'l Bhd. Of Teamsters, Commc'n Workers of Am., United Food & Commercial Workers Int'l Union & Change to Win to Comm'rs of the Fed. Trade Comm'n, 6 (July 23, 2020) (stating that if seller reports are true, "Amazon's hold over sellers effectively took food from the shelves of neighborhood grocery stores . . . and moved it to Amazon's own warehouses, where it earned fees for Amazon."); *see also* Renee Dudley, *The Amazon Lockdown: How an Unforgiving Algorithm Drives Suppliers to Favor the E-Commerce Giant Over Other Retailers*, PROPUBLICA (Apr. 26, 2020), https://www.propublica.org/article/the-amazon-lockdown-how-an-unforgiving-algorithm-drives-suppliers-to-favor-the-e-commerce-giant-over-other-retailers.

[1598] Esther Fung & Sebastian Herrera, *Amazon and Mall Operator Look at Turning Sears, J.C. Penney Stores Into Fulfillment Centers*, WALL ST. J. (Aug. 9, 2017), https://www.wsj.com/articles/amazon-and-giant-mall-operator-look-at-turning-sears-j-c-penney-stores-into-fulfillment-centers-11596992863.

[1599] *See infra* Appendix.

relative to its historical approach.[1600] In 2017, the company made its largest acquisition to date by purchasing Whole Foods for $13.7 billion.[1601] Amazon's other large purchases include Ring, which it bought for $1.2 billion in 2018; PillPack, which it bought for $1 billion in 2018; and Zappos, which it bought for $1.2 billion in 2009.[1602] Over the years, Amazon has acquired an assortment of highly recognizable companies, including IMDB.com, which it bought in 1998; Audible, which it bought in 2008; Goodreads, which it bought in 2013; and Twitch, which it bought in 2014.[1603]

Amazon's acquisition strategy has led to fewer choices for consumers in terms of differentiated online retail channels, as well as reduced competitive pressure in terms of price and quality. Additionally, Amazon's expansion into a diverse array of business lines—from brick-and-mortar supermarkets to home security—has reinforced its significant stockpile of consumer data. With more data about online and offline consumer behavior, Amazon's acquisitions set in motion a self-reinforcing cycle, creating an ever-widening gap between the platform and its competitors. As one former Amazon employee told Subcommittee staff, "Amazon is first and foremost a data company, they just happen to use it to sell stuff."[1604]

Over its history, Amazon has acquired a number of its rivals.[1605] A decade ago, Amazon acquired two of its direct competitors: Zappos and Quidsi.[1606] Documents reviewed by Subcommittee staff show that Amazon viewed both online retailers as competitive threats prior to acquiring them.

Amazon's 2009 acquisition of Zappos, an online shoe-retailer, marked the company's first $1 billion-plus purchase.[1607] Acquiring Zappos provided Amazon with two important advantages. First, it

---

[1600] *Infographic: Amazon's Biggest Acquisitions,* CB INSIGHTS (June 19, 2019), https://www.cbinsights.com/research/amazon-biggest-acquisitions-infographic/.

[1601] *Id.*

[1602] *Id.*

[1603] *Amazon Acquisitions*, MICROACQUIRE, https://acquiredby.co/amazon-acquisitions/ (last visited Oct. 3, 2020).

[1604] Interview with Source 91 (May 8, 2020); *see also* Submission from Artist Rights Alliance, to H. Comm. on the Judiciary, 2 (July 31, 2019) (on file with Comm.) ("With respect to the music world, at the heart of this problem lies a simple, economic truth – companies like . . . Amazon are not music businesses. They are advertising platforms and data machines. As our then-President, Melvin Gibbs, told the *New York Times* back in 2017, 'None of these companies that are supposedly in the music business are actually in the music business. They are in the data-aggregation business. They're in the ad-selling business. The value of music means nothing to them.'").

[1605] *See* Stigler Report at 75 n.152 ("The number of potential competitors purchased by the tech giants is large. For example, Amazon has purchased Zappos, Fabric, CDNow, Quorus, Audible, Goodreads, and Quidsi"); TIM WU, THE CURSE OF BIGNESS: ANTITRUST IN THE NEW GILDED AGE 124 (Columbia Global Reports ed., 2018) ("Amazon acquired would-be competitors like Zappos, Diapers.com, and Soap.com.").

[1606] *Amazon Closes Zappos Deal, Ends Up Paying $1.2 Billion*, TECHCRUNCH (Nov. 2, 2009), https://techcrunch.com/2009/11/02/amazon-closes-zappos-deal-ends-up-paying-1-2-billion/; *Confirmed: Amazon Spends $545 Million on Diapers.com Parent Quidsi*, TECHCRUNCH (Nov. 8, 2010, 9:04 AM), https://techcrunch.com/2010/11/08/confirmed-amazon-spends-545-million-on-diapers-com-parent-quidsi/.

[1607] Eric Engleman, *Amazon and Zappos, Six Months Later: How They're Fitting Together*, PUGET SOUND BUS. J. (May 21, 2010), https://www.bizjournals.com/seattle/blog/techflash/2010/05/amazon_and_zappos_how_theyre_fitting_together.html.

enabled Amazon to add significant selection to its category of shoes and other fashion-related items at a time when expanding its selection was critical to the company's success.[1608] The added selection included access to "hold-out" brands, which had previously refused to sell on Amazon.com or Amazon's other online retail store Endless.com.[1609] Second, Zappos' unique approach to customer service, marked by "a deeply felt connection with customers," added an emotional and psychological element to Amazon's relationship with consumers.[1610] An Amazon internal planning document from 2008 referred to Zappos as one of Endless's "primary competitors," and notes that "Zappos offers the largest selection of brands and styles and carries all of our top holdouts including Nike, Merrell, Keen, Cole Haan and Michael Kors."[1611]

About a year later, Amazon acquired Quidsi, the parent company of Diapers.com and Soap.com, for about $540 million.[1612] Prior to buying it, Amazon identified Diapers.com as its "largest and fastest growing competitor in the on-line diaper and baby care space,"[1613] and its "#1 short term competitor."[1614] Amazon's internal documents said that Diapers.com "keep[s] the pressure on pricing on us" and provided extremely high customer service levels, which—prior to the merger—had forced Amazon to up its game.[1615] Amazon executives took swift and predatory action in response to this competitive threat. As Representative Mary Gay Scanlon (D-PA) summarized at the Subcommittee's sixth hearing, Amazon's internal documents "show that Amazon employees began strategizing about ways to weaken this company, and, in 2010, Amazon hatched a plot to go after Diapers.com and take it out."[1616] Specifically, Amazon's documents show that the firm entered into an aggressive price war, in which Amazon was willing to bleed over $200 million in losses on diapers in one month.[1617] Addressing Mr. Bezos, Representative Scanlon added, "Your own documents make clear that the price

---

[1608] Bill Taylor, *Amazon and Zappos: A Savvy Deal*, Harv. Bus. Rev. (July 23, 2009), https://hbr.org/2009/07/a-savvy-deal-from-amazon-to-za.

[1609] Alistair Barr, *Amazon to Close Fashion Website endless.com*, Reuters: Indus., Materials and Utils. (Sept. 18, 2012), https://www.reuters.com/article/amazon-endless/amazon-to-close-fashion-website-endless-com-idUSL1E8KINKD20120918 (quoting an Amazon spokesman who stated that Amazon shut down Endless.com as an independent site in 2012 and incorporated it into Amazon's main website, Amazon.com, "in order to focus on the Amazon Fashion experience").

[1610] Bill Taylor, *Amazon and Zappos: A Savvy Deal*, Harv. Bus. Rev. (July 23, 2009), https://hbr.org/2009/07/a-savvy-deal-from-amazon-to-za.

[1611] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00170649 (Sept. 23, 2008) (on file with Comm.).

[1612] Claire Cain Miller, *Amazon Has a Reported Deal to Buy Parent of Diapers.com*, N.Y. Times (Nov. 7, 2010), https://www.nytimes.com/2010/11/08/technology/08amazon.html.

[1613] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00142833 (May 12, 2009) (on file with Comm.).

[1614] *Id.* at AMAZON-HJC-00151722 (Feb. 9, 2009).

[1615] *Id.* at AMAZON-HJC-00151722–24 (Feb. 9, 2009).

[1616] CEO Hearing Transcript at 81–82 (question of Rep. Mary Gay Scanlon (D-PA), Vice Chair, H. Comm. on the Judiciary).

[1617] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00057007 (Apr. 5. 2010) (on file with Comm.).

war against Diapers.com worked, and within a few months it was struggling, and so then Amazon bought it."[1618]

In 2017, Amazon shut down Diapers.com, citing profitability issues, though some industry experts questioned the legitimacy of this rationale.[1619] In shutting down the company, Amazon eliminated a differentiated online retailer that consumers loved[1620]—reducing the number of online options for consumers in the diaper and baby care markets. Further, it eliminated a potential competitor in other verticals such as household goods, toys, and pets.[1621]

More recently, Amazon acquired Whole Foods, a strategic move to acquire both a competitor,[1622] and a new source of customer data.[1623] Amazon purchased Whole Foods at around $13.7 billion, more than 10 times the cost of its second-most expensive acquisition.[1624] In addition to bolstering its position in the grocery market, Amazon's purchase of Whole Foods expanded its touchpoints with Prime members and gave it access to a unique set of customer information.[1625] Specifically, the deal enabled Amazon to monitor and compile data on how the same person shops

---

[1618] CEO Hearing Transcript at 82–83 (question of Rep. Mary Gay Scanlon (D-PA), Vice Chair, H. Comm. on the Judiciary).

[1619] *See, e.g.*, Jason Del Rey, *Why Amazon's Explanation for Shutting Down Diapers.com and Quidsi Stunned Employees*, Vox: Recode (Apr. 2, 2017), https://www.vox.com/2017/4/2/15153844/amazon-quidsi-shutdown-explanation-profits.

[1620] *See, e.g.*, Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00034097 (Nov. 8, 2010) (on file with Comm.) (email from Diapers.com founder Vinit Bharara forwarding a customer testimonial in the form of a poem titled "An Ode to Diapers.com," beginning, "Oh how do I love thee, my Diapers.com?" and ending with "Don't ever leave me, my Diapers.com").

[1621] *Id.* at AMAZON-HJC-00154656 (noting that "[a]lthough Quidsi is still primarily an online baby care specialty retailer, it has recently begun selling new items such as household goods and personal-care products with the launch of Soap.com . . . . In the future, management intends to launch additional vertical shopping categories such as beauty, toys and pets."); AMAZON-HJC-00132026 (June 8, 2010) (email from Doug Herrington, Vice President of Consumables, to Jeff Bezos stating, "While we find no evidence that alice.com has gotten traction with vendors or customers, and can't see an economic model for them that pencils out, soap.com feels like a more credible threat").

[1622] *Id.* at AMAZON-HJC-00172932 (June 22, 2017) (showing analysis that for Amazon Fresh customers who don't do 100% shopping on Amazon Fresh, Whole Foods is consistently among the top 5 stand-alone national chains where Amazon Fresh customers do their grocery shopping).

[1623] Lauren Hirsch, *A year after Amazon announced its acquisition of Whole Foods, here's where we stand*, CNBC (June 15, 2018), https://www.cnbc.com/2018/06/15/a-year-after-amazon-announced-whole-foods-deal-heres-where-we-stand.html.

[1624] *Infographic: Amazon's Biggest Acquisition*, CB Insights (June 19, 2019), https://www.cbinsights.com/research/amazon-biggest-acquisitions-infographic/.

[1625] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00172090 (June 22, 2017) (on file with Comm.) ("[A] survey said about 45% of WFM customers are Prime; and about 20% of Prime members shop at [Whole Foods Market]."); Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00173652 (June 23, 2017) (on file with Comm.) ("Based on our survey results, we estimate that approximately 46% of Prime members have shopped at a [Whole Foods] store in the last four weeks.").

both online and in person, data that is particularly useful for targeted advertising and promotional campaigns.[1626]

While the deal was under review by the FTC, then-Ranking Member Cicilline raised concerns that "the proposed acquisition w[ould] result in additional consolidation in the retail sector, erode American jobs through increased automation, and threaten local communities through diminished economic opportunity for hardworking Americans."[1627] Amazon's acquisition of Whole Foods has added to the platform's market power in retail by increasing its buyer power over suppliers,[1628] adding to the platform's capabilities in online grocery, and expanding the company's brick-and-mortar retail footprint. In addition, it appears that concerns about diminished economic opportunities may have been well-founded as Amazon reportedly plans to implement cashier-less technology across all of its Whole Foods stores.[1629]

In recent years, Amazon has also made several significant acquisitions of home security companies, further expanding its reach and visibility into Americans' homes. An Amazon executive described the company's in-home strategy by noting, "Two senses matter – eyes and ears."[1630] In 2017, Amazon paid $90 million to acquire Blink, a home security camera company whose technology and energy-efficient chips could be used by Amazon in its Echo speakers and other products.[1631] In 2018, Amazon spent $1.2 billion to acquire Ring, a home-security system spanning cameras, doorbells, and floodlights.[1632] Ring's "eyes and ears" add significant value to Amazon's smart home, allowing customers to virtually interact with Amazon delivery personnel and instruct them on where to drop off Amazon packages.[1633] Amazon's significant investments in the Internet of Things ecosystem and its strategy, centered on Amazon's voice assistant, Alexa, are discussed in other parts of this Report.

---

[1626] Lauren Hirsch, *A Year After Amazon Announced Its Acquisition of Whole Foods, Here's Where We Stand*, CNBC (June 15, 2018), https://www.cnbc.com/2018/06/15/a-year-after-amazon-announced-whole-foods-deal-heres-where-we-stand.html.

[1627] Letter from Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary to Hon. Bob Goodlatte, Chairman, H. Comm. on the Judiciary, Hon. Tom Marino, Chairman, Subcomm. on Regulatory Reform, Commercial and Antitrust Law, 3 (July 13, 2017), https://cicilline.house.gov/sites/cicilline.house.gov/files/images/Amazon_Whole_Foods_Acquistion.pdf.

[1628] *See, e.g.*, Interview with Source 153 (May 11, 2020); Interview with Nat'l Grocers Ass'n (May 28, 2020).

[1629] Taylor Lyles, *Amazon Go's Cashierless Tech May Come to Whole Foods As Soon As Next Year*, THE VERGE (Aug. 24, 2020), https://www.theverge.com/2020/8/24/21399607/amazon-cashierless-go-technology-whole-foods-2021-rumor.

[1630] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00170877 (Oct. 11, 2017) (on file with Comm.).

[1631] Jeffrey Dastin, *Amazon Quietly Dropped $90 Million on a Camera Startup Last Year to Acquire its Unique Chip Technology*, BUS. INSIDER (Feb. 12, 2018), https://www.businessinsider.com/amazon-blink-camera-maker-acquisition-2018-2.

[1632] Dennis Green, *Amazon's $1 Billion Acquisition of the Door Camera Startup Ring is the Company Doing What It Does Best – and it Should Terrify Every Other Retailer*, BUS. INSIDER (Mar. 3, 2018), https://www.businessinsider.com/why-amazon-acquired-ring-2018-3.

[1633] *Id.*

Other notable acquisitions include Kiva Systems in 2012, which provided Amazon with a robotics company that accelerated its ability to streamline picking, packing, and shipping e-commerce products;[1634] and PillPack in 2018, which equips Amazon with an online pharmacy and marks its entry into the pharmaceutical market.[1635]

Amazon's acquisition of Kiva gave it power over an important input for competitors. When Amazon bought the robotics company, Kiva was supplying technology to a large number of retailers, including Gap, Staples, and Walgreens.[1636] Many of these customers had invested a sunk cost of $4 million to $6 million per warehouse in order to make use of Kiva's technologies.[1637] Kiva had promised to keep shipping its technology to non-Amazon customers—regardless of whether they competed with Amazon—but in 2015, Amazon rebranded the company as Amazon Robotics and announced it would stop servicing other firms.[1638] Amazon stated that retailers seeking to use Kiva's robots would need to use Amazon Services to fulfill orders with Amazon's technology in Amazon's warehouses.[1639]

Documents Subcommittee staff reviewed relating to the PillPack deal, meanwhile, give insight into how Amazon views some acquisitions as opportunities to collect additional customer data and to cross-sell across its different business lines. One Amazon executive summarized a potential upside of the PillPack deal, asking, "Is there a cross-selling opportunity with amazon.com based on known maladies from prescriptions? Or is this prohibited by privacy law? My understanding is there is a number of different ways we could cross-sell customers in both directions (Rx<>non-Rx)."[1640] Though it is unclear whether and the extent to which Amazon implemented this strategy, the exchange reveals how Amazon assesses potential acquisitions and the cross-business opportunities they create, suggesting that the firm views its vast operations in a highly integrated manner.

---

[1634] Leena Rao, *Amazon Acquires Robot-Coordinated Order Fulfillment Company Kiva Systems For $775 Million In Cash*, TECHCRUNCH (Mar. 19, 2012), https://techcrunch.com/2012/03/19/amazon-acquires-online-fulfillment-company-kiva-systems-for-775-million-in-cash/.

[1635] Christina Farr, *The Inside Story of Why Amazon Bought PillPack in its Effort to Crack the $500 Billion Prescription Market*, CNBC (May 13, 2019), https://www.cnbc.com/2019/05/10/why-amazon-bought-pillpack-for-753-million-and-what-happens-next.html.

[1636] Evelyn M. Rusli, Amazon.com to Acquire Manufacturer of Robotics, N.Y. TIMES: DEALBOOK (Mar. 19, 2012), https://dealbook.nytimes.com/2012/03/19/amazon-com-buys-kiva-systems-for-775-million/.

[1637] Mick Mountz, *Kiva the Disrupter*, HARV. BUS. REV. (Dec. 2012), https://hbr.org/2012/12/kiva-the-disrupter.

[1638] Adam Putz, M&A flashback: Amazon announces $775M Kiva Systems acquisition, PITCHBOOK (Mar. 19, 2018), https://pitchbook.com/news/articles/ma-flashback-amazon-announces-775m-kiva-systems-acquisition.

[1639] *Id.*

[1640] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00172665 (May 23, 2018) (on file with Comm.).

The FTC investigated several of these transactions, including Amazon's acquisition of Quidsi, the parent company of Diapers.com,[1641] and Whole Foods.[1642] The agency declined, however, to challenge any of them as a violation of antitrust law despite: (1) strong evidence, in some cases, of direct head-to-head competition on price and quality between the merging firms; and (2) evidence that many of these mergers would enable Amazon to expand or entrench its market power, particularly in e-commerce. For most, if not all, of the acquisitions discussed in this Report, the FTC had advance notice of the deals but did not attempt to block any of them.

In addition to eliminating competitive threats, Amazon's acquisition strategy has expanded and protected the company's dominance. The company's significant expansion into new markets, paired with Amazon's wealth of data from its retail business, has fueled the platform's increasing market power. Amazon Associate General Counsel Nate Sutton testified at the Subcommittee's hearing last July that "Amazon is proud to be a company of builders and we have built our company from within, not through acquisitions."[1643] But the evidence examined during the investigation demonstrates that Amazon's acquisitions—including acquisitions of its direct competitors—have been key to Amazon's attainment, maintenance, and expansion of market power.

    c.   <u>Conduct</u>

        i.   <u>Treatment of Third-Party Sellers</u>

           1)  <u>Bullying</u>

While Amazon has referred to third-party sellers on its Marketplace as "partners," and "customers,"[1644] numerous small and medium-sized businesses told the Subcommittee that Amazon routinely bullies and mistreats them. The Online Merchants Guild, a trade association representing the interests of sellers engaged in online commerce, stated that they "have seen Amazon use their position of strength to take advantage of sellers."[1645]

Underlying Amazon's public-facing rhetoric is the reality that it views many of the sellers on its platform as competitors. In its internal documents, Amazon refers to third-party sellers as "internal

---

[1641] Letter from April Tabor, Acting Sec. of the Fed. Trade Comm'n, to Thomas Barnett (Aug. 22, 2012).

[1642] Press Release, Fed. Trade Comm'n, Statement of Federal Trade Commission's Acting Director of the Bureau of Competition on the Agency's Review of Amazon.com, Inc.'s Acquisition of Whole Foods Market Inc. (Aug. 23, 2017), https://www.ftc.gov/news-events/press-releases/2017/08/statement-federal-trade-commissions-acting-director-bureau.

[1643] Innovation and Entrepreneurship Hearing Transcript at 39 (statement of Nate Sutton, Assoc. Gen. Counsel, Competition, Amazon.com, Inc.).

[1644] *See, e.g.*, CEO Hearing at 44 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.) ("Amazon makes significant investments to support Amazon's selling partners."); 41 ("Amazon recognizes that third-party sellers are our customers too, and their trust is critical to Amazon's success.").

[1645] Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 3 (Oct. 29, 2019) (on file with Comm.).

competitors."[1646] At the Subcommittee's sixth hearing, Subcommittee Chairman Cicilline asked Mr. Jeff Bezos about Amazon's apparent doublespeak.[1647] In response, Mr. Bezos conceded, "[I]t wouldn't surprise me. In some ways, we are competing."[1648]

Over the course of the investigation, the Subcommittee heard from numerous sellers who described abusive tactics or mistreatment by Amazon in a variety of circumstances. For example, at the Subcommittee's fifth hearing, CEO and Founder of PopSockets David Barnett testified about Amazon's bullying tactics, which he said were enabled by "the asymmetry in power between Amazon and its partners."[1649] He stated that after the two companies decided on a minimum price at which Amazon would sell PopSockets, Amazon sold the products for a lower price and then demanded that PopSockets pay for the lost margin.[1650] As a result, PopSockets decided to end its relationship with Amazon Retail.[1651] When PopSockets communicated this intent to Amazon, its response was, "No, you are not leaving the relationship."[1652] PopSockets did sever its relationship with Amazon Retail for a period of time, but reestablished it about a year later.[1653] Mr. Barnett estimates that in 2019 his company incurred losses of $10 million in revenue from when he stopped selling to Amazon Retail and Amazon blocked one of his authorized distributors from selling on the marketplace.[1654]

Subcommittee staff learned about numerous other instances of Amazon employing strong-arm tactics in negotiations. A company that conducts business with multiple divisions of Amazon described how the platform leveraged its dominance in e-commerce to force acceptance of certain terms and conditions during negotiations over a different part of its business.[1655] According to this company, Amazon knows the power they have as a retailer. In the midst of negotiations, the platform repeatedly referenced its power to destock the company's products on Amazon.com as a "bargaining chip to force terms" unrelated to retail distribution on the company.[1656] The company added, "Amazon know[s] they

---

[1646] *See, e.g.*, Production from Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00206715 (Mar. 8, 2016) (on file with Comm.) (describing change to manual Pricing Rules when Amazon offer is competing with "internal 3P competitor" offers); AMAZON-HJC-00038917 (Sept. 2009) (describing proposal on "how to treat FBA sellers differently from other Buy Box (BB) eligible 3P sellers when we're matching *internal* competitors for non-media categories."); AMAZON-HJC-00142724 (defining Amazon's "Standard Price Matching Policy," and conditions when "Internal competitors (3P merchants) are matched" on price").

[1647] CEO Hearing Transcript at 93 (question of Rep. David N. Cicilline (D-RI), Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary).

[1648] *Id.* (statement of Jeff Bezos, CEO, Amazon, Inc.)

[1649] Competitors Hearing at 5 (statement of David Barnett, CEO & Founder, Popsockets LLC),

[1650] *Id.* at 22 (statement of David Barnett, CEO & Founder, Popsockets LLC).

[1651] *Id.*

[1652] *Id.* at 23.

[1653] *Id.* at 3–4 (statement of David Barnett, CEO & Founder, Popsockets LLC).

[1654] *Id.* at 4 (statement of David Barnett, CEO & Founder, Popsockets LLC).

[1655] Interview with Source 148 (Aug. 26, 2020).

[1656] *Id.*

have a lot of power [in retail e-commerce] and they are not afraid to use it to get terms they want in other markets."[1657]

Book publishers described a similar asymmetric power dynamic with Amazon. According to one publisher, "Amazon has used retaliation . . . to coerce publishers to accept contractual terms that impose substantial penalties for promoting competition" with Amazon's rivals.[1658] The publisher added that the platform's retaliatory conduct shows "Amazon's ability and willingness to leverage its market power to prevent publishers from working effectively with rival e-book retailers and, thereby, maintain and enhance its dominance in e-book distribution."[1659] Amazon's retaliatory tactics against publishers include removing the "buy" button, which blocks a customer's ability to purchase a publisher's current titles;[1660] and removing the "pre-order" button, which eliminates the ability for a consumer to pre-order a publishers' forthcoming titles.[1661] Another form of retaliation that Amazon reportedly engaged in was showing publishers' titles as out of stock or with delayed shipping times.[1662] According to credible reports, Amazon used these tactics in its public battle with Hachette Book Group in 2014 over e-book pricing,[1663] and has used them or threatened to use them in more recent negotiations.[1664] Publishers, authors, and booksellers have "significant fear" because of Amazon's dominance.[1665]

Amazon can treat sellers in this manner because it knows that sellers have no other realistic alternatives to the platform. As Mr. Barnett noted in his testimony:

> When there is bullying by an extremely successful company with all these partners that continue to do business with it, one has to ask how is it that such a successful business maintains partnerships with so many companies while bullying them. It is because of the power asymmetry . . . that companies tolerate this.[1666]

---

[1657] *Id.*

[1658] Submission from Source 17, to H. Comm. on the Judiciary, 13 (Nov. 14, 2019) (on file with Comm.).

[1659] *Id.* at 3 (Sept. 22, 2020) (on file with Comm.).

[1660] *See, e.g.*, David Streitfeld, *Amazon Pulls Thousands of E-Books in Dispute*, N.Y TIMES: Bits (Feb. 22, 2012), https://bits.blogs.nytimes.com/2012/02/22/amazon-pulls-thousands-of-e-books-in-dispute/?hpw.

[1661] *See, e.g.*, Polly Mosendz, *Amazon Blocks Pre-orders Of Hachette Books*, THE ATLANTIC (May 23, 2014), https://www.theatlantic.com/business/archive/2014/05/amazon-blacklists-hachette-books/371545/.

[1662] *See, e.g.*, David Streitfeld, *Writers Feel an Amazon-Hachette Spat*, N.Y. TIMES (May 9, 2014), https://www.nytimes.com/2014/05/10/technology/writers-feel-an-amazon-hachette-spat.html.

[1663] *Id.*

[1664] *See* Interview with Source 155 (Sept. 29, 2020); Submission from Source 17, to H. Comm. on the Judiciary, 13–18 (Nov. 14, 2019) (on file with Comm.).

[1665] Interview with Ass'n of Am. Publishers, Authors Guild & Am. Booksellers Ass'n (Aug. 26, 2020).

[1666] Competitors Hearing at 23 (statement of David Barnett, CEO & Founder, Popsockets LLC).

A recent complaint filed against Amazon described the situation as follows, "From the third-party retailers' perspective, Amazon Marketplace is like Hotel California, a lovely place to start or expand an online retail business, but check out from Amazon Marketplace and you can quickly find your business in bankruptcy."[1667] Additional comments from sellers that Subcommittee staff interviewed include, "We're stuck. We don't have a choice but to sell through Amazon,"[1668] and, referring to Amazon, "They've never been a great partner, but you have to work with them."[1669]

As Stacy Mitchell, Co-Director of the Institute for Local Self-Reliance, noted during the Subcommittee's hearing on Innovation and Entrepreneurship, "Among the most egregious examples of Amazon's arbitrary treatment of sellers are its abrupt suspensions of their accounts, frequently made without explanation."[1670] Once Amazon suspends a seller's account or delists its products, the business is left with largely ineffective remedies as they watch their sales disappear. Sellers shared with Subcommittee staff that communications to Amazon's Seller Support Central generally prompt automated, unhelpful responses, which may be entirely unrelated to the specific case, question, or concern raised by the seller.[1671]

The founder of an infant product sold on Amazon told Subcommittee staff that after her products were mistakenly delisted, "[i]t would take weeks of repeated calls—at least 10 or 15 contacts with Seller Support—before somebody inside would determine that it was a mistake and error," and take action to fix the problem.[1672] She stated that this happened at least six times, and that in each instance her listings would be down for two to three weeks at a time.[1673] Describing how Amazon's mistakes can threaten a new business's survival, this small-business owner said:

> When you're a new company and Amazon suddenly delists you, it creates fear in the customer. "Where did it go? Is there something wrong with the product? What happened?" If a customer searched and it's no longer there, they're unlikely to ever come back and buy it . . . You've probably lost that customer for good.[1674]

---

[1667] Class Action Complaint at 20, Frame-Wilson v. Amazon.com, Inc., No. 20-cv-00424 (W.D. Wash., Mar. 9, 2020).

[1668] Interview with Source 150 (July 11, 2020).

[1669] Interview with Source 151 (July 2, 2020).

[1670] Innovation and Entrepreneurship Hearing at 9 (statement of Stacy F. Mitchell, Co-Dir., Inst. for Local Self-Reliance).

[1671] Interview with Source 125 (Jan. 9, 2020); see also Submission from Joel Hellmann, to H. Comm. on the Judiciary (July 31, 2019) (on file with Comm.) (responding to automated messaged, "If you were a person and not a robot you would have read that I already tried this and it failed.").

[1672] Interview with Source 149 (July 22, 2020).

[1673] Id.

[1674] Id.

In another example, a third-party bookseller told Subcommittee staff that Amazon delisted 99% of his business's inventory in September 2019.[1675] The bookseller requested that Amazon return its products, which were stored in Amazon's warehouses.[1676] As of July 2020, Amazon had only returned a small fraction of the bookseller's inventory and continued to charge him storage fees.[1677] Amazon blocked the bookseller both from selling its products on its marketplace and retrieving its inventory, precluding the seller from trying to recover some of his losses by making sales through another, albeit lesser, channel. At the Subcommittee's sixth hearing, Representative Lucy McBath (D-GA) presented the bookseller's story to Mr. Bezos, who responded that this treatment is "not the systematic approach that [Amazon] take[s]."[1678] However, evidence Subcommittee staff collected through extensive seller interviews shows that Amazon's poor treatment of sellers is far from an isolated incident—a fact supported both by public posts on Amazon's Seller Central forum,[1679] as well as pleas for help routinely sent directly to Mr. Bezos.[1680]

Because of the severe financial repercussions associated with suspension or delisting, many Amazon third-party sellers live in fear of the company.[1681] For sellers, Amazon functions as a "quasi-state," and many "[s]ellers are more worried about a case being opened on Amazon than in actual court."[1682] This is because Amazon's internal dispute resolution system is characterized by uncertainty, unresponsiveness, and opaque decision-making processes.

---

[1675] Interview with Source 125 (July 7, 2020).

[1676] *Id.*

[1677] *Id.*

[1678] CEO Hearing Transcript at 89 (statement of Jeff Bezos, CEO, Amazon.com, Inc.).

[1679] *See, e.g.*, iNOVATECH_MEDICAL, *Inventory being held hostage by Amazon for 3 months*, AMAZON SERVICES SELLER FORUMS (Apr. 8, 2020, 10:30 PM), https://sellercentral.amazon.com/forums/t/inventory-being-held-hostage-by-amazon-for-3-months/607892.

[1680] *See* Josh Dzieza, *Prime and Punishment: Dirty Dealing in the $175 Billion Amazon Marketplace*, THE VERGE (Dec. 19, 2018), https://www.theverge.com/2018/12/19/18140799/amazon-marketplace-scams-seller-court-appeal-reinstatement ("Emailing the richest man in the world is actually the standard method of escalating an Amazon seller appeal. It's called a Jeff Bomb, or . . . a Jeff Letter."); Interview with Chris McCabe, Founder, ecommerceChris LLC (Dec. 30, 2019) ("Out of desperation, some sellers try to email Jeff Bezos directly."); Submission from Source 125, to H. Comm. on the Judiciary (Jan. 27, 2020) (on file with Comm.); Submission from Source 150, to H. Comm. on the Judiciary (Aug. 16, 2017) (on file with Comm.).

[1681] *See, e.g.*, Submission from Source 125, to H. Comm. on the Judiciary (July 17, 2020) (on file with Comm.) ("My pregnant wife had to visit the ER due to increased anxiety and fear for the future . . . . Due to Amazon's stature, influence, and bullying nature, we are afraid of retaliation."); Interview with Source 154 (July 2, 2019) ("[Amazon] know[s] that small sellers have no power and no ability to avoid them," because "they are the powerhouse giant in the transaction and they could crush us."). *See also* Submission from Nat'l Ass'n of Wholesaler-Distributors, to H. Comm. on the Judiciary, 3 (July 22, 2020) (on file with Comm.) ("Small businesses that depend upon Amazon for access to their markets, including many of our members, fear retribution by Amazon if they speak up.").

[1682] Josh Dzieza, *Prime and Punishment: Dirty Dealing in the $175 Billion Amazon Marketplace*, THE VERGE (Dec. 19, 2018), https://www.theverge.com/2018/12/19/18140799/amazon-marketplace-scams-seller-court-appeal-reinstatement.

Additionally, the sellers interviewed by Subcommittee staff generally indicated that Amazon's customer service and treatment towards them have declined significantly in recent years. One business owner, who has been selling on Amazon for over a decade, told Subcommittee staff that in the past, a seller could get meaningful assistance by talking to an Amazon representative over the phone.[1683] He said, "I used to think that Amazon was a partner," but, now, "I don't think they care about the third party seller . . . . They treat us as a commodity."[1684] Internal Amazon documents suggest that the company's hyper-focus on a cost-cutting strategy to adopt automated processes for nearly everything—which Amazon refers to as "HOTW" or "Hands off the wheel"[1685]—combined with the platform's monopoly power over sellers may be to blame for Amazon's atrocious levels of customer service for sellers.

Amazon has recently monetized the degradation of its seller services, rolling out a program where sellers can pay an extra fee for a dedicated account representative. Sellers are supposed to pay for representatives to help them solve the very problems that Amazon created in the first place. Many sellers say, however, that even with paid Amazon account managers they are often unable to get their issues resolved. One seller told Subcommittee staff, "It [i]s a problem that an algorithm can make a decision that just shuts off my income stream and there's nothing I can do to get it back . . . . The only thing I can do to get it back is pay $6,000 a month for a dedicated rep and even then, it doesn't always work."[1686]

The last resort for sellers facing these circumstances is the "Jeff Bomb," or "Jeff Letter," in which a seller sends an email to Mr. Bezos to plead their case.[1687] As the Online Merchants Guild explained in its submission, "a 'Jeff Letter' is almost like a Writ of Certiorari within Amazon's internal kangaroo court system."[1688] But by the time this point is reached, "a seller could be locked out of their account, or denied funds, for weeks, losing hundreds of thousands of dollars even if the mistake was

---

[1683] Interview with Source 152 (Sept. 18, 2020).

[1684] *Id.*

[1685] *See, e.g.*, Production from Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00227277 (on file with Comm.) ("The implementation of Hands Off the Wheel in [Site Merchandising] will mean that through automation . . . there is less work for humans. . . . Project Tiger combines all Hands off the Wheel (HOTW) programs and Amazon spans of control guidelines."); AMAZON-HJC-00227278 (Apr. 27, 2017) ("We are pursuing three tracks to drive Productivity savings: 1) FCF initiatives; 2) HOTW; and 3) Defect Reduction & Catalog Improvement.").

[1686] Interview with Source 149 (July 22, 2020). *See also* Submission from Source 100, to H. Comm. on the Judiciary (identifying one concern with Amazon's treatment of sellers as, "Pay or Die - Forcing sellers to pay for their support services to correct Amazon's wrong doings").

[1687] Josh Dzieza, *Prime and Punishment: Dirty Dealing in the $175 Billion Amazon Marketplace*, THE VERGE (Dec. 19, 2018), https://www.theverge.com/2018/12/19/18140799/amazon-marketplace-scams-seller-court-appeal-reinstatement ("Emailing the richest man in the world is actually the standard method of escalating an Amazon seller appeal. It's called a Jeff Bomb, or . . . a Jeff Letter."). *See also* Interview with Chris McCabe, Founder, ecommerceChris LLC (Dec. 30, 2019) ("Out of desperation, some sellers try to email Jeff Bezos directly."); Submission from Source 125, to H. Comm. on the Judiciary (Jan. 27, 2020) (on file with Comm.); Submission from Source 150, to H. Comm. on the Judiciary (Aug. 16, 2017) (on file with Comm.).

[1688] Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 3 (Oct. 29, 2019) (on file with Comm.).

Amazon's."[1689] Because of the large volume of sellers who reach this point of last resort, sending a "Jeff Letter" is not a realistic avenue for most sellers to get their issues addressed.

### 2) Forced Arbitration

All of Amazon's third-party sellers and most of its vendors are subject to a pre-dispute, binding ("forced") arbitration clause,[1690] requiring them to sign away the right to their day in court if a dispute with Amazon arises. Subcommittee staff heard from sellers who said that if it were not for Amazon's market power over them, they would not agree to this term.[1691] As noted by the Online Merchants Guild, "Through arbitration, Amazon knows it holds all the cards, and in many ways has the final say whenever there is a dispute."[1692] As a result, sellers rarely initiate arbitration actions against Amazon. Between 2014 and 2019, even as the number of Amazon sellers continued to grow by hundreds of thousands per year, only 163 sellers and 16 vendors initiated arbitration proceedings.[1693] Because sellers are generally aware that the process is unfair and unlikely to result in a meaningful remedy, they have little incentive to bring an action.

As extensive scholarship has shown, forced arbitration often fails to provide a legitimate forum for resolving disputes and instead usually serves to insulate those engaging in wrongdoing from liability.[1694] The case of Amazon sellers is no different. In practice, arbitration functions as a way for Amazon to keep disputes within its control, with the scales tipped heavily in its favor. As such, Amazon can withhold payments from sellers, suspend their accounts without cause, and engage in other abusive behavior without facing any legal consequences for its actions.[1695]

### 3) Seller Fee Increases

Amazon's treatment of sellers indicates that it sees them as a source of profit, rather than "Amazon's treatment of sellers indicates that it sees them as a source of profit, rather than

---

[1689] *Id.*

[1690] Data and Innovation Hearing at 49–50 (response to Questions for the Record, Nate Sutton, Assoc. Gen. Counsel, Competition, Amazon.com, Inc.); *Amazon Services Business Solutions Agreement*, AMAZON SELLER CENTRAL, https://sellercentral.amazon.com/gp/help/external/G1791 (last visited Sept. 29, 2020).

[1691] *See, e.g.*, Interview with Source 125 (Jan. 9, 2020) (explaining reason for agreeing to Amazon's terms, "What can I do? They don't give me much choice. You are so small that you don't have any leverage.").

[1692] Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 3 (Oct. 29, 2019) (on file with Comm.).

[1693] Data and Innovation Hearing at 49–51 (response to Questions for the Record, Nate Sutton, Assoc. Gen. Counsel, Competition, Amazon.com, Inc.).

[1694] *See* Cynthia Estlund, *The Black Hole of Mandatory* Arbitration, 96 N.C. L. REV. 679, 684 (2018) (stating that mandatory arbitration "effectively enables employers to nullify employee rights and to insulate themselves from the liabilities that back up crucial public policies"); see *also* Judith Resnik, *Diffusing Disputes: The Public in the Private of Arbitration, the Private in Courts, and the Erasure of Rights*, 124 YALE L.J. 2804, 2873 (2015) ("Mandated arbitration is also common in web-based sales.").

[1695] *See* Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 3 (Oct. 29, 2019) (on file with Comm.).

"partners."[1696] Individuals and small businesses who depend on access to the platform to make sales report that Amazon has raised seller fees significantly over the past decade. Over the past five years, a recent Institute for Local Self-Reliance report estimates that Amazon added an extra 11% to its cut of third-party sales.[1697] The platform now takes an average of 30% of each sale compared to 19% in 2015.[1698] In 2018, third-party sellers paid Amazon $39.7 billion in fees, which totaled about 25% of Amazon's $160 billion in Gross Merchandise Volume.[1699] This amount includes commissions, fulfillment and shipping fees, and other third-party seller services, but does not include revenue from the advertising fees for third-party sellers,[1700] which are often substantial.[1701] An internal Amazon document suggests the company can increase fees to third-party sellers without concern for them switching to another marketplace. The document notes that the amount of "seller attrition as a result of [2018] fee increases" for its Fulfillment by Amazon program was "[n]othing significant."[1702]

Amazon's pattern of exploiting sellers, enabled by its market dominance, raises serious competition concerns. For many sellers, there is no viable alternative to Amazon, and a significant number of sellers rely on its marketplace for their entire livelihood.[1703]

### 4) Appropriation of Third-Party Seller Data

One of the widely reported ways in which Amazon treats third-party sellers unfairly centers on Amazon's asymmetric access to and use of third-party seller data.[1704] During the investigation, the Subcommittee heard repeated concerns that Amazon leverages its access to third-party sellers' data to

---

[1696] See, e.g., Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00206936 (Nov. 8, 2013) (on file with Comm.) ("Seems like we should be making more on the seller loans. . . . Net takeaway is that sellers may be getting too good of a deal… There are different ways to fix… commitment fees, higher rates, etc.. We should get rewarded for satisfying a timing spike like this.").

[1697] STACY MITCHELL, RON KNOX & ZACH FREED, INST. OF LOCAL SELF-RELIANCE, REPORT: AMAZON'S MONOPOLY TOLLBOOTH 3 (2020), https://ilsr.org/amazons_tollbooth/.

[1698] Id. See also Interview with Jason Boyce, Founder & CEO, Avenue7Media, LLC (Sept. 15, 2020) (estimating that most sellers are currently paying an average of 35% in fees to Amazon when you add up the referral fees and payments for ads based on his experience).

[1699] MARKETPLACE PULSE, MARKETPLACES YEAR IN REVIEW 4 (2019), https://cdn.marketplacepulse.com/misc/marketplaces-year-in-review-2019.pdf.

[1700] Id.

[1701] See, e.g., Interview with Top Shelf Brands (Sept. 29. 2020) (estimating Top Shelf paid Amazon over $1 million in fees for advertising in one year); Submission from Top Shelf, to H. Comm. on the Judiciary, Ex. 1 (Oct. 26, 2019) (on file with Comm.).

[1702] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00186540 (Jan. 30, 2018) (on file with Comm.).

[1703] See, e.g., JUNGLESCOUT, THE STATE OF THE AMAZON SELLER 2020 4 (2020), https://www.junglescout.com/wp-content/uploads/2020/02/State-of-the-Seller-Survey.pdf ("More than a third (37%) of sellers [surveyed] earn income from Amazon sales alone.").

[1704] Innovation and Entrepreneurship Hearing at 5 (statement of Stacy Mitchell, Co-Dir., Inst. for Local Self-Reliance) ("Amazon's [gatekeeper power] allows it to maintain a God-like view of the transactions of rival businesses and customers, and use this data to move into new markets with a built-in advantage.").

identify and replicate popular and profitable products from among the hundreds of millions of listings on its marketplace.[1705] Armed with this information, it appears that Amazon would: (1) copy the product to create a competing private-label product[1706]; or (2) identify and source the product directly from the manufacturer to free ride off the seller's efforts, and then cut that seller out of the equation.[1707]

Amazon claims that it has no incentive to abuse sellers' trust because third-party sales make up nearly 60% of its sales, and that Amazon's first-party sales are relatively small.[1708] Amazon has similarly pointed out that third-party listings far outnumber Amazon's first-party listings.[1709] In a recent shareholder letter, CEO Jeff Bezos wrote, "Third-party sellers are kicking our first-party butt. Badly."[1710] In response to a question from the Subcommittee, however, Amazon admitted that by percentage of sales—a more telling measure—Amazon's first-party sales are significant and growing in a number of categories. For example, in books, Amazon owns 74% of sales, whereas third-party sellers only account for 26% of sales.[1711] At the category level, it does not appear that third-party sellers are kicking Amazon's first-party butt. Amazon may, in fact, be positioned to overtake its third-party sellers in several categories as its first-party business continues to grow.

---

[1705] *See, e.g.*, Interview with Source 158 (July 2, 2020); Submission from Nat'l Ass'n of Wholesaler-Distributors, to H. Comm. on the Judiciary (July 22, 2020) (on file with Comm.).

[1706] *See, e.g.*, Interview with Jason Boyce, Founder & CEO, Avenue7Media (Sept. 15, 2020).

[1707] *See, e.g.*, Submission from Nat'l Ass'n of Wholesaler-Distributors, to H. Comm. on the Judiciary (July 22, 2020) (on file with Comm.).

[1708] CEO Hearing at 23 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

[1709] *Id.* at 24.

[1710] Jeff Bezos, *2018 Letter to Shareholders*, THE AMAZON BLOG: DAY ONE (Apr. 11, 2019), https://blog.aboutamazon.com/company-news/2018-letter-to-shareholders.

[1711] CEO Hearing at 25 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

275



**Third-Party vs. First-Part Listings and Sales on Amazon**[1712]

Amazon recognizes that it competes against many of its third-party sellers.[1713] In response to concerns about its unfair use of third-party seller data, Amazon points to its Seller Data Protection Policy, which it instituted in 2014.[1714] According to the company:

> Amazon recognizes that third-party sellers are our customers too, and their trust is critical to Amazon's success. In an effort to further this partnership, Amazon decided years ago to take additional voluntary steps to protect seller data by instituting its voluntarily-adopted Seller Data Protection Policy, which prohibits Amazon Retail teams from using non-public seller-specific data to compete against third-party sellers.[1715]

Following up on public reporting and information collected during the investigation suggesting that Amazon might be abusing its access to third-party sellers' data, Representative Pramila Jayapal (D-WA) asked Amazon lawyer Nate Sutton about this precise issue at a Subcommittee hearing in July 2019. Sutton testified: "We do not use [third-party sellers'] individual data when we're making decisions to launch private brands."[1716]

---

[1712] *Id.* at 24–25 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

[1713] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00142724 (on file with Comm.).

[1714] CEO Hearing at 2 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

[1715] *Id.* at 41 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

[1716] Innovation and Entrepreneurship Hearing Transcript at 51 (statement of Nate Sutton, Assoc. Gen. Counsel, Competition, Amazon.com, Inc.).

Since the July 2019 hearing, public reporting has made clear that, contrary to its own internal policy and testimony before Congress, Amazon routinely appropriates seller data to benefit its own private-label and retail businesses. After the hearing, according to a July 2019 report, a former employee who worked in product management told *The Capitol Forum*, "I used to pull sellers' data to look at what the best products were when I was there … That was my job."[1717] In September 2019, employees reported to *Yahoo Finance* that access to data is a "free-for-all" and that Amazon Retail and Marketplace teams "share the same access to the data warehouse, which makes it possible for the retail team to use the data from marketplace sellers to develop private labels."[1718]

Earlier this year, in a groundbreaking article, the *Wall Street Journal* reported that executives in Amazon's private-label division "had access to data containing proprietary information that they used to research bestselling items they might want to compete against, including on individual sellers on Amazon's website."[1719] In one case, Amazon employees reportedly used non-public sales data about a third-party seller of car-trunk organizers named Fortem to develop an Amazon private-label version of the very same product.[1720]

In light of the April 2020 report from the *Wall Street Journal*, the Committee requested that Jeff Bezos testify before Congress to address the possibility that Amazon's lawyer had misled Congress.[1721] Despite significant public reporting on the issue and references to it in Amazon's internal documents, Mr. Bezos claimed to be unaware of these practices. According to Mr. Bezos, "Amazon first learned about the alleged violations of Amazon's voluntarily adopted Seller Data Protection Policy recently reported in the *Wall Street Journal* from the *Wall Street Journal*."[1722] When Representative Pramila Jayapal (D-WA) again asked in July 2020 about whether Amazon uses third-party seller data to benefit its private-label products, Bezos could only respond: "I can't answer that

---

[1717] *Amazon: Former Employee Challenges Executives' Denial About Company's Use of Sellers' Data*, THE CAPITOL FORUM (July 18, 2019).

[1718] Krystal Hu, *Amazon Uses Third-Party Seller Data to Build a Private Label Juggernaut*, YAHOO FIN. (Sept. 27, 2019), https://finance.yahoo.com/news/amazon-uses-thirdparty-sellers-data-to-build-private-labels-145813238.html.

[1719] Dana Mattioli, *Amazon Scooped Up Data From Its Own Sellers to Launch Competing Products*, WALL ST. J. (Apr. 23, 2020), https://www.wsj.com/articles/amazon-scooped-up-data-from-its-own-sellers-to-launch-competing-products-11587650015.

[1720] *Id.*

[1721] Letter from Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary, Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, Hon. Joe Neguse, Vice-Chair, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, Hon. Pramila Jayapal, Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, Hon. Ken Buck, Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary & Hon. Matt Gaetz, Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, to Jeff Bezos, CEO, Amazon.com, Inc. (May 1, 2020) (on file with Subcomm.).

[1722] CEO Hearing at 1 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).